ACCEPTED
03-14-00416-CV
3781001
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/15/2015 12:12:27 PM
JEFFREY D. KYLE
CLERK

Case No. 03-14-00416-CV

**IN THE
THIRD COURT OF APPEALS
AT AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/15/2015 12:12:27 PM
JEFFREY D. KYLE
Clerk

**BRADLEY B. WARE,**
*Appellant,*

**v.**

**TEXAS COMMISSION ON ENVIROMENTAL QUALITY,**
*Appellee.*

**ON APPEAL FROM THE 53RD JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS**

**APPELLANT'S BRIEF**

Stephen P. Webb
Bar No. 21033800
s.p.webb@webbwebblaw.com
Gwendolyn Hill Webb
Bar No. 21026300
g.hill.webb@webbwebblaw.com
Attorneys for Appellant
Webb & Webb, Attorneys at Law
211 East Seventh Street
Austin, Texas 78701
Phone: 512-472-9990

**APPELLANT REQUESTS ORAL ARGUMENT**

Case No. 03-14-00416-CV

# BRADLEY B. WARE,
*Appellant,*

v.

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
*Appellee.*

## IDENTITY OF PARTIES AND COUNSEL

Stephen P. Webb
Bar No. 21033800
s.p.webb@webbwebblaw.com
Gwendolyn Hill Webb
State Bar No. 21026300
g. hill.webb@webbwebblaw.com
Webb & Webb, Attorneys at Law
211 East Seventh Street, Suite 712
Austin, Texas 78701
Phone: 512-472-9990
Fax: 512-472-3183
ATTORNEY FOR APPELLANT,
BRADLEY B. WARE

Linda Secord, Asst. Attorney General
Bar No. 1797400
Office of the Attorney General
P.O. Box 12548-MC066
Austin, Texas 78711-2548
Phone: 512-475-4002
Fax:    512-320-0911
Linda.secord@texasattorneygeneral.gov
ATTORNEY FOR APPELLEE,
TEXAS COMISSION ON
ENVIROMENTAL QUALITY

i

Case No. 03-14-00416-CV


# BRADLEY B. WARE,
*Appellant,*

## v.

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,
*Appellee.*

---

## REQUEST FOR ORAL ARGUMENT

---

Appellant, Bradley B. Ware, requests an oral argument in this case.

# TABLE OF CONTENTS

Identify of Parties and Counsel ............................................................................... i
Request for Oral Argument ..................................................................................... ii
Index of Authorities ............................................................................................... vi
Appellant's Brief ...................................................................................................... 1
Statement of the Case ............................................................................................... 2
Statement of Oral Argument .................................................................................... 4
Points of Error Presented for Review ...................................................................... 4
Statement of the Facts .............................................................................................. 5
Background Legal and Factual Framework of Application No. 5594A .................... 7
Points of Error and Brief of Argument .................................................................. 13

Point of Error Number One:

The District Court erred in failing to find that the Commission's April 20, 2010 Order unlawfully ignores the evidence of record regarding the water available for appropriation by Plaintiff; therefore, the Commission's action in adopting the April 20, 2010 Order was arbitrary and capricious, and was characterized by an abuse of discretion .............................................................................. 13

Summary of the Argument ....................................................................... 13

Argument .................................................................................................. 13

Point of Error Number Two:

The Commission's April 20, 2010 Order violates the directives and requirement of Texas Water Code, §11.134 (b), regarding Commission action on water rights applications .................................................................................................... 18

Summary of the Argument ....................................................................... 18

Argument .................................................................................................. 19

Point of Error Number Three:

The District Court erred in failing to find that the Commission's April 20, 2010 Order is in violation of the requirements of Texas Water Code, §11.1381, regarding the consideration and granting of water rights permits for a term of years........................................................................................................... 21

      Summary of the Argument................................................................... 21

      Argument............................................................................................. 21


Point of Error Number Four:

The District Court in failing to find that the Commission's April 20, 2010 Order violates the fundamental doctrine of water rights law of "first in time, first in right," as set forth in the Texas Water Code, Section 11.027.............................. 25

      Summary of the Argument................................................................... 26

      Argument............................................................................................. 26

Point of Error Number Five:

The District Court erred in failing to find that the Commission acted arbitrarily and capriciously to deprive Plaintiff of any continued right to divert and use any water at any time for Ware Farm under Permit No. 5594, an authorized appropriation, on the stated basis of no water available for appropriation, while at the same time granting water rights for new appropriations and issuing statements of water availability for other Plaintiffs, new permittees, and other water rights holders.... 32

      Summary of the Argument................................................................... 32

      Argument............................................................................................. 33

Point of Error Number Six:

The District Court erred in failing to find that the Commission's April 20, 2010 Order adopted Findings of Fact pertaining to a pending non-party applicant; moreover, the details of said Plaintiff's pending application and *proposed*

appropriation were unlawfully used as a basis to deny Plaintiff's water right application ............................................................................................ 38

     Summary of the Argument............................................................... 38

     Argument......................................................................................... 38

Summary .................................................................................................. 42
Prayer for Relief....................................................................................... 42
Certificate of Compliance ........................................................................ 44
Certificate of Service................................................................................ 45
Glossary of Technical Terms ................................................................... 45
Appendix .................................................................................................. 46

# INDEX OF AUTHORITIES

## CASES

*Balla v. Texas State Board of Medical Examiners,* 693 S.W.2d 715-717 (Tex. App. – Dallas 1985, ref.n.v.e) .................................................................. 41

*Berkley v. Railroad Commission of Texas,* 282 S.W.3d 240, 242-244 (Tex. App – Amarillo 2009, no pet.h.) .................................................................. 35

*Chocolate Bayou Water Company and Sand Supply v. Texas Natural Resource Conservation Commission, et al.,* 124 S.W.3d 844, 853 (Tex. App-Austin 2003, pet. denied) .................................................................. 29

*City of Waco v. Texas Comm'n on Envtl. Quality,* 346 S.W.3d 781, 819 – 20 (Tex.App – Austin, pet. denied)] .................................................................. 31

*City of El Paso v. Public Utility Com'n. of Texas,* 883 S.W.2d 179, 184 (Tex. 1994) .................................................................. 35

*Dodd v. Meno,* 857 S.W.2d 575, 576 (Tex.App. – Austin 1993), aff'd on other grounds, 870 S.W.2d 4 (Tex. 1994) .................................................................. 34, 36

*Entex v. Railroad Comm., Texas,* 18 S.W.3d 858, 862 (Tex. App. – Austin 2000, pet. denied) .................................................................. 34, 36, 37

*Heritage on San Gabriel Homeowners v. TCEQ,* 393 S.W.3d 417, 423 (Tex.App. – Austin 2012) .................................................................. 31

*Hernandez v. Meno,* 828 S.W.2d 491, 493-495 (Tex. App. – Austin 1992, den.) . 40

*House of Tobacco, Inc. v. Calvert,* 394 S.W.2d 654, 656 – 657 (Tex. 1965) ........ 29

*Langford v. Employees Retirement System of Texas,* 73 S.W.3d 560, 564-565 (Tex. App. – Austin 2002, pet. denied) .................................................................. 35

*Lower Colorado River Authority, et al, v. Texas Department of Water Resources,* 689 S.W. 2d 873 (Tex. 1984) .................................................................. 24

*Railroad Commission of Texas v. Home Transportation Company,* 670 S.W.2d 319, 325 (Tex. App-Austin 1984, no writ) .................................................................. 29

*Texas Citizens for a Safe Future and Clean Water v. Railroad Commission of Texas*, 254 S.W.3d 492, 496-497 (Tex. App. – Austin 2007, pet. filed)...... 40

*Texas Department of Public Safety v. Chad Michael Henson* (14-09-00010-CV) ...2

*Texas Department of Public Safety v. Guajardo*, 970 S.W.2d 602 (Tex. App.-Hous. [14th Dist.] 1998) ................................................................2

*Texas Farm Bureau, et al v. Texas Commission on Environmental Quality*, Cause No. D-1-GN-12-003937 ................................................................ 31

*Texas Water Com'n v. Dellana*, 849 S.W.2d 808, 810 (Tex. 1993)..................... 29

*TGS – NOPEC Geophysical Company v. Combs*, 268 S.W.3d 637, 651-652 (Tex. App. – Austin 2008, pet. filed) ................................................................ 35

## TEXAS WATER CODE

§11.021 ................................................................................................ 11
§11.022 ................................................................................................ 11
§11.025 ................................................................................................ 11
§11.026 ................................................................................................ 11
§11.027 ............................................................................... 4, 25, 26, 27
§11.046 ................................................................................................ 11
§11.046(c) ..................................................................................... 18, 33
§11.121 ................................................................................................ 11
§11.134 ........................................................................................... 8, 11
§11.134(b) ................................................................................. 4, 18, 19
§11.1381 ............................................................................. 4, 11, 21, 23
§11.141 ............................................................................. 11, 26, 27, 28, 41
§11.172 ................................................................................................ 23

## TEXAS GOVERNMENT CODE

§2001.005(a) ........................................................................................ 39
§2001.081 ............................................................................................ 39
§2001.087 ............................................................................................ 40
§2001.174(2) ................................................................................. 39, 41
§2001.174(2)(a) ................................................................................... 28
§2001.174(2)(c) ................................................................................... 39

§2001.174(2)(e) .................................................................... 18, 39

§2001.174(2)(f) .................................................................... 35, 39

§2001.175 ............................................................................. 29

§2003.047(l)(m) .................................................................... 15

**Case No. 03-14-00416-CV**


**BRADLEY B. WARE,**
*Appellant,*


**v.**


**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY,**
*Appellee.*

---

**APPELLANT'S BRIEF**

---


TO THE COURT OF APPEALS:


Appellant, Bradley B. Ware, submits this Brief in appeal of the Order on administrative appeal affirming the decision of the Texas Quality on Environmental Quality ("TCEQ", "Commission" or "Agency"). This Appeal is from the District Court of Travis County, Texas, 53rd Judicial District, the Honorable John Dietz presiding in which Appellant was the Plaintiff and Appellee was the Defendant. For clarity, Bradley B. Ware will be referred to as "Plaintiff" and the Texas Quality on Environmental Quality will be referred to as "Defendant."

# I. STATEMENT OF THE CASE

Plaintiff, Bradley B. Ware appeals from the 53rd Judicial District Court of Travis County, Texas in its failure to overturn the final order of the TCEQ which denied Plaintiff the right to divert and use water under Permit to Appropriate State Water No. 5594 ("Permit No. 5594"). Plaintiff asserts that the Commission's April 20, 2010 Final Order of the TCEQ ("Order") violates extant provisions of the Texas Water Code ("TWC"), and contains obviously reversible legal error. A May 11, 2010 decision of the Texas Court of Appeals, Fourteenth District, Houston, in *Texas Department of Public Safety v. Chad Michael Henson* (14-09-00010-CV) sets forth the standards of judicial review of decisions by an administrative agency. The text of the discussion is set forth in full below:

> When reviewing an administrative decision under the substantial evidence rule, the review court may affirm the decision in whole or in part. Tex. Gov't. Code Ann. §2001.174 (Vernon 2008). It [the reviewing court] must reverse or remand the case if the Appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decision are:
>
> (1)    in violation of a constitutional or statutory provision;
> (2)    in excess of the agency's statutory authority;
> (3)    made through an unlawful procedure;
> (4)    affected by other error of law;
> (5)    not reasonably supported by substantial evidence when considering the record as a whole; or
> (6)    arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[Citing and paraphrasing Tex. Gov't. Code §2001.174 (Vernon 2008), and *Texas Department of Public Safety v. Guajardo*, 970 S.W.2d 602 (Tex.App-Hous. [14th Dist.] 1998)]

Generally, as shown below, the Commission's order is in violation of the fundamental precepts of the Constitution of the United States (5th and 14th Amendments) and the Texas Constitution (Art. 1, Bill of Rights, Sections 3 and 19), the Texas Water Code and the Texas Government Code; is in excess of the Commission's statutory authority; is made through unlawful procedure; is affected by numerous other errors of law; is not reasonably supported by substantial evidence when considering the record as a whole; *and* is on its face arbitrary, capricious, and characterized by abuse of discretion, or clearly unwarranted exercise of discretion. The Commission's final order is not entitled to the deference that agency decisions are typically afforded in a simple substantial evidence review.

Put simply, the Commission's April 20, 2010 Order is subject to reversal because it finds and concludes that there is water available for appropriation in the Brazos River Basin in the form of return flows, but reserves the available water to a pending Applicant-- not an existing appropriator-- and denies water availability in the current proceeding, against the substantial evidence of record. The trial court erred in failing to recognize these deficiencies in the Commission's April 20, 2010

Order and erred in rendering its June 11, 2014 order which denied Plaintiff's appeal.

## II.   STATEMENT OF ORAL ARGUEMENT

Plaintiff requests oral argument due to the size and complexity of the record and the numerous factual and legal issues. Plaintiff requests oral arguments to property address the points of error.

## III.   POINTS OF ERROR PRESENTED FOR REVIEW

Point of Error One:
The District Court erred in failing to find that the Commission's April 20, 2010 Order unlawfully ignores the evidence of record regarding the water available for appropriation by Plaintiff; therefore, the Commission's action in adopting the April 20, 2010 Order was arbitrary and capricious, and was characterized by an abuse of discretion.

Point of Error Two:
The Commission's April 20, 2010 Order violates the directives and requirements of Texas Water Code, §11.134(b), regarding Commission action on water rights applications.

Point of Error Three:
The District Court erred in failing to find that the Commission's April 20, 2010 Order is in violation of the requirements of Texas Water Code, §11.1381, regarding the consideration and granting of water rights permits for a term of years.

Point of Error Four:
The District Court in failing to find that the Commission's April 20, 2010 Order violates the fundamental doctrine of water rights law of "first in time, first in right," as set forth in the Texas Water Code, Section 11.027.

Point of Error Five:

The District Court erred in failing to find that the Commission acted arbitrarily and capriciously to deprive Plaintiff of any continued right to divert and use any water at any time for Ware Farm under Permit No. 5594, an authorized appropriation, on the stated basis of no water available for appropriation, while at the same time granting water rights for new appropriations and issuing statements of water availability for other Plaintiffs, new permittees, and other water rights holders.

Point of Error Six:

The District Court erred in failing to find that the Commission's April 20, 2010 Order adopted Findings of Fact pertaining to a pending non-party applicant; Moreover, the details of said Plaintiff's pending application and *proposed* appropriation were unlawfully used as a basis to deny Plaintiff's water right application.

## IV.  STATEMENT OF FACTS

1.  On November 15, 2005, Plaintiff filed Application for Amendment to a Water Right No. 5594A ("Application No. 5594A") with the Agency for authority to delete or extend the term of his current water rights Permit No. 5594, which authorized the appropriation of 130 acre-feet of water for agricultural purposes from the Lampasas River, so that Plaintiff could continue to operate a family farm that has been owned and operated by the Ware family in excess of 100 years.  Mr. Ware's timely applications was to: (1) either extend his Permit for another 10-year period or convert his Permit to a perpetual right, (2) withdraw 20 more acre-feet of water annually and (3) irrigate 31 more acres of his farm. Therefore, Plaintiff applied for a perpetual water right, and if that was not possible, the renewal of his term permit.  A true copy of the Plaintiff's application is attached as Exhibit A and is fully incorporated into this brief by reference; Clerk's Record p. 63-75.

2.  On October 28 and 29, 2009, an adjudicative hearing was held on the Agency's case number 2008-0181-WR (SOAH Docket No. 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), before the State Office of Administrative Hearings ("SOAH") on the Plaintiff's application.  The Executive Director ("ED") of the TCEQ appeared in Application No. 5594A as a party to the hearing, opposing the relief sought by the Plaintiff.  In connection with the adjudicative hearing, a record was made consisting of all pleadings and evidence introduced before

SOAH. Thereafter, the TCEQ considered the Proposal for Decision of Administrative Law Judge ("ALJ") Paul Keeper on April 14, 2010. Subsequently, the Agency prepared a final decision, represented by its Final Order including its Findings of Fact and Conclusions of Law.

3.   On April 20, 2010, the Agency rendered its decision in the form of *AN ORDER Concerning the Application of Bradley B. Ware to amend water use Permit No. 5594: TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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* and denied Plaintiff's Application No. 5594A to delete or extend the term of the current permit and also to authorize the appropriation of an additional 20 acre-feet of water per annum.

4.   The Plaintiff timely filed a Motion for Rehearing ("Motion") to the Agency's April 20, 2010 Order, and the Motion was overruled by operation of law by the Agency when the TCEQ failed to act on Plaintiff's Motion (See Exhibit B, Applicant Bradley B Ware's Motion for Rehearing, exhibits not attached; Clerk's Record p. 76-98). Notice of the Agency's inaction was provided to the Plaintiff on June 17, 2010.

5.   The Plaintiff timely filed his appeal to the Travis County District Court on July 8, 2010.

6.   All conditions precedent having been performed or having occurred, the Plaintiff was entitled to judicial review of the Agency's decision in accordance with Texas Water Code §11.134 and the Texas Government Code, §§2001.175 and 2001.176.

7.   On June 11, 2014, the District Court issued its order which denied Plaintiff's appeal of the Commission Order.

8.   On June 30, 2014, Plaintiff filed his Notice of Appeal.

## V. BACKGROUND LEGAL AND FACTUAL FRAMEWORK OF APPLICATION NO. 5594A

### 1. *Application No. 5594A*

This application, designated Application No. 5594A by the ED of the TCEQ and a party to the administrative hearing, is a water rights application by Plaintiff Bradley B. Ware on behalf of Ware Farms, seeking to renew or delete the 10 year term of his water rights Permit No. 5594. Plaintiff's existing water rights Permit No. 5594 was granted November 7, 1997 after no person protested the granting the of application (See, Exhibit A's attachment, Permit No. 5594; Clerk's Record p. 65-66), and authorizes the diversion and use of 130 acre-feet of water for agricultural purposes for the irrigation of 100 acres of farmland. Permit No. 5594 also contains the following SPECIAL CONDITIONS:

> b. The authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on <u>November 7, 2007</u> unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. The priority date of this permit and all extensions hereof shall be July 1, 1997.

Plaintiff filed Application No. 5594A on November 17, 2005, and the application was declared administratively complete on March 20, 2006. In Application No. 5594A, Plaintiff sought to add an additional 20 acre-feet of water per annum, and

to extend the term of the permit. Notice of Application No. 5594A advised Brazos River Basin water rights holders:

> "Applicant seeks to amend Water Use Permit No. 5594[1], to extend or delete the expiration date of November 7, 2007; add an additional 31 acres for irrigation in Bell County, and to divert and use an additional 20 acre-feet of water."

In reviewing the application, the Agency Executive Director's Water Availability staff informed Plaintiff repeatedly that the results from the Brazos River Basin Water Availability Model ("Brazos WAM" or "WAM") showed that water was not available for the proposed application at Plaintiff's diversion point on the Lampasas River in the Brazos River Basin. Plaintiff elected to go forward with a contested case hearing.

## 2.    *Background of the Water Availability Question*

Plaintiff's water rights application began as a simple question of water availability and protection of senior and superior water rights in the Brazos River Basin under Texas Water Code, §11.134[2]. Plaintiff was the owner of a term permit and applied for a renewal. The Executive Director used the Brazos WAM and determined that water was not available in sufficient quantities and with sufficient

---

[1] Although the Notice prepared by the Executive Director and issued by the Chief Clerk refers to Plaintiff's water rights permit as a "Water Use Permit," Permit No. 5594, issued by the Commission is entitled, "PERMIT TO APPROPRIATE AND USE STATE WATER."

[2] All section references in this brief are to the Texas Water Code, unless otherwise noted.

---

frequency to justify granting the application for an additional term. Brazos River Authority ("BRA"), holder of senior water rights in the Brazos River Basin protested the application at first, stating that it did not object to the issuance of the permit for an additional term and with an additional 20 acre-feet. BRA later withdrew its protest of the application, before the contested case hearing, See correspondence attached as Exhibit C; Clerk's Record p. 100.

### 3. The Doctrine of Prior Appropriation as the Cornerstone of Texas Water Code, Chapter 11

Texas water rights are issued pursuant to the principles of Western water law, including the doctrine of prior appropriation, which is codified in Texas Water Code, Chapter 11. The legal principles of Western water law, which grew out of the experience of the development of the American West, where water was a scarce and valuable resource. The doctrine of prior appropriation supports the concepts of government oversight of water resources, deemed essential to promoting the beneficial use of available water in accordance with the public welfare. Originally, water rights were given not only based on application to the State in the form of a certified filing, but also based on proximity of land to a watercourse. Unfortunately, this dual system was deemed to preclude efficient government regulation, and the existing riparian rights, certified filings and water rights permits were unified during the water rights adjudication. Claims under

riparian rights, certified filings, and permits were replaced by certificates of adjudication, and subsequent water rights issued under the permitting system set forth in Chapter 11. Plaintiff testified at his hearing that, although water was used on his farm by his great grandfather since 1874 (See Exhibit D, Tr. Vol. 1[3], p. 19, line 6 through p. 20, line 4; Clerk's Record p. 102-103 and Tr. Vol. 1, p. 22, line 18 through p. 23, line 3; Clerk's Record p. 105-106.), his parents were involved in a bitter divorce which diverted their attention from participation in water rights adjudication (See Exhibit D, Tr. Vol. 1[4], p. 21, line 14 through p.22, line 17; Clerk's Record p. 104-105). After the completion of the Adjudication of Water Rights in all segments of the Brazos River Basin, Ware Farm was left without any adjudicated right to appropriate State water. Consequently, after Plaintiff became owner of Ware Farm, he sought the means to keep the farm operating as a going concern, including farming crops such as pumpkins and hay for grazing and raising cattle. In 1997, Plaintiff obtained a water right, Permit No. 5594, which authorized water use for a term of ten (10) years (See Exhibit D, Vol. 1, p. 45, line 3 through p. 47, line 8; Clerk's Record p. 107-109).

Although Texas water rights permitting has evolved from a regulatory standpoint in the time period following Water Rights Adjudication, the

---

[3] In this brief, references to the transcript are designated: Tr. Vol. __, p. __, line __; and followed by the Clerk's Record page reference.

fundamental doctrine of the prior appropriation system remains embedded in Texas

water rights. Those principles are enunciated specifically in the following sections

of Texas Water Code, Chapter 11:

§ 11.021, State Water - Asserts State sovereignty over the surface waters of the State in watercourses

§ 11.022, Acquisition of Right to Use State Water - Provides for the use of State water by authorized appropriators;

§ 11.025, Scope of Appropriative Right - Sets forth the limitations of the appropriative rights;

§ 11.026, Perfection of an Appropriation - Provides for perfection of an appropriation by beneficial use in accordance with the permit;

§ 11.027, Rights Between Appropriators - Provides for resolution of conflict between appropriators on the basis of "first in time is first in right;"

§ 11.046, Return Surplus Water - Provides that water authorized to be appropriated but not needed for the authorized use be returned to the watercourse for further appropriation and for other uses;

§ 11.121, Permit Required - Requires the issuance of water rights permits to authorize appropriation

§ 11.134, Action on Application - Specifies the conditions under which the Commission may grant a water rights permit;

§ 11.1381, Term Permits - Establishes a means for issuance of term permits; and

§ 11.141, Date of Priority - Establishes the priority date for water rights permits as the date the application was filed.

Taken as whole, the provisions of the Texas Water Code establish the regulatory framework for the administration of Texas water rights.

### 4. *Permit No. 5594 Implements Prior Appropriation Doctrine*

Plaintiff's Permit No. 5594 embodies the principles of prior appropriation set forth in the Texas Water Code. Permit No. 5594 specifies the purpose of use (irrigation); the location of land to be irrigated [100 acres of land out of 261 acres in the W. Brown Survey, Abstract No. 67, the D.G. Vicheton (Vecheton) Survey Abstract No. 851, and the C. Edwards Survey, Abstract 291 in Bell County, Texas; the water course which is the source of water (Lampasas River, tributary of the Little River, tributary of the Brazos River); the amount of water authorized to be used (130 acre-feet); and the diversion point and diversion rate (2.67 cubic feet per second ("cfs") or 1200 gallons per minute ("gpm")) from any point on the left or east bank of the Lampasas River]. And, the permit was issued in accordance with the provisions of §11.1381 to allow Ware Farm to make beneficial use of State water in the Brazos River Basin which was stated to be present in the stream but appropriated to others and which would otherwise go unused until senior water rights are perfected[5]. The priority date is specified as the date the application was

---

[5] The Executive Director's August 28, 1997 Water Availability Analysis (Exhibit F; Clerk's Record p. 164-178), stated that downstream water rights in the vicinity of Ware Farm on the Lampasas River, the Little River, and the Brazos River had not been perfected, or "fully developed," and that, "Therefore, the hydrological analysis only support issuance of a ten year term permit for the Plaintiff." (Exhibit F, more specifically Clerk's Record p. 165)

accepted for filing. Finally, under the doctrine of "First in time is first in right," the Plaintiff's term permit states unequivocally that the priority date for the permit "and all extensions hereof shall be July 1, 1997."

## VI. POINTS OF ERROR AND BRIEF OF ARGUMENT

### 1. POINT OF ERROR NUMBER ONE.

THE DISTRICT COURT ERRED IN FAILING TO FIND THAT THE COMMISSION'S APRIL 20, 2010 ORDER UNLAWFULLY IGNORES THE EVIDENCE OF RECORD REGARDING THE WATER AVAILABLE FOR APPROPRIATION BY PLAINTIFF; THEREFORE, THE COMMISSION'S ACTION IN ADOPTING THE APRIL 20, 2010 ORDER WAS ARBITRARY AND CAPRICIOUS, AND WAS CHARACTERIZED BY AN ABUSE OF DISCRETION.

*Summary of Argument*

The Commission's Order of April 20, 2010 was based upon its staff's refusal to consider record evidence that completely contradicted the evidence upon which the staff and the agency relied to make its primary determination. The primary issue in Plaintiff's application for a perpetual right was whether there was state water available for appropriation in Plaintiff's section of the Brazos River Basin. The agency's Executive Director performed a November 14, 2006 analysis that concluded there was no water available. The record shows that the same Executive Director performed a 2008 updated analysis on the entire Brazos River basin and found on an additional 74, 387 acre-feet per year available for appropriation. The Commission never resolved, on the record, the contradiction between these factual determinations.

---

*Argument*

The adopted Findings of Fact regarding water availability and "The reliability of the Model" in the Commission's April 20, 2010 Order, attached as Exhibit E (Clerk's Record p. 146-463) are, on their face, inconsistent with each other, directly contrary to the evidence of record, and founded upon unlawful procedure. While the Commission is entitled to draw an appropriate inference from the substantial evidence of record regarding water availability in the Brazos River Basin, the Commission is not entitled to abuse its discretion by disregarding the existing evidence of record concerning water availability in favor of outdated evidence known to be inaccurate.

On November 14, 2006, the Executive Director performed a water availability review of Mr. Ware's amendment application using the Commission's Brazos WAM which was current and accurate at the time it was performed. *See,* Exhibit G (Clerk's Record p. 179-181), attached hereto. Two years later, however, the Executive Director preformed another water availability review of the Brazos River Basin using updated information which was *not available* at the time Mr. Ware's application was reviewed. The Executive Director updated the Brazos WAM's Current Conditions data set and found that there was an additional 74,387 acre-feet per year available for appropriation in the Brazos River Basin. *See,* Exhibit H (Clerk's Record p. 182-196), also attached hereto.

It is undisputed in the record that Mr. Ware's amendment application did *not* benefit from the Executive Director's 2008 update of the Brazos WAM, which occurred well before the contested case hearing on Plaintiff's Application No. 5594A. The Executive Director's staff hydrologist, Jeffrey Charles Thomas, testified at the hearing that neither he nor anyone else in the Executive Director's office performed a water availability review of Mr. Ware's application, other than the one completed on November 14, 2006 and included in Exhibit H (Clerk's Record p. 182-196). The same witness also testified that no portion of the 74,387 acre-feet found to be available in the Brazos River Basin in 2008 and set forth in Exhibit H (Clerk's Record p. 182-196) was ever applied to Mr. Ware's application or the Executive Director's analysis of water availability for the Ware application[6].

In considering the Plaintiff's argument regarding water availability based on return flows and updated information, the Commissioners appeared to believe that their questioning of Commission staff during the April 14, 2010 Commission Agenda meeting on the Proposal for Decision on Application No. 5594A regarding consideration of return flows and water availability was a lawful substitute for the evidence of record. This procedure is not lawful. The Commission's decision must be based on the evidence of record, not the earnest responses of Commission staff at Agenda, which responses are *not* contained in the administrative record

---

[6] (Attached as Exhibit D, Tr. Vol. 1 p. 109 line 6 – 110 line 8; Clerk's Record 112-113; and pp. 134 line 9 – 154 line 24; Clerk's Record p. 125-145)

upon which the decision must be based[7]. TCEQ staff hydrologist Kathy Alexander, (now Ph.D.) responded to Commission inquiries stating that the Executive Director had included the return flows shown on Exhibit H, attached hereto, in its consideration of water available for Plaintiff's proposed appropriation. This statement is directly *contrary* to the testimony of TCEQ staff during the hearing, including Dr. Alexander, regarding the consideration of 74,384 acre-feet of water shown to be available in the updated Current Conditions data set of the Brazos WAM. The evidence of record, as shown in an excerpt of the official transcript, is set forth below.

### CROSS EXAMINATION OF JEFFREY CHARLES THOMAS, TCEQ HYDROLOGIST ON THE BRADLEY B. WARE APPLICATION

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 28, 2009, Page 149, line 24 to Page 150, line 2:*

> Q. Okay, the point is you didn't use any portion of that additional water in the basin in your model?
> A. That's correct.

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 28, 2009, Page 150, lines 10 through 19:*

> Q. Additional unappropriated water would benefit the entire basin, wouldn't it?
> A. Yes.
> Q. And so it doesn't matter whether it's above Stillhouse Hollow Lake, below it? It would benefit everyone, wouldn't it?

---

[7] Texas Gov. Code §2003.047(l)(m)

---

A.     It would benefit everyone downstream of it and potentially that—yes, I can—say that it would benefit everyone in the basin, yes.


*CROSS EXAMINATION OF KATHY ALEXANDER, TCEQ HYDROLOGIST EXECUTIVE DIRECTOR'S REBUTTAL WITNESS ON THE BRADLEY B. WARE APPLICATION*

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 29, 2009, Page 378, line 15 to Page 379, line 8:*

Q.     Okay. And so there were return flows available and you gave them a priority date of October 15, 2004?

A.     Yes.

Q.     Okay. You mentioned that there were 74,387 acre-feet of return flows resulting from different discharges up and down the Brazos River Basin determined to be available by TCEQ hydrology?

A.     Yes.

Q.     And those are the return flows that were given the October 15, 2004, priority date?

A.     Yes.

Q.     Okay. And that—and none of those return flows, not any portion of them were allocated for use by Mr. Ware under either a 1997 priority date or any other priority date?

A.     The return flows were considered and –

Q.     Yes or no, Ms. Alexander.

A.     No.


Therefore, to the extent that the Commission's April 20, 2010 Order contains Findings of Fact which state that water is not available for continued appropriation in the Brazos River Basin, under the Brazos WAM, such Findings of Fact are not reasonably supported by substantial evidence when considering the record as a whole. Exhibit H (Clerk's Record p. 182-196) shows that 74,387 acre-feet of water

per year are available in the Brazos River Basin in the latest version of the Brazos WAM.[8]

Texas law does not confer upon the Commission discretion to disregard the evidence of record. Tex. Gov't Code, §2001.174(2)(E) requires a reviewing court to reverse an order of the Commission that is not reasonably supported by substantial evidence considering the reliable probative evidence in the record as a whole. The only *reliable* evidence is that Mr. Ware's application never received a water availability review which referenced the amount of water now known to be available for appropriation in the Brazos River Basin. The Commission's reliance on the outdated water availability information included in Exhibit H (Clerk's Record p. 182-196), known to be superseded by more reliable and updated information in Exhibit H (Clerk's Record p. 182-196) deprives the Commission's April 20, 2010 Order of any legitimacy under the law and constitutes an obvious abuse of the Commission's discretion.

2.    POINT OF ERROR NUMBER TWO.

THE COMMISSION'S APRIL 20, 2010 ORDER VIOLATES THE DIRECTIVES AND REQUIREMENTS OF TEXAS WATER CODE, §11.134(B), REGARDING COMMISSION ACTION ON WATER RIGHTS APPLICATIONS.

---

[8] The Commission was only willing to use the evidence of water availability under the Brazos WAM in favor of an application filed by Brazos River Authority, as shown in its adoption of Findings of Fact Nos. 42-52.

## Summary of Argument

The Commission's April 20, 2012 Order fails to comply with Texas Water Code §11.134(b). Under the agency's erroneous construction of Texas Water Code §11.046(c), the Commission specifically and erroneously "reserves" state water that was available for appropriation for a subsequent pending *applicant*, rather than a senior water right holder.

## Argument

Pertinent requirements of Texas Water Code, §11.134(b) is:

> (b) The Commission shall grant the application only if:
> (1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;
> (2) unappropriated water is available in the source of supply;
> (3) the proposed appropriation:
> (A) is intended for a beneficial use;
> (B) does not impair existing water rights or vested riparian rights;
> (C) is not detrimental to the public welfare;
> (D) considers any applicable environmental flow standards established under Section 11.1471 and, if applicable, the assessments performed under Sections 11.147(d) and (e) and Sections 11.150, 11.151, and 11.152; and
> (E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and

(4) The Applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Section 11.002(8) (B).

The Findings of Fact and Conclusions of Law in the Commission's April 20, 2010 Order do not address the requirements of Texas Water Code, §11.134(b). To the extent that the Conclusions of Law ultimately denying Application No. 5594A flow from the Findings of Fact regarding water available for appropriation in the Brazos River Basin, they are not reasonably supported by substantial evidence when considering the record as a whole; are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. Moreover, the Commission's April 20, 2010 Order also violates Texas Water Code, §11.134(b) as well. The Commission's Order states:

44. The addition of "new water," [return flows] if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.

Finding of Fact No. 44 clearly fails to incorporate the most recent amendments to §11.046(c) as discussed herein below. Finding of Fact No. 44 presents an unlawful interpretation of Commission requirements under Texas Water Code, §11.134(b), which is only highlighted by the subsequent contradictory finding that:

45. The full amount [described in Finding of Fact No. 49 as 421,449 acre-feet of water per year] of the Brazos River Authority's requested return flows become available only at the furthest downstream point in the basin; diversions at other

points are possible due to specific facts and circumstances of that application.

The Commission is charged with granting water rights applications when it finds that water is available for appropriation. Instead of discharging its statutory responsibilities in accordance with Texas Water Code, §11.134(b), and granting Plaintiff a continued right to appropriate 150 Acre-feet of water dating from his July 1, 1997 priority date, the Commission's April 20, 2010 Order "allocated" the water available for appropriation in the Brazos River Basin to a subsequent applicant, BRA, in an application yet to be completed at SOAH, even as of the date of this appeal to the Court of Appeals.

## 3.   POINT OF ERROR NUMBER THREE.

THE DISTRICT COURT ERRED IN FAILING TO FIND THAT THE COMMISSION'S APRIL 20, 2010 ORDER IS IN VIOLATION OF THE REQUIREMENTS OF TEXAS WATER CODE, §11.1381, REGARDING THE CONSIDERATION AND GRANTING OF WATER RIGHTS PERMITS FOR A TERM OF YEARS.

*Summary of Argument*

The Commission's April 20, 2010 Order fails to comply with Texas Water Code §11.1381, regarding an appropriation of state water for a term of years. The Commission inappropriately evaluated Plaintiff's application, that included a

request to renew his term permit, in consideration of its impact on a pending applicant, rather than a senior water right holder.

*Argument*

Texas Water Code §11.1381 states:

> Sec. 11.1381. TERM PERMITS. (a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.
>
> (b) The commission shall refuse to grant an application for a permit under this section if the commission finds that there is a substantial likelihood that the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area.
>
> (c) The commission shall refuse to grant an application for a term permit if the holder of the senior appropriative water right can demonstrate that the issuance of the term permit would prohibit the senior appropriative water right holder from beneficially using the senior rights during the term of the term permit. Such demonstration will be made using reasonable projections based on accepted methods.
>
> (d) A permit issued under this section is subordinate to any senior appropriative water rights.

Accordingly, even the Commission's unlawful recognition of the availability of return flows in the Brazos River Basin, albeit solely for use under BRA's pending water rights *application*, is unspoken Commission recognition that the

evidence of record shows there is water available for appropriation for Plaintiff's diversion and use, *at least for a term of years*. BRA still has only a pending application for a proposed appropriation. The water that the Commission's April 20, 2010 Order finds available for that proposed appropriation by BRA is, by definition, available to Plaintiff under his 1997 priority date *before* any new appropriation by BRA with a 2004 priority date is authorized by the Commission. Additionally, the evidence of record is that BRA is using only 20% of its **existing** Stillhouse Hollow Lake water right, the closest and most pertinent water right to Plaintiff. Tex. Water Code §11.1381 requires the **holder of a senior appropriative water right** to "demonstrate that the issuance of a term permit would prohibit the senior appropriative water right holder from beneficially using the senior right during the term of the term permit." In this case, there was no senior appropriator party-- BRA withdrew; And, there could have been no demonstration of harm to BRA because it only has a pending application, not any right to appropriate the 421,449 acre-feet per year of return flows found to be available for appropriation in the Brazos River Basin under the Commission's April 20, 2010 Order. There was *no* demonstration of harm to *any other* existing water rights holder in the Brazos River Basin, on the facts of record in this contested case hearing.

In this case, the TCEQ is essentially implementing a cancellation program for term permits. The problem with the TCEQ's program is that through the Texas Water Code, the Texas Legislature has authorized the Commission to cancel permits for failure to put all or a part of the water to beneficial use for ten (10) years or more. (See, Texas Water Code, §11.172[9]) This is the same directive given by the Texas Supreme Court in reviewing actions of the predecessor agency to the TCEQ in the "Stacy Dam case," *Lower Colorado River Authority, et al, v. Texas Department of Water Resources*, 689 S.W. 2d 873 (Tex. 1984), the most recent comprehensive review on water law in this State. In that case, just as in the case at bar, we are all called to consider the issue of how to make the best use of the state's resources during times of water shortage, when questions of water availability become most pronounced.

The problem with the Commission's actions in this case, is that TCEQ attempts to effect a cancellation of a water right by a party who the evidence of record shows has put the water to beneficial use in the last ten years. In the "Stacy Dam case," the Texas Supreme Court told the TCEQ that it had to honor appropriations in accordance with the prior appropriation system of the Texas Water Code. Specifically, the Texas Supreme Court stated:

---

[9] Sec. 11.172. GENERAL PRINCIPLE. A permit, certified filing, or certificate of adjudication is subject to cancellation in whole or part for 10 years nonuse as provided by this subchapter.

---

Section 11.146(e), by providing that water granted under *any* permit is not again subject to a new permit to appropriate until the permit has been cancelled in whole or in part, is consistent with the overall legislative purpose [of providing security for investors that water needed for a project will be there when the project is built].

*Id*, at p. 877.

In other words, under extant provisions of the Texas Water Code, the TCEQ has two avenues to provide for water for additional appropriation:

(1)     It can make use of surplus water returned to the stream in the form of return flows after use by authorized appropriators under Texas ; or

(2)     It can undertake a cancellation program as specified in Texas Water Code, Chapter 11, Subchapter E. Cancellation of Permits, Certified Filings, and Certificates of Adjudication for Nonuse.

In order to grant new water rights and provide for a growing Texas economy, the TCEQ must cancel water rights—that is, de-appropriate the water—from people who are not using the water. The problem, with the current TCEQ practice of changing priority dates and cancelling term permits is that the Agency seeks to cancel water rights of people who are using their water, in favor of those who have yet to be authorized to use the return flows made available under Texas Water Code, §11.046. In other words, instead of following the Stacy Dam case directive to consider only water not subject to a duly issued Permit to Appropriate State Water, the TCEQ seeks to impose an unofficial "back door" cancellation program

of water rights which were issued for a term of years, even where the permittees are seeking to continue to use the water as originally authorized, and even though additional water in the form of return flows has become available legally to satisfy that continued use.

## 4.    POINT OF ERROR NUMBER FOUR.

THE DISTRICT COURT IN FAILING TO FIND THAT THE COMMISSION'S APRIL 20, 2010 ORDER VIOLATES THE FUNDAMENTAL DOCTRINE OF WATER RIGHTS LAW OF "FIRST IN TIME, FIRST IN RIGHT," AS SET FORTH IN THE TEXAS WATER CODE, SECTION 11.027.

*Summary of Argument*

The Commission's April 20, 2012 Order violates the doctrine of prior appropriation and is based upon an unlawful procedure that was prejudicial to the Plaintiff. Under Texas Water Code §11.141, the Commission is obligated to use the priority date of the applicant to determine the availability of state water for appropriation. Plaintiff filed an application that should have been given a July 1, 1997, based on a previous order of the Commission. The agency order which set Plaintiff's priority date was final order over which the Commission had lost jurisdiction. Without notice to the Plaintiff or opportunity for him to protest, the Commission's staff *changed* the priority date of Plaintiff's application to *January 5, 2006.* Then, the agency compared this "new" priority date unfavorably to the

2004 priority rate of a *pending applicant*. The Commission's order is unlawful and is based on unlawful procedure.

## Argument

Texas water law established long ago the prior appropriation doctrine of "first in time, first in right" to resolve disputes between appropriators and potential appropriators of State water. The Texas Legislature codified the doctrine in the Texas Water Code, §11.027 and further defined the priority of an appropriation at Texas Water Code, §11.141. When the Commission issued Mr. Ware's original Permit No. 5594 to "Appropriate and Use State Water" in 1997, the Commission's inclusion of Special Condition 3(b) merely memorializes the "first in time first in right" doctrine in Texas Water Code, §11.027 and §11.141. Special Condition 3(b) states, unequivocally:

"The priority date of this permit and all extensions hereof shall be July 1, 1997."

Sections 11.027 and 11.141 protect the *appropriation of State water*, not an application for an appropriation, or for a proposed appropriation of State water. The intent of the Texas Water Code is obvious, on this point. The priority date of July 1, 1997 included in Permit No. 5594 establishes the priority of Plaintiff's appropriation; Tex. Water Code, §11.141 states:

> Sec. 11.141. DATE OF PRIORITY. When the commission issues a permit, the priority of the appropriation of water and the claimant's right to use the water date from the date of filing of the application.

The priority date applies to the original appropriation, regardless of whether the appropriation is authorized for a term of years or in perpetuity.[10] Where the appropriation is perpetual, the date of the original application, and the priority date would not change. When the appropriation is for a term of years, necessitating re-application if the appropriator wished to retain the water right, there could be confusion about *which* "application" date controlled. Logically, on a *renewal* of an existing appropriation it would remain the date of the *original* application. However, the Commission in 1997 eliminated all confusion and ambiguity by expressly and correctly interpreting Texas Water Law and including Special Condition 3(b) of Permit No. 5594.

When the Executive Director and, ultimately, the Commission, changed Mr. Ware's priority date to January 5, 2006 (Finding of Fact 48) the action violated §11.141 of the Water Code and §2001.174(2)(A) of the Government Code. The exact process of "changing" a final order of a state agency where the agency had lost jurisdiction over the contested case years before, was never explained during the hearing. The record shows that the Commission's Executive Director's Staff never notified Plaintiff that is had changed his 1997 priority date when it did so "administratively." When the Executive Director's representative was pressed

---

[10] In water rights, this is known as the "doctrine of relation back," meaning the right to appropriate relates to the first point in time (as of the date of the completed application) that the state could have authorized the appropriation.

about the procedure, or the exact nature of the "policy" that was used to change Plaintiff's priority date, the witness could not answer the questioning[11]. In fact, the presiding SOAH ALJ prevented further questioning about this important factor in the Agency's pre-hearing consideration of Plaintiff's application[12]. Because the record could not be completed, whether it was because of the limitations of the Executive Director's representative, or the failure of the witness to *know* the policy used to change Mr. Ware's permit, the Court is allowed to examine the TCEQ procedural irregularities that occurred within the Executive Director's Office. [Tex. Gov't Code §2001.175; See *Tex. Water Com'n v. Dellana*, 849 S.W.2d 808,810 (Tex. 1993)]

The record is clear that the Commission's Executive Director's staff did not model[13] or determine water availability to meet the requests in Mr. Ware's amendment application with a 1997 priority date. Therefore, the Commission's administrative record lacks competent evidentiary support for a determination of available water in the Brazos River Basin if the staff had modeled Plaintiff's application correctly.

---

[11] (Attached as Exhibit D, Tr. Vol. 1, p. 116 line 8 – 124 line 25; Clerk's Record p. 114-122)

[12] (Attached as Exhibit D, Tr. Vol. 1, p. 125 line 1 – 126 line 7; Clerk's Record p. 123-124)

[13] By "model" we mean use the agency's Brazos River Basin Water Availability Model computer based simulation of available water within the basin that takes into account inflows, evaporation and channel losses, and the rights granted to senior water rights holders within the basin.

Of course, Texas law prohibits the collateral attack of an order derived from a closed contested case. *Chocolate Bayou Water Company and Sand Supply v. Texas Natural Resource Conservation Commission, et al.,* 124 S.W.3d 844, 853 (Tex. App – Austin 2003, pet. denied) This prohibition extends to the agency itself. In *Railroad Commission of Texas v. Home Transportation Company,* 670 S.W.2d 319, 325 (Tex. App – Austin 1984, no writ) the Court held; "Agencies are entitled to interpret their own orders, for administrative purposes, *so long as the agency does not use the occasion to interpret as a means to amend the prior order.*" Even if the Executive Director sought to "change" or otherwise "interpret" the plain, unambiguous priority date listed in Plaintiff's permit during the hearing, the cited case law would prevent such a collateral attack of a determination and grant of a water right that has been made by a previous Agency decision. What is more egregious to Mr. Ware's due process rights is that Mr. Ware's permit was amended by a unilateral *staff* action, without notice and opportunity for Mr. Ware to adjudicate the change or even comment on the change.

The effect of the action was that Mr. Ware was deprived of a right (a water right with a 1997 priority date) conferred by the original Commission order issuing Permit No. 5594 without any notice and opportunity to respond to the removal of the right. A new, far less senior priority date was used, improperly, in the Executive Director's November 14, 2006 Water Availability Review of Mr.

Ware's application and formed the basis for the denial of Mr. Ware's application. Therefore, the Commission's order denying Mr. Ware's application on the basis of the change in priority date, also violated Tex. Gov't. Code §2001.174(2)(C).

Moreover, in *House of Tobacco, Inc. v. Calvert*, 394 S.W.2d 654, 656 – 657 (Tex. 1965), the Texas Supreme Court held that even a person who is granted a privilege under the state's police power such as a licensee, is entitled to procedural due process when that license is taken away. Mr. Ware was granted an important and *valuable* priority date of July 1, 1997. He was entitled to procedural due process when it was taken away by the Executive Director's staff without notice and the opportunity for a hearing on the removal of the priority date. The agency compounded the error when it ratified the Executive Director staff's action by issuing a final order.

The TCEQ's Final Order itself indicates that the priority date of Mr. Ware's application is relevant. The Final Order includes findings 49, 50, and 51, pertaining to BRA's application for a system water right. Assuming that *all* findings of fact are necessary and relevant to the TCEQ's Conclusion of Law and ultimate decision [See *Heritage on San Gabriel Homeowners v. TCEQ*, 393 S.W.3d 417, 423 (Tex.App. – Austin 2012); citing *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819 – 20 (Tex.App – Austin, pet. denied)], we can only assume that BRA's October 15, 2004 priority date (Finding 50) as a competing *applicant* is

part of the reason why Mr. Ware's application, using a January 5, 2006 priority date (Finding 48) was denied. (Finding 51).

The Texas State District Court in Travis County has already considered the importance of recognizing the priority of water rights for agricultural use in *Texas Farm Bureau, et al v. Texas Commission on Environmental Quality*, Cause No. D-1-GN-12-003937, and found the TCEQ Drought Curtailment Rules, 30 Texas Administrative Code §§ 36.1-36.8, are invalid because:

> 1. The rules exceed TCEQ's statutory authority because they allow exemption of preferred uses from a curtailment or suspension order, and such exemptions are not in accordance with the priority of water rights established by Texas Water Code § 11.027; and

> 2. Exemption of junior water rights from a priority call and curtailment or suspension order [meaning administering water rights during a time of shortage by putting later water users in front of earlier priority water users] is not authorized by TCEQ's police power or any general authority to protect the public health, safety, or welfare.

> [Parenthetical explanatory comments supplied. June 6, 2013, Order on Cross Motions for Summary Judgment, the Honorable Scott H. Jenkins]

## 5. POINT OF ERROR NUMBER FIVE.

THE DISTRICT COURT ERRED IN FAILING TO FIND THAT THE COMMISSION ACTED ARBITRARILY AND CAPRICIOUSLY TO DEPRIVE PLAINTIFF OF ANY CONTINUED RIGHT TO DIVERT AND USE ANY

WATER AT ANY TIME FOR WARE FARM UNDER PERMIT NO. 5594, AN AUTHORIZED APPROPRIATION, ON THE STATED BASIS OF NO WATER AVAILABLE FOR APPROPRIATION, WHILE AT THE SAME TIME GRANTING WATER RIGHTS FOR NEW APPROPRIATIONS AND ISSUING STATEMENTS OF WATER AVAILABILITY FOR OTHER PLAINTIFFS, NEW PERMITTEES, AND OTHER WATER RIGHTS HOLDERS.

*Summary of Argument*

The Commission's April 20, 2010 Order is based on an erroneous construction of Texas Water Code §11.046(c) pertaining to the availability of return flows for re-appropriation; and is based on an unlawful procedure. The Commission's construction of Texas Water Code §11.046(c) is erroneously in that it included a limitation on the availability of return flows for reappropriation that was not imposed on return flows by the Texas Legislature. This erroneous agency construction of the applicable law is not entitled to deference by this court. Further, the Commission's Order then unlawfully reserves these return flows that should have been available to the Plaintiff, for the benefit of a subsequent, pending applicant.

*Argument*

The Commission's April 20, 2010 Order denying Plaintiff's amendment application is made through the unfair and unlawful procedure of denying some Plaintiff's Brazos River Basin access to water available for appropriation in the

form of return flows or updated information on water availability. Texas Water Code §11.046(c) states:

> §11.046(c). Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication. **Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.**
>
> (Emphasis supplied)

The Commission's order, which recognizes the presence of "the full amount [421,449 acre-feet of water per year] of BRA's requested return flows," but also denies that 150 acre-feet of water is available for Plaintiff's continued appropriation, is founded upon unlawful procedure. Plaintiff asserts that the Executive Director's and TCEQ's erroneous interpretation of §11.046(c) is not subject to the usual substantial evidence review by this court because it is clearly a question of law and the TCEQ's interpretation is not entitled to a presumption of validity [*Entex v. Railroad Comm., Texas,* 18 S.W.3d 858, 862 (Tex. App. – Austin 2000, pet.denied); *Dodd v. Meno,* 857 S.W.2d 575, 576 (Tex.App. – Austin 1993),

aff'd on other grounds, 870 S.W.2d 4 (Tex. 1994)] The Texas Water Code and Commission rules do not provide for reservation of state water available for appropriation to *future Plaintiffs*. There is no law or rule, and consequently no legal justification for the Commission's actions denying a requested appropriation for Ware Farm while granting or providing documentation to support granting, perpetual or long term permits for other later applicants and future appropriators.

Moreover, the arbitrary limitations that the Executive Director placed on the availability of return flows for re-appropriation is not supported by the law or even the potentially changing position of the TCEQ on the proper appropriation of return flows. The Executive Director's witnesses testified that Plaintiff's application was not reviewed assuming that return flows upstream of Mr. Ware's diversion point were available for re-appropriation[14]. Dr. Alexander testified that the Executive Director asserts that return flows are available for re-appropriation only to the entity that discharged such return flows[15]. Plainly, this qualification on the availability of return flow for re-appropriation is not contained in §11.046(c), cited herein. The consideration of a pending application of a non-party applicant and use of such legally irrelevant factors is evidence that the TCEQ's Denial of Plaintiff's application was arbitrary and capricious. [See *City of El Paso v. Public*

---

[14] (See Exhibit D, Tr. Vol. 1 p. 109 line 6 – 110 line 8; Clerk's Record p. 112-133 and pp. 134 line 9 – 154 line 24; Clerk's Record p. 125-145)
[15] (See Exhibit J, Tr. Vol. 2 p. 377 line 10 – 379 line 8; Clerk's Record p. 224-226)

*Utility Com'n. of Texas,* 883 S.W.2d 179, 184 (Tex. 1994)] Further, it is evidence that the agency's final order is characterized by an abuse of discretion or a clearly unwarranted exercise of discretion [Tex. Gov't Code §2001.174(2)(F); *Berkley v. Railroad Commission of Texas,* 282 S.W.3d 240, 242-244 (Tex.App – Amarillo 2009, no pet.h.); *Langford v. Employees Retirement System of Texas,* 73 S.W.3d 560, 564-565 (Tex. App. – Austin 2002, pet. denied); *TGS – NOPEC Geophysical Company v. Combs,* 268 S.W.3d 637, 651-652 (Tex. App. – Austin 2008, pet. filed)] In addition the Executive Director's erroneous interpretation of §11.046(c) is at odds with BRA's position in the pending application that the TCEQ references in its Final Order. BRA seeks all available return flows in its pending application. Since the issuance of the TCEQ's Final Order in Mr. Ware's case, BRA's application has been heard, considered by the Commission, and remanded to the ALJ's for further hearing. The Administrative Law Judges who heard BRA's application in Brazos River Authority's System Operation Permit Application No. 5851 ("BRA Application No. 5851") issued a proposal for decision with a construction of §11.046(c) consistent with BRA's and Plaintiff's interpretation of §11.046(c). The ALJs concluded that the Executive Director's interpretation was erroneous and in conflict with the plain language of the statute. See excerpts of the Proposal for Decision, BRA Application No. 5851, attached as Exhibit I; Clerk's Record p. 197-222.

The real reason the TCEQ determined that there is no water available for Mr. Ware is because the TCEQ Staff has construed the law to exclude return flows as a basis for a new appropriation under certain unspecified and uncodified conditions. The TCEQ may wish to invoke the protections of "substantial evidence review" and point to the "more than substantial evidence" to support its order; but the lynch-pin of the TCEQ's argument is its construction of the controlling statutory authority: §11.134(b) and, consequently §11.046 of the Texas Water Code. Therefore, the TCEQ's Final Order in Mr. Ware's application is *not* entitled to the deference of this Court. [*Entex v. Railroad Comm., Texas,* 183 S.W.3d 858, 862 (Tex. App. – Austin 2000, pet. denied); *Dodd v. Meno,* 857 S.W.2d 575, 576 (Tex. App. – Austin 1993, aff'd on other grounds, 870 S.W.2d 4 (Tex. 1994)] The case-law is clear: a court reviewing a state agency's construction of controlling statutory authority *is* entitled to substitute its interpretation of the law for that used by the state agency. (*Entex, supra*) Moreover, it is important that this court provide its construction is a matter of first impression. As noted in the proposal for decision in BRA's actual pending application [SOAH Docket No. 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; TCEQ Docket No. 2005-1490-WR; *On Re: Concerning the Application by the Brazos River Authority for Water Use Permit No. 5851 and Related Filings*] (A relevant excerpt was attached as Exhibit I to Plaintiff's Initial Brief), the issue of the appropriate use of return flows is a matter "*in play*" still under consideration and

subject to interpretation at the TCEQ. The legal construction of Texas Water Code, §11.046(c) is crucial to Mr. Ware in his application and this appeal.

The importance of fair and accurate water availability analysis by the Commission, has its basis, not only in the Texas Water Code, but also in principles of fundamental fairness, and prohibition against property deprivation without compensation or due process, under the Constitution of the United States of America and the Texas Constitution. Water rights are property rights, and the termination or denial of those rights without just cause or fair compensation amounts to an unauthorized use of the State's police powers. The Commission, in every water rights case, must act in a just and reasonable way. Reliance on erroneous or outdated data, refusal to apply facts as dictated by statute, operating in accordance with non-existent rules and procedures unlawfully compromise the Commission's water rights regulation. Above everything, Plaintiff should not be denied under Commission procedures which determine water availability based on unspecified procedures and non-public rules which favor some Plaintiffs over others without regard to the statutory mandate, "As between *appropriators*, the first in time in the first in right.

6.    POINT OF ERROR NUMBER SIX.

THE DISTRICT COURT ERRED IN FAILING TO FIND THAT THE COMMISSION'S APRIL 20, 2010 ORDER ADOPTED FINDINGS OF FACT

PERTAINING TO A PENDING NON-PARTY APPLICANT; MOREOVER, THE DETAILS OF SAID PLAINTIFF'S PENDING APPLICATION AND *PROPOSED* APPROPRIATION WERE UNLAWFULLY USED AS A BASIS TO DENY PLAINTIFF'S WATER RIGHT APPLICATION.

*Summary of Argument*

The Commission's April 20, 2010 Order is unlawful and voidable on its face because is it based upon consideration given to a non-party, pending applicant, to the detriment of the Plaintiff.

*Argument*

The Commission's April 23, 2010 Order contains Findings of Fact 45, 49, 50 and 51; which refer to the unidentified application of Brazos River Authority, a non-party. These findings of fact regarding the ongoing contested application of a non-party were used as a basis to deny Mr. Ware's application. Therefore, the Commission order violated Tex. Gov't. Code §2001.174(2) because the decision was made through unlawful procedure [§2001.174(2)(C)]; it was not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole [§2001.174(2)(E)]; and was arbitrary and capricious and was characterized by an abuse of discretion [§2001.174(2)(F)]. The referenced Findings of Fact Nos. 45, 49, 50 and 51 appear to refer to pending water rights BRA Application No. 5851. However, as of its April 14, 2010 consideration of the Proposal for Decision in Plaintiff's case, the Commission had yet to even consider that pending application in an open meeting lawfully convened pursuant to the

Texas Open Meeting Act, Tex. Gov't. Code Chapter 551 *et. seq.* and, of course, had not rendered any final order granting all or any portion of BRA's proposed appropriation. [See Tex. Gov't. Code §2001.005(a)]

On April 28, 2010, the Commission referred BRA's Application No. 5851 to SOAH granting the requests for a contested case hearing of several protestants. The hearing before SOAH is subject to the Texas Rules of Evidence in a non-jury civil trial. (See Tex. Gov't. Code §2001.081) BRA was not a party to Mr. Ware's application, and no witness on behalf of BRA was sponsored to verify any portion of Application 5851 or any other application filed by BRA. Even more importantly, Plaintiff was provided no opportunity to cross examine or otherwise determine the validity of any evidence associated with BRA's application or the supposed evidence which may or may not support the Findings of Fact Nos. 45, 49, 50 or 51 in the Commission's April 20, 2010 Order. (See Tex. Gov't. Code §2001.087) Therefore, in denying Mr. Ware's application based on unsupported evidence from a pending application of a non-party, the Commission's April 20, 2010 Order amounts to a taking of Mr. Ware's property without the benefit of any procedural due process, in direct contravention of the Article XIV of the U.S. Constitution. In that regard, the Commission's order also violated the Texas Constitution, Art. 1, Sections 3 and 19, and Tex. Gov't. Code §2001.174(A). [See also *Texas Citizens for a Safe Future and Clean Water v. Railroad Commission of*

*Texas*, 254 S.W.3d 492, 496-497 (Tex. App. – Austin 2007, pet. filed); *Hernandez v. Meno*, 828 S.W.2d 491, 493-495 (Tex. App. – Austin 1992, writ den.)]

There is little doubt about the damaging impact of the referenced findings on Mr. Ware's application. The most significant Findings of Fact Nos. 49, 50 and 51 were included in a section of the Commission's order labeled "Priority dates." In Findings of Facts 40 and 41 (which directly contradict the Commission Finding of Fact 47) the Commission established the importance of an Plaintiff's priority date in the Commission's determination of water availability. Then, the Commission directly compares BRA's alleged priority date to a less senior priority assigned to Mr. Ware's application (Finding of Fact 48) rather than the date included in his permit (Finding of Fact 46). In so doing, the effect of the Commission's order was to deny Mr. Ware's application in favor of *another pending and undecided application*. Moreover, the Commission's Finding of Fact 51 violates Tex. Water Code §11.141 by implying that the pending BRA application had already resulted in a valid appropriation of water. That section of the Water Code provides:

> "DATE OF PRIORITY. *When the Commission issues a permit,* the priority of the appropriation of water and the claimant's right to use the water date from the date of filing of the application."
>
> (Emphasis supplied)
> Texas Water Code, §11.141

The agency's actions in adopting Findings of Fact 40, 41, 45, 47, 49, 50 and 51 substantially prejudiced Plaintiff's substantial rights discussed herein, including

his right to due process, and therefore Plaintiff is entitled to the reversal and remand of the TCEQ's decision [Tex. Gov't. Code §2001.174(2); *Balla v. Texas State Board of Medical Examiners,* 693 S.W.2d 715-717 (Tex. App. – Dallas 1985, ref.n.v.e)]

Plaintiff did not agree to use information about BRA's pending application or waive his objection to receipt of information about BRA's application into his hearing record. Plaintiff offered the Executive Director's 2008 Water Availability Review to the ALJ for the limited purpose of establishing that it was the most current water available analysis performed by the Executive Director regarding the Brazos River Basin. In that review (Exhibit H; Clerk's Record p. 183-196) the Executive Director updated the Brazos WAM that had been used two years before in its review of Mr. Ware's application. The fact that the Executive Director found that 74,387 additional acre-feet of water per year was available in the Brazos River Basin using the same period of record as was used in Mr. Ware's Water Availability Review was relevant and probative information for the Commission's consideration of Mr. Ware's application. The fact that another applicant (or any other applicant) may have also applied for the water available for appropriation is *irrelevant* to any issue in this case. Plaintiff strenuously objected to the admission of any evidence about BRA's application during Mr. Ware's hearing for the reasons discussed herein. The Commission's inclusion of any information about

BRA or its pending application is objectionable and unlawful and has no bearing on the question of water availability for Mr. Ware.

## VII. SUMMARY

The Commission's April 20, 2010 Order denying Mr. Ware's application to appropriate 150 acre-feet of water per year from the Lampasas River, Brazos River Basin, violates the Texas Water Code, the Texas Constitution, and the Constitution of the United States and is voidable and reversible. Apart from being unlawful, the Commission's role in administering water rights is called into question when it denies a family farmer access to water available for appropriation in the Brazos River Basin for any term at all on the one hand, and supports contractual water rights, and issues perpetual permits for use of State water associated with return flows and updated streamflow conditions and data sets on the other hand.

## VIII. PRAYER FOR RELIEF

WHEREFORE, CONSIDERING THE FOREGOING, Plaintiff asks the court to vacate the Texas Commission on Environmental Quality's unlawful April 20, 2010 Order denying the Application of Bradley B. Ware to Amend his Permit to Appropriate State Water No. 5594, and remand the case to the TCEQ for further consideration of Plaintiff's application based on the evidence of record and the Texas Water Code and all applicable law; and for such other and further relief that Plaintiff may show himself to be entitled.

Respectfully Submitted,

**WEBB & WEBB**
Attorneys at Law
712 Southwest Towers
211 East 7th Street
Austin, Texas 78701
(512) 472-9990 Telephone
(512) 472-3183 Facsimile

STEPHEN P. WEBB
s.p.webb@webbwebblaw.com
State Bar No. 21033800
GWENDOLYN HILL WEBB
g.hill.webb@webbwebblaw.com
State Bar No. 21026300
ATTORNEY FOR APPELLANT,
BRADLEY B. WARE

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 10,260 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

STEPHEN P. WEBB

## CERTIFICATE OF SERVICE

I hereby certify that I have this ___15th___ day of ___January___, 2015, served copies of the foregoing instrument upon the parties to this proceeding, who's full and complete names and addresses appear below, by certified mail, facsimile, hand delivery, or regular U.S. mail.

Linda Secord, Asst. Attorney General
Office of the Attorney General
P.O. Box 12548-MC015
Austin, Texas 78711-2548
Phone: 512-475-4002
Fax:    512-320-0911
Linda.secord@texasattorneygeneral.gov



STEPHEN P. WEBB

## GLOSSARY OF TECHNICAL TERMS

Brazos Water Availability Model – "Brazos WAM"

The Brazos WAM is a computer simulation that is designed to simulate the water permits in the Brazos River Basin and the available water supply in the basin in priority order. It is designed for TCEQ to determine when all of the senior water rights have been satisfied, that there is additional water available. (See Exhibit D, Tr. Vol. 1 p.71 line 12 - p.72 line 6; Clerk's Record p. 110-111)

## APPENDIX

Exhibit A.  July 21, 2009 Application for Amendment to Water Right 5594A

Exhibit B.  Applicant Bradley B. Ware's Motion for Rehearing

Exhibit C.  June 7, 2006 Letter from BRA regarding Conditions of Withdrawal of Protest

Exhibit D.  Excerpts of Transcript Volume No. 1 of Hearing conducted October 28, 2009

Exhibit E.  April 20, 2010 Final Order of TCEQ

Exhibit F.  August 28, 1997 Interoffice Memorandum regarding Water Availability Analysis

Exhibit G.  November 14, 2006 Interoffice Memorandum regarding Water Availability Review for Permit No. 5594

Exhibit H.  November 25, 2008 Interoffice Memorandum regarding Water Availability Analysis for BRA's Application No. 5851

Exhibit I.    Excerpts of the October 17, 2011 Proposal for Decision

Exhibit J.    Transcript Volume No. 2 of Hearing conducted October 29, 2009

# Exhibit A

# July 21, 2009 Application for Amendment to Water Right 5594A

App. Exh. _____2_____



THE STATE OF TEXAS
COUNTY OF TRAVIS
JUL 2 1 2004

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

P.O. BOX 13088, MC-160
Austin, Texas 78711-3088
Telephone No. (512) 239-4691 FAX (512) 239-4770

## APPLICATION FOR AMENDMENT TO A WATER RIGHT

REQUIRING MAILED AND PUBLISHED NOTICE; or

NOT REQUIRING MAILED AND PUBLISHED NOTICE
Reference Texas Administrative Code Section 295.158(b) or ©

stomer Reference Number (if issued): CN _____5594_____

If you do not have a Customer Reference Number, complete Section II of the Core Data Form (TCEQ-10400) and submit it with this application.

1. NAME: BRADLEY B. WARE

   ADDRESS: 911 GANN BRANCH RD. KILLEEN, TEXAS 76549

   EMAIL EDIESSTUFF@AOL.COM                    ADDRESS:

2. SYMBOL \F "WINGDINGS" 168 PERMIT SYMBOL \F
   "WINGDINGS" 168 CERTIFIED FILING OR SYMBOL \F
   "WINGDINGS" 168 ADJUDICATION CERT. NO.

   STREAM LAMPASAS RIVER                    WATERSHED
   RESERVOIR (PRESENT CONDITION, IF ONE EXISTS):

   COUNTY: BELL COUNTY

3. PROPOSED CHANGES TO WATER RIGHT AUTHORIZATIONS:

   RENEWAL OF 130 ACRE FEET, WOULD LIKE TO ADD 20 MORE ACRE FEET.

(ATTACH ADDITIONAL PAGE AS NECESSARY; ATTACH MAP/PLAT DEPICTING PROJECT LOCATION, DIVERSION PLACE OF USE AND OTHER PERTINENT DATA)

Form TCEQ-10201(revised 8/02)

EXHIBIT
A
PENGAD 800-631-6989

63

I UNDERSTAND THAT THE AGENCY MAY REQUIRE ADDITIONAL INFORMATION IN REGARD TO THE REQUESTED AMENDMENT BEFORE CONSIDERING MY APPLICATION.

5. I HAVE SUBMITTED THE REQUIRED FEES HEREWITH. (SECTIONS 295.131-295.139)

WITNESS ___My_____ HAND AT TEXAS, 
      (MY/OUR)

THIS __15__ DAY OF __11_____, 200_5_.
      (EXAMPLE: TWENTY-EIGHT DAY OF NOVEMBER)

_Bry B. Ware_____
_Bradley B. Ware_____
NAME (PRINT)                          NAME (PRINT)

SUBSCRIBED AND SWORN TO AS BEING TRUE AND CORRECT BEFORE ME THIS ___15th_____ DAY OF __November_____, 200_5_.

NOTARY PUBLIC, STATE OF TEXAS

JENNIFER L. WILEY
Notary Public, State of Texas
My Commission Expires 10-14-2006

Form TCEQ-10201(revised 8/02)

64

# TEXAS NATURAL RESOURCE CONSERVATION COMMISSION



## PERMIT TO APPROPRIATE
## AND USE STATE WATER

APPLICATION NO. 5594  PERMIT NO. 5594  TYPE: Section 11.121

Name: Bradley B. Ware  Address: Rte. 3, Box 211
Killeen, TX 76542

Filed: July 1, 1997  Granted: **NOV 0 7 1997**

Purposes: Irrigation  County: Bell

Watercourse: Lampasas River, tributary  Watershed: Brazos River Basin
of the Little River, tributary
of the Brazos River

WHEREAS, Bradley B. Ware has requested authorization to divert and use not to exceed 130 acre-feet of water per annum to irrigate 100 acres of land owned by the applicant in Bell County approximately 15 miles southwest of Killeen, Texas; and

WHEREAS, the Texas Natural Conservation Commission finds that jurisdiction over the application is established; and

WHEREAS, no person protested the granting of this application; and

WHEREAS, the Commission has complied with the requirements of the Texas Water Code and Rules of the Texas Natural Resource Conservation Commission in issuing this permit.

NOW, THEREFORE, this permit to appropriate and use State Water is issued to Bradley B. Ware, subject to the following terms and conditions:

1. USE

Permittee is authorized to divert and use not to exceed 130 acre-feet of water per annum from the Lampasas River to irrigate 100 acres of land out of 261 acres in the W. Brown Survey, Abstract No. 67, the D.G. Van Vicheton (Vecheton)

1

Survey, Abstract No. 851, and the C. Edwards Survey, Abstract No. 291 in Bell County, Texas approximately 15 miles southwest of Killeen, Texas. This land is conveyed to permittee in a deed recorded in Volume 1524, page 671 of the Bell County Deed Records.

2. DIVERSION

a. Diversion Area: Permitte is authorized to divert water from any point on the left or east bank of the Lampasas River, between a point N60.6°W 2,050 feet from the southeast corner of the aforesaid Van Vicheton Survey and a point located S37°E 4,200 feet from the aforesaid survey corner in Bell County. This downstream point is located at Latitude 31.032°N, Longitude 97.992°W.

b. Maximum Diversion Rate: 2.67 cfs (1200 gpm).

3. SPECIAL CONDITIONS

a. In order to protect instream uses, biological habitats and water quality, permittee is authorized to divert water hereunder during the months of April through June only when the flow of the Lampasas River at U.S.G.S. Gaging Station No. 08103800 near Kempner, Texas equals or exceeds 38 cfs and during the other months only when it equals or exceeds 12 cfs.

b. The authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on November 7, 2007 unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity. The priority date of this permit and all extensions hereof shall be July 1, 1997.

4. WATER CONSERVATION

Permitee shall implement a water conservation plan that provides for the utilization of those practices, techniques, and technologies that reduce the consumption of water, prevent or reduce the loss or waste of water, maintain or improve the efficiency in the use of water, or increase the recycling and reuse of water so that a water supply is made available for future or alternative uses.

This permit is issued subject to all superior and senior water rights in the Brazos River Basin.

2

66

Permittee agrees to be bound by the terms, conditions and provisions contained herein and such agreement is a condition precedent to the granting of this permit.

All other matters requested in the application which are not specifically granted by this permit are denied.

This permit is issued subject to the Rules of the Texas Natural Resource Conservation Commission and to the right of continuing supervision of State water resources exercised by the Commission.

TEXAS NATURAL RESOURCE
CONSERVATION COMMISSION

For the Commission

DATE ISSUED: NOV 0 7 1997

ATTEST:

Eugenia K. Brumm, Ph.D., Chief Clerk

3

67



# REQUIREMENTS FOR WATER CONSERVATION PLANS FOR INDIVIDUAL IRRIGATION SYSTEMS

These Requirements are a synopsis of the rules as approved by the Commissioners of the Texas Commission on Environmental Quality on April 7, 1993. The approved rules were published in the Texas Register on April 23, and are recorded in the Texas Administrative Code, Title 30, Chapter 288. Conservation plans required to be submitted to the Texas Commission on Environmental Quality must follow these guidelines.

A water conservation plan for an individual irrigator shall provide information, where applicable, in response to each of the following elements, including what the user intends to do, or not to do and why, with regard to that element:

(1)     A description of the agricultural production process which shall include but is not limited to the type of crops and acreage of each crop to be irrigated, monthly irrigation diversions and any seasonal or annual crop rotation and soil types of the land to be irrigated;

(2)     A description of the irrigation method or system and equipment including pumps, flow rates, plans, and/or sketches of the system layout;

(3)     A description as to which practice and/or device will be utilized to measure and account for the amount of water diverted from the source of supply;

(4)     Any previous assessments which may have been performed regarding the system efficiency of the irrigation system;

(5)     Specification of conservation goals including quantitative goals for irrigation water use efficiency;

(6)     Water conserving irrigation equipment and application system or method including but not limited to surge irrigation, low pressure sprinkler, drip irrigation, pollution prevention, and non-leaking pipe;

(7)     Leak-detection, repair, and water-loss control;

(8)     Scheduling the timing and/or measuring the amount of water applied, such as, soil · moisture monitoring;

(9)     Land improvements for retaining or reducing runoff, and increasing the infiltration of rain and irrigation water including but not limited to land leveling, furrow diking, terracing, and weed control;

(10)    Tailwater recovery and reuse;

(11)    Any other water conservation practice, method, or technique which the irrigator show to be appropriate for preventing waste and achieving conservation.

# Texas Commission on Environmental Quality
## IRRIGATION WATER CONSERVATION DATA AND PLAN
## FOR INDIVIDUALLY OPERATED SYSTEMS

Submit this form with an application for Permit to Appropriate State Water. You may want to contact the local County Agent, Natural Resources Conservation Service office, the Texas Water Development Board or a professional engineer in preparing this form. If you have any questions concerning the information requested, contact us at (512)239-4730.

Name of Applicant: __BRADLEY  B. WARE__

Daytime Telephone No.: __254-634-6327__

Requested Diversion Amount: __150__

SEE ATTACHED PAGE FOR THIS CHART →

I.

| Type of crop: | Growing season (months): | Acres irrigated/year: |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| Total number of acres: | | 132 |

Include hybrid crop names: for example, which type of coastal Bermuda?

II  On average, how much water in acre-feet will be diverted monthly for irrigation?

| January | 6 | May | 21 | September | 20 | TOTAL for all months |
|---|---|---|---|---|---|---|
| February | 4 | June | 17 | October | 7 | |
| March | 3 | July | 25 | November | 5 | |
| April | 7 | August | 30 | December | 5 | |
| MONTHLY TOTALS | 20 | | 93 | | 37 | 150 |

III. Do you seasonally or annually rotate crops?  (YES)    NO    (circle one)

If yes, please describe: __WHEAT, FORAGE, SORGHUM, OATS WITH A LEGUME__

__SUCH AS AUSTRIAN WINTER PEAS.__

Bradley Ware

Part I.

Some of my land I double crop.

| Type of crop: | | Growing season (months) | Acres irri/year |
|---|---|---|---|
| 1. Tifton 85 Bermuda | | 8 months | 36 |
| Soft Wheat (Grazing) | (double crop) | 6 months | 36 |
| 2. Improved Native Grass | | 9 months | 22 |
| 3. Brown midrib Sorghum | | 7 months | 54 |
| Bob oats or soft wheat | (double crop) | 5 months | 54 |
| 4. Costal Bermuda grass | (double crop) | 8 months | 20 |
| Bob oats or soft wheat | | 5 months | 20 |

70

IV. Describe your soil type (include permeability characteristics, if available): BOSQUE CLAY LOAM HIGH WATER HOLDING CAPACITY, DENTON SILTY CLAY-DEEP WELL DRAINED, SLOWLY PERMABLE PRESENTLY CONTOUR TERRACED AND SEEDED TO NATIVE GRASS SPECIES, CRAWFORD CLAY-WELL DRAINED PRESEN CONTOUR TERRACED, ALSO REFER TO TEXAS COOPERATIVE EXTENSION PUBLICATION B-1670 p.3.

V. Describe the existing/proposed irrigation system including plans, designs and/or sketches of the system layout, pump location, slope of the land to be irrigated, and specifics about the delivery method. (For example: Single pivot with big gun sprinkler)

SLOPE 0 to 3 PERCENT / DELIVERY UNDERGROUND PVC PUMP

CAPACITY 500 GPM. / POWER UNIT 25 H.P. ELECTRIC CENTER PIVOT-

LEPA DESIGN (LOW ENERGY PRECISE APPLICATION) WITH A DESIGN

EFFECIENCY ABOVE 95% DRAWING EXHIBITS A, B, C, ↑ D. TEXAS

COOPERATIVE EXTENSION PUBLICATION B-1611, L-2218, L-5066,
B-6096, B-6162

VI. Describe the methods and/or device which will be used to measure and account for the amount of water diverted for irrigation.

CENTER PIVOT NOZZLE CHART AND PUMP EFFICENCY CURVE.

EHIBIT B AND C, LOG OF OPERATION HOURS EXHBIT H.

VII. If there's is an existing irrigation system, have any system evaluations been performed regarding the efficiency of the system? (YES) NO (circle one)
If YES, please indicate:
When: SEE ATTACHED TEXAS A+M PUBLICATION B-1670 ↑ B6019

Who performed the evaluation: DR. BILL LYLE TEXAS A+M EXTENSION
SERVICE, LUBBOCK TX
DR. LEON NEW, TEXAS COOPERATIVE EXTENSION
AMARILLO, TX

71

Results of the evaluation: LEPA DESIGN CENTER PIVOT SYSTEMS ARE PROVEN TO EXCEED 95% EFFECIENCY AND 96% UNIFORMITY OF DISTRIBUTION, EXHIBITS F & G, CHOOSING A CENTER PIVOT BY GUY FIPPS

VIII. Describe any water conserving equipment used in the irrigation system. (i.e. closed pipes, leak detection, pressure loss cut-off valve, etc.)

HIGH EFFECIENCY, ELECTRIC CENTRIFICAL PUMP; SEALED AND
(FRICTION)
PRESSURE TESTED LOW FRICTION, PVC UNDERGROUND

VIII. cont. DELIVERY PIPE LOW ENERGY PRECISE APPLICATION

(LEPA) CENTER PIVOT, USING LOW DRIFT NOZZLES AND DRAG

HOSES, WATER RELEASE WILL BE AT NO MORE THAN 18"
ABOVE SOIL SURFACE, TEXAS COOPERATIVE EXTENSION SERVICE
PUBLICATIONS, B-6011, L-2219, B6162, B-6150, B-6096

IX. Describe any methods which will be used for water loss control and leak detection and repair.

REGULAR PRESSURE TEST, REPAIRS MADE USING APPROVED

METHODS AND STANDARDS / SUPERVISION DURING OPERATION

X. Describe any water saving scheduling or measurement practices to be utilized in the application of water, for example: irrigation only early in the morning, late evening or night hours, when the wind is calm and temperatures lower, and also the utilization of soil moisture monitoring:

ALL THE ABOVE, GYPSUM MOISTER MONITERING BLOCKS

DELMORST METER IRRIGATION WILL BE MONITORED

SO AS MOISTURE LEVELS ARE MAINTAINED FOR CROP DEVELOPMENT BUT NOT TO THE POINT OF RUNOFF, ALSO REFER TO TEXAS COOPERATIVE EXTENSION PUBLICATION L-5039, B-1610, B-1670, B-6019.
TEXAS COOPERATIVE EXTENSION WATER RESOURCES WEBSITE: HTTP;/www.texas et .tamu.edu

XI. Describe any water saving land improvements which the applicant plans to incorporate into the irrigation practices, such as conservation tillage (and other organic methods), knifing, furrow diking, weed control, etc.

FIELDS ARE CONTOUR TERRACED, SOME SEEDED TO NATIVE GRASS SPECIES. TILLAGE WILL BE MANAGED TO MAINTAIN AT LEAST 30% GROUND COVER ON SOIL SURFACE, TILLAGE WILL BE WITH NON-INVERSION TILLAGE IMPLEMENTS (CHISELS, SWEEPS, FIELD CULT, ETC)

XII. Describe any recovery and reuse of tailwater runoff.

IRRIGATION WILL BE MONITORED SO THAT SOIL WILL CONTAIN SUFFICIENT MOISTURE FOR PROPER CROP DEVELOPMENT BUT NOT IRRIGATED TO THE POINT OF RUNOFF, REFER TO TEXAS COOPERATIVE EXTENSION PUBLICATION L-5039.

XIII. Describe, where applicable, any xeriscape practices utilized (usually associated with landscaping).

N/A

73

XIV. Indicate (in gallons-per-minute or cubic-feet-per-second) the rate that water is diverted from the source: _____ 500 GPM OR 1.2 cfs _____

74



# Exhibit B

# Applicant Bradley B. Ware's Motion for Rehearing



| | | |
|---|---|---|
| APPLICATION OF BRADLEY B. WARE | § | BEFORE THE TEXAS COMMISSION |
| | § | |
| TO AMEND WATER USE | § | ON |
| | § | |
| PERMIT NO. 5594 | § | ENVIRONMENTAL QUALITY |

## APPLICANT BRADLEY B. WARE'S MOTION FOR REHEARING

TO THE HONORABLE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY:

NOW COMES, Bradley B. Ware ("Mr. Ware," or "Applicant"), Applicant in the above styled and docketed water rights permit amendment application, by and through his attorneys of record, Stephen P. Webb and Gwendolyn Hill Webb, of Webb & Webb, Attorneys at Law, 211 Seventh Street, Suite 712, Austin, Texas, 78701, and files this, Applicant's Motion for Rehearing regarding the April 20, 2010 Order of the Texas Commission on Environmental Quality ("TCEQ" or "Commission") "Concerning the Application of Bradley B. Ware to amend water use Permit No. 5594; TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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," ("the Commission's April 20, 2010 Order") and respectfully states as follows:

## I.    INTRODUCTION

Apart from the grievous injustice perpetrated by the Commission on Applicant, Bradley B. Ware, in denying him any continuing right to divert and use water under Water Use Permit No. 5594 for Ware Farm after over 100 years of water use, Applicant asserts that the Commission's April 20, 2010 Order violates extant provisions of the Texas Water Code, and contains obviously reversible legal error. A May 11, 2010 decision of the Texas Court of Appeals, Fourteenth District, Houston, in *Texas Department of Public Safety v. Chad Michael Henson* (14-09-0010-CV) sets forth the standards of judicial review of decisions by an administrative agency. The text of the discussion is set forth in full below:



PLAINTIFF'S
EXHIBIT
B

When reviewing an administrative decision under the substantial evidence rule, the review court may affirm the decision in whole or in part. Tex. Gov't. Code Ann. §2001.174 (Vernon 2008). It [the reviewing court] must reverse or remand the case if the Appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decision are:

(1)     in violation of a constitutional or statutory provision;

(2)     in excess of the agency's statutory authority;

(3)     made through an unlawful procedure;

(4)     affected by other error of law;

(5)     not reasonably supported by substantial evidence when considering the record as a whole; or

(6)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[Citing and paraphrasing Tex. Gov't. Code §2001.174 (Vernon 2008), and *Tex. Dept. of Public Safety v. Guajardo*, 970 S.W.2d 602.]

Generally, as shown below, the Commission's order is in violation of the fundamental precepts of the Constitution of the United States (5th and 14th Amendments) and the Texas Constitution (Art. 1, Bill of Rights, Sections 3 and 19), Texas Water Code and the Texas Government Code; is in excess of the Commission's statutory authority; is made through unlawful procedure; is affected by numerous other errors of law; is not reasonably supported by substantial evidence when considering the record as a whole; *and* is on its face arbitrary, capricious, and characterized by abuse of discretion, or clearly unwarranted exercise of discretion.

Put simply, the Commission's April 20, 2010 Order is subject to reversal because it finds and concludes that there is water available for appropriation in the Brazos River Basin in the form of return flows, but reserves the available water to a pending applicant-- not appropriator-- and yet denies water availability in the current proceeding, against the substantial evidence of record.

## II.    STATEMENT OF POINTS OF ERROR

### POINT OF ERROR NUMBER ONE

The Commission's April 20, 2010 Order unlawfully ignores the evidence of record regarding the water available for appropriation by Applicant; therefore, the Commission's action in adopting the April 20, 2010 Order was arbitrary and capricious, and was characterized by an abuse of discretion.

### POINT OF ERROR NUMBER TWO

The Commission's April 20, 2010 Order violates the directives and requirements of Texas Water Code, §11.134 (b), regarding Commission action on water rights applications.

### POINT OF ERROR NUMBER THREE

The Commission's April 20, 2010 Order is in violation of the requirements of Texas Water Code, §11.1381, regarding the consideration and granting of water rights permits for a term of years.

### POINT OF ERROR NUMBER FOUR

The Commission's April 20, 2010 Order violates the fundamental doctrine of water rights law of "first in time, first in right," as set forth in the Texas Water Code, Chapter 11.

### POINT OF ERROR NUMBER FIVE

The Commission acted arbitrarily and capriciously to deprive Applicant of any continued right to divert and use any water at any time for Ware Farm under Permit No. 5594, an authorized appropriator, on the stated basis of no water available for appropriation, while at the

same time granting water rights for new appropriations and issuing statements of water availability for other applicants, new permittees, and other water rights holders.

## POINT OF ERROR NUMBER SIX

The Commission's April 20, 2010 Order adopted of Findings of Fact pertaining to a pending non-party applicant; Moreover, the details of said applicant's pending application and *proposed* appropriation were unlawfully used as a basis to deny Applicant's water right application.

79

## III. POINT OF ERROR NUMBER ONE

The Commission's April 20, 2010 Order unlawfully ignores the evidence of record regarding the water available for appropriation by Applicant; therefore, the Commission's action in adopting the April 20, 2010 Order was arbitrary and capricious, and was characterized by an abuse of discretion.

## DISCUSSION

The adopted Findings of Fact regarding water availability and "The reliability of the Model" in the Commission's April 20, 2010 Order are, on their face, inconsistent with each other, directly contrary to the evidence of record, and founded upon unlawful procedure. While the Commission is entitled to draw an appropriate inference from the substantial evidence of record regarding water availability in the Brazos River Basin, the Commission is not entitled to abuse its discretion by disregarding the existing evidence of record concerning water availability in favor of outdated evidence known to be inaccurate. There was much hand wringing during the Commission's consideration of Applicant's amendment application on April 14, 2010, and the Administrative Law Judge and the Commissioners all opined that it was a sad and difficult decision that had to be made to protect the water resources of the state. In fact, the Commission's decision to deny Mr. Ware's application to amend Permit to Appropriate State Water No. 5594 and terminate all water use thereunder should not have been made at all.

On November 14, 2006, the Executive Director performed a water availability review of Mr. Ware's amendment application using the Commission's Brazos River Basin Water Availability Model ("the Brazos WAM") which was current and accurate at the time it was performed. *See*, Applicant's Exhibit No. 47, attached hereto. Two years later, however, the Executive Director preformed another water availability review of the Brazos River Basin using updated information which was *not available* at the time Mr. Ware's application was reviewed. The Executive Director updated the Brazos WAM's Current Conditions data set and found that

there was an additional 74,387 acre-feet per year available for appropriation in the Brazos River Basin. *See*, Applicant's Exhibit 50, also attached hereto.

It is undisputed in the record that Mr. Ware's amendment application did *not* benefit from the Executive Director's 2008 update of the Brazos WAM. The Executive Director's staff hydrologist, Jeffrey Charles Thomas, testified at the hearing that neither he nor anyone else in the Executive Director's office performed a water availability review of Mr. Ware's application, other than the one completed on November 14, 2006 and included in Applicant's Exhibit No. 47. The same witness also testified that no portion of the 74,387 acre-feet found to be available in the Brazos River Basin in 2008 and set forth in Applicant's Exhibit No. 50 was ever applied to Mr. Ware's application or the Executive Director's analysis of water availability for the Ware application.

In considering the Applicant's argument regarding water availability based on return flows and updated information, the Commissioners appeared to believe that their questioning of Commission staff during the April 14, 2010 Commission Agenda meeting regarding consideration of return flows and water availability was a lawful substitute for the evidence of record. This procedure is not lawful. The Commission's decision must be based on the evidence of record, not the earnest responses of Commission staff at Agenda, which responses are *not* contained in the administrative record upon which the decision must be based. TCEQ staff hydrologist Kathy Alexander responded to Commission inquiries stating that the Executive Director had included the return flows shown on Applicant's Exhibit 50, attached hereto, in its consideration of water available for Applicant's proposed appropriation. This statement is directly *contrary* to the testimony of TCEQ staff during the hearing, including Ms. Alexander, regarding the consideration of 74,384 acre-feet of water shown to be available in the updated Current Conditions data set of the Brazos River Basin Water Availability Model. The evidence of record, as shown in an excerpt of the official transcript, is set forth below.

81

## CROSS EXAMINATION OF JEFFREY CHARLES THOMAS, TCEQ HYDROLOGIST ON THE BRADLEY B. WARE APPLICATION

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 28, 2009, Pages 149, 150:*

Q.     Okay, the point is you didn't use any portion of that additional water in the basin in your model?

A.     That's correct.

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 28, 2009, Page 149, 150:*

Q.     Additional unappropriated water would benefit the entire basin, wouldn't it?
A.     Yes.

Q.     And so it doesn't matter whether it's above Stillhouse Hollow Lake, below it? It would benefit everyone, wouldn't it?

A.     It would benefit everyone downstream of it and potentially that—yes, I can—say that it would benefit everyone in the basin, yes.

## CROSS EXAMINATION OF KATHY ALEXANDER, TCEQ HYDROLOGIST EXECUTIVE DIRECTOR'S REBUTTAL WITNESS ON THE BRADLEY B. WARE APPLICATION

*Transcript, Bradley B. Ware SOAH Contested Case Hearing October 29, 2009, Pages 378, 379:*

Q.     . Okay. And so there were return flows available and you gave them a priority date of October 15, 2004?

A.     Yes.

Q.     Okay. You mentioned that there were 74,387 acre-feet of return flows resulting from different discharges up and down the Brazos River Basin determined to be available by TCEQ hydrology?

A.     Yes.

Q.     And those are the return flows that were given the October 15, 2004, priority date?

A.     Yes.

Q.     Okay. And that—and none of those return flows, not any portion of them were allocated for use by Mr. Ware under either a 1997 priority date or any other priority date?

A.     The return flows were considered and –

Q.     Yes or no, Ms. Alexander.

A.     No.

Therefore, to the extent that the Commission's April 20, 2010 Order contains Findings of Fact which state that water is not available for continued appropriation in the Brazos River Basin, under the Brazos WAM, they are not reasonably supported by substantial evidence when considering the record as a whole. Applicant's Exhibit No. 50 shows that 74,387 acre-feet of water per year are available in the Brazos River Basin in the latest version of the Brazos River Basin Water Availability Model.[1]

Texas law does not confer upon the Commission discretion to disregard the evidence of record. Tex. Gov't Code, §2001.174(2)(E) requires a reviewing court to reverse an order of the Commission that is not reasonably supported by substantial evidence considering the reliable probative evidence in the record as a whole. The only *reliable* evidence is that Mr. Ware's application never received a water availability review which referenced the amount of water now known to be available for appropriation in the Brazos River Basin. The Commission's reliance on the outdated water availability information included in Applicant's Exhibit No. 47, known to be superseded by more reliable and updated information in Applicant's Exhibit No. 50 deprives the Commission's April 20, 2010 Order of any legitimacy under the law and constitutes an obvious abuse of the Commission's discretion.

---

[1] The Commission was only willing to use the evidence of water availability under the Brazos WAM in favor of an application filed by Brazos River Authority, as shown in its adoption of Findings of Fact Nos. 42-52.

## IV. POINT OF ERROR NUMBER TWO

The Commission's April 20, 2010 Order violates the directives and requirements of Texas Water Code, §11.134 (b), regarding Commission action on water rights applications.

### DISCUSSION

Pertinent requirements of Texas Water Code, §11.134(b) are:

> (b) The Commission shall grant the application only if:
>
> (1) the application conforms to the requirements prescribed by this chapter and is accompanied by the prescribed fee;
>
> (2) unappropriated water is available in the source of supply;
>
> (3) the proposed appropriation:
>
> (A) is intended for a beneficial use;
>
> (B) does not impair existing water rights or vested riparian rights;
>
> (C) is not detrimental to the public welfare;
>
> (D) considers any applicable environmental flow standards established under Section 11.1471 and, if applicable, the assessments performed under Sections 11.147(d) and (e) and Sections 11.150, 11.151, and 11.152; and
>
> (E) addresses a water supply need in a manner that is consistent with the state water plan and the relevant approved regional water plan for any area in which the proposed appropriation is located, unless the commission determines that conditions warrant waiver of this requirement; and
>
> (4) the applicant has provided evidence that reasonable diligence will be used to avoid waste and achieve water conservation as defined by Section 11.002(8)(B).

The Findings of Fact and Conclusions of Law in the Commission's April 20, 2010 Order do not address the requirements of Texas Water Code, §11.134(b). To the extent that the Conclusions of Law ultimately denying Application No. 5594A flow from the Findings of Fact regarding water available for appropriation in the Brazos River Basin are not reasonably supported by substantial evidence when considering the record as a whole; are arbitrary or capricious or

characterized by abuse of discretion or clearly unwarranted exercise of discretion, the Commission's April 20, 2010 Order also violates Texas Water Code, §11.134(b) as well. The Commission's Order states:

> 44. The addition of "new water," [return flows] if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.

Finding of Fact No. 44 presents an unlawful interpretation of Commission requirements under Texas Water Code, §11.134(b), which is only highlighted by the subsequent contradictory finding that:

> 45. The full amount [described in Finding of Fact No. 49 as 421,449 acre-feet of water per year] of the Brazos River Authority's requested return flows become available only at the furthest downstream point in the basin; diversions at other points are possible due to specific facts and circumstances of that application.

The Commission is charged with granting water rights applications when it finds that water is available for appropriation. Instead of discharging its statutory responsibilities in accordance with Texas Water Code, §11.134(b), and granting Applicant a continued right to appropriate 150 Acre-feet of water dating from his July 1, 1997 priority date, the Commission's April 20, 2010 Order "allocated" the water available for appropriation in the Brazos River Basin to a subsequent applicant, BRA.

85

## V.    POINT OF ERROR NUMBER THREE

The Commission's April 20, 2010 Order is in violation of the requirements of Texas Water Code, §11.1381, regarding the consideration and granting of water rights permits for a term of years.

### DISCUSSION

Texas Water Code §11.1381 states:

Sec. 11.1381. TERM PERMITS. (a) Until a water right is perfected to the full extent provided by Section 11.026 of this code, the commission may issue permits for a term of years for use of state water to which a senior water right has not been perfected.

(b) The commission shall refuse to grant an application for a permit under this section if the commission finds that there is a substantial likelihood that the issuance of the permit will jeopardize financial commitments made for water projects that have been built or that are being built to optimally develop the water resources of the area.

(c) The commission shall refuse to grant an application for a term permit if the holder of the senior appropriative water right can demonstrate that the issuance of the term permit would prohibit the senior appropriative water right holder from beneficially using the senior rights during the term of the term permit. Such demonstration will be made using reasonable projections based on accepted methods.

(d) A permit issued under this section is subordinate to any senior appropriative water rights.

Accordingly, even the Commission's unlawful recognition of the availability of return flows in the Brazos River Basin, albeit solely for use under Brazos River Authority's ("BRA") pending water rights *application*, is unspoken Commission recognition that the evidence of record shows there is water available for appropriation for Applicant's diversion and use, *at least for a term of years*. BRA has only a pending application for a proposed appropriation. The water

that the Commission's April 20, 2010 Order finds available for that proposed appropriation by BRA is, by definition, available to Applicant *before* any new appropriation by BRA is authorized by the Commission. Additionally, the evidence of record is that BRA is using only 20% of its existing Stillhouse Hollow Lake water right, the closest and most pertinent water right to Applicant. Tex. Water Code §11.1381 requires the holder of a senior appropriative water right to "demonstrate that the issuance of a term permit would prohibit the senior appropriative water right holder from beneficially using the senior right during the term of the term permit." In this case, there was no senior appropriator party-- BRA withdrew; and there could have been no demonstration of harm to BRA because it only has a pending application, not any right to appropriate the 421,449 acre-feet per year of return flows found to be available for appropriation in the Commission's April 20, 2010 Order. There was *no* demonstration of harm to *any other* existing water rights holder in the Brazos River Basin, on the facts of record in this contested case hearing.

## VI.   POINT OF ERROR NUMBER FOUR

The Commission's April 20, 2010 Order violates the fundamental doctrine of water rights law of "first in time, first in right," as set forth in the Texas Water Code, Chapter 11.

## DISCUSSION

Texas water law establishes long ago the prior appropriation doctrine of "first in time, first in right" to resolve disputes between appropriators and potential appropriators of State water. The Texas Legislature codified the doctrine in the Texas Water Code, §11.027 and further defined the priority of an appropriation at Texas Water Code, §11.141. When the Commission issued Mr. Ware's original Permit No. 5594 to "Appropriate and Use State Water" in 1997, the Commission's inclusion of Special Condition 3(b) merely memorializes the "first in time first in right" doctrine in Texas Water Code, §11.027 and §11.141. Special Condition 3.(b) states:

> "The priority date of this permit and all extensions hereof shall be July 1, 1997."

Sections 11.027 and 11.141 protect the *appropriation of State water*, not an application for the appropriation for a proposed appropriation of State water. The intent of the Texas Water Code is obvious, on this point. The priority date of July 1, 1997 establishes the priority of Applicant's appropriation; Tex. Water Code, §11.141 states:

> Sec. 11.141. DATE OF PRIORITY. When the commission issues a permit, the priority
> of the appropriation of water and the claimant's right to use the water date from the date
> of filing of the application.

The priority date applies to the original appropriation, regardless of whether the appropriation is authorized for a term of years or in perpetuity.   Where the appropriation is perpetual, the date of the original application for same would not change. When the appropriation is for a term of years, necessitating re-application if the appropriator wished to retain the water right, there could be confusion about *which* "application" date controlled. Logically, on a *renewal* of an existing appropriation it would remain the date of the *original* application. However, the Commission in

1997 eliminated all confusion and ambiguity by expressly interpreting Texas Water Law and including Special Condition 3(b) of Permit No. 5594.

When the Executive Director and, ultimately, the Commission, changed Mr. Ware's priority date to January 5, 2006 [Finding of Fact 48] the action violated §11.141 of the Water Code and §2001.174(2)(A) of the Government Code. Mr. Ware was deprived of a property right conferred by the original Commission order issuing Permit No. 5594 without any notice and opportunity to respond to the removal of the right. A new, far less senior priority date was used, improperly, in the Executive Director's November 14, 2006 Water Availability Review of Mr. Ware's application and in the denial of Mr. Ware's application. Therefore, the Commission's order denying Mr. Ware's application on the basis of the change in priority date, also violated Tex. Gov't. Code §2001.174(2)(C).

## VII.  POINT OF ERROR NUMBER FIVE

The Commission acted arbitrarily and capriciously to deprive Applicant of any continued right to divert and use any water at any time for Ware Farm under Permit No. 5594, an authorized appropriator, on the stated basis of no water available for appropriation, while at the same time granting water rights for new appropriations and issuing statements of water availability for other applicants, new permittees, and other water rights holders.

## DISCUSSION

The Commission's unlawful insistence on the absence of water available for a requested 150 acre-feet per year appropriation for Applicant's Ware Farm in this case stands in stark contrast to its determination of water availability for other appropriations. Without contested case hearings, the Commission issued water rights for perpetual permits to the City of Bryan and the City of College Station. During the pendency of this proceeding, the Commission granted Permit No. 5912 to the City of Bryan on February 5, 2010, authorizing the diversion and use of 14,282 acre-feet (less losses) of those return flows [returned to a surface watercourse in the Brazos River Basin] per year with not priority date. Also during the pendency of this proceeding, the Commission granted Permit No. 5913 to the City of College Station , also on February 5, 2010 authorizing diversion and use of 12,881 acre-feet (less losses) of those return flows [returned to a surface watercourse in the Brazos River Basin] per year with no priority date. And, of course, in this case, the Commission's April 20, 2010 Order found water available for a proposed appropriation by BRA, *even though BRA is not a party to this case.*

Effective March 10, 2005, almost eight years after Applicant's authorized appropriation, BRA, the City of Abilene, and West Central Texas Municipal Water District entered into an agreement on file with TCEQ regarding in part, the water proposed to be appropriated under BRA's pending water rights application (and, at the same time, the water requested for appropriation by Applicant), conferring upon each other water rights "for so long as any of the Parties' water rights referenced in this Agreement remain in effect." The Commission's April

20, 2010 Order then, effectively supports the unlawful allocation of water to the parties to this agreement in violation of Texas Water Code §11.027. Other parties who "settled with BRA," include the City of College Station and the City of Bryan. Consequently, the Commission's April 20, 2010 Order is founded upon the unquestionably unlawful procedure of allowing a water rights holder to determine the allocation of State water available for appropriation.

Consequently, the Commission's April 20, 2010 Order denying Applicant's amendment application is made through the unfair and unlawful procedure of denying some Applicant's access to water available for appropriation in the form of return flows or updated information on water availability. Texas Water Code §11.046(c) states:

> §11.046(c). Except as specifically provided otherwise in the water right, water appropriated under a permit, certified filing, or certificate of adjudication may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit, certified filing, or certificate of adjudication for the purposes and locations of use provided in the permit, certified filing, or certificate of adjudication. **Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication.** [Emphasis supplied.]

The Commission's order, which recognizes the presence of "the full amount [421,449 acre-feet of water per year] of BRA's requested return flows," but also denies that 150 acre-feet of water is available for Applicant's continued appropriation, is founded upon unlawful procedure. The Texas Water Code and Commission rules do not provide for reservation of state water available for appropriation to *future applicants*. There is no law or rule, and consequently no legal justification for the Commission's actions denying a requested appropriation for Ware Farm while granting perpetual or long term permits for other later applicants and appropriators.

The importance of fair and accurate water availability analysis by the Commission, has its basis, not only in the Texas Water Code, but also in principles of fundamental fairness, and

prohibition against property deprivation without compensation or due process, under the Constitution of the United States of America and the Texas Constitution. Water rights are property rights, and the termination or denial of those rights without just cause or fair compensation amounts to an unauthorized use of the State's police powers. The Commission, in every water rights case, must act in a just and reasonable way. Secret deals with applicants, reliance on erroneous or outdated data, refusal to apply facts as dictated by statute, operating in accordance with non-existent rules and procedures unlawfully compromise the Commission's water rights regulation. Above everything, Applicant should not be denied under Commission procedures which determine water availability based on unspecified procedures and non-public rules which favor some applicants over others without regard to the statutory mandate, "As between *appropriators*, the first in time in the first in right.

Apparently, the Commission misled Applicant in 1997 when it issued a term permit, but issued perpetual water rights to later Brazos River Basin applicants. Now, the Commission's April 20, 2010 Order compounds its previous errors by continuing to deny Mr. Ware access to water available for appropriation in the Brazos River Basin.

## VIII. POINT OF ERROR NUMBER SIX

The Commission's April 20, 2010 Order adopted of Findings of Fact pertaining to a pending non-party applicant; Moreover, the details of said applicant's pending application and *proposed* appropriation were unlawfully used as a basis to deny Applicant's water right application.

### DISCUSSION

The Commission's April 23, 2010 Order contains Findings of Fact 45, 49, 50 and 51; which refer to the unidentified application of Brazos River Authority, a non-party. These findings of fact regarding the ongoing contested application of a non-party were used as a basis to deny Mr. Ware's application. Therefore, the Commission order violated Tex. Gov't. Code §2001.174(2) because the decision was made through unlawful procedure [§2001.174(2)(C)]; it was not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole [§2001.174(E)]]; and was arbitrary and capricious and was characterized by an abuse of discretion [§2001.174(F)]. The referenced Findings of Fact Nos. 45, 49, 50 and 51 appear to refer to BRA's pending water rights Application No. 5851. However, as of its April 14, 2010 consideration of the Proposal for Decision in Applicant's case, the Commission had yet to even consider that pending application in an open meeting lawfully convened pursuant to the Texas Open Meeting Act, Tex. Gov't. Code Chapter 551 *et. seq.* and, of course, had not rendered any final order granting all or any portion of BRA's proposed appropriation. [See Tex. Gov't. Code §2001.005(a)]

On April 28, 2010, the Commission referred BRA's Application No. 5851 to the State Office of Administrative Hearings ("SOAH"), granting the requests for a contested case hearing of several protestants. The hearing before SOAH is subject to the Texas Rules of Evidence in a non-jury civil trial. (See Tex. Gov't. Code §2001.081) BRA was not a party to Mr. Ware's application, and no witness on behalf of BRA was sponsored to verify any portion of Application 5851 or any other application filed by BRA. Even more importantly, Applicant was provided no opportunity to cross examine or otherwise determine the validity of any evidence associated with

BRA's application or the supposed evidence which may or may not support the Findings of Fact Nos. 45, 49, 50 or 51 in the Commission's April 20, 2010 Order. (See Tex. Gov't. Code §2001.087) Therefore, in denying Mr. Ware's application based on unsupported evidence from a pending application of a non-party the Commission's April 20, 2010 Order amounts to a taking of Mr. Ware's property without the benefit of any procedural due process, in direct contravention of the Article XIV of the U.S. Constitution. In that regard, the Commission's order also violated the Texas Constitution, Art. 1, Sections 3 and 19, and Tex. Gov't. Code §2001.174(A).

There is little doubt about the damaging impact of the referenced findings on Mr. Ware's application. The most significant Findings of Fact Nos. 49, 50 and 51 were included in a section of the Commission's order labeled "Priority dates." In Findings of Facts 40 and 41 (which directly contradict the Commission Finding of Fact 47) the Commission established the importance of an applicant's priority date in the Commission's determination of water availability. Then, the Commission directly compares BRA's alleged priority date to a less senior priority assigned to Mr. Ware's application (Finding of Fact 48) rather than the date included in his permit (Finding of Fact 46). In so doing, the effect of the Commission's order was to deny Mr. Ware's application in favor of *another pending but undecided application*. Moreover, the Commission's Finding of Fact 51 violates Tex. Water Code §11.141 by implying that the pending BRA application has already resulted in a valid appropriation of water. That section of the Water Code provides:

> "DATE OF PRIORITY. *When the Commission issues a permit,* the priority of the appropriation of water and the claimant's right to use the water date from the date of filing of the application."
>
> [Emphasis supplied.]
> Texas Water Code, §11.141

Applicant did not agree to use information about BRA's pending application or waive his objection to receipt of information about BRA's application into his hearing record. Applicant offered the Executive Director's 2008 Water Availability Review to the ALJ for the limited

purpose of establishing that it was the most current water available analysis performed by the Executive Director of the Brazos River Basin. In that review (App. Ex. 50) the Executive Director updated the Brazos WAM that had been used two years before in its review of Mr. Ware's application. The fact that the Executive Director found that 74,387 acre-feet of water was available in the Brazos River Basin using the same period of record as was used in Mr. Ware's Water Availability Review was relevant and probative information for the Commission's consideration of Mr. Ware's application. The fact that another applicant (or any other applicant) may have also applied for the water available for appropriation is *irrelevant* to any issue in this case. Applicant strenuously objected to the admission of any evidence about BRA's application during Mr. Ware's hearing for the reasons discussed herein. The Commission's inclusion of any information about BRA or its pending application is objectionable and unlawful.

95

## IX.    SUMMARY

The Commission's April 20, 2010 Order denying Mr. Ware's application to appropriate 150 acre-feet of water per year from the Lampasas River, Brazos River Basin, violates the Texas Water Code, the Texas Constitution, and the Constitution of the United States and is voidable and reversible.  Apart from being unlawful, the Commission's role in administering water rights is called into question when it denies a family farmer access to water available for appropriation in the Brazos River Basin for any term at all on the one hand, and supports contractual water rights, and issues perpetual permits for use of State water associated with return flows and updated streamflow conditions and data sets on the other hand.  Applicant requests the Commission rehear this case and reverse its unfair and unlawful decision.

WHEREFORE, CONSIDERING THE FOREGOING, Applicant asks the Texas Commission on Environmental Quality to vacate its unlawful April 20, 2010 Order denying the Application of Bradley B. Ware to Amend his Permit to Appropriate State Water No. 5594, and issue lawful order based on the evidence of record and the Texas Water Code and all applicable law which grants Applicant a right to divert and use 150 acre-feet of water per year for agricultural purposes at Ware Farm, a Texas Century Farm, in accordance with the Commission's updated determinations of water availability in the Brazos River Basin.

Respectfully Submitted,

WEBB & WEBB
Attorneys at Law
712 Southwest Towers
211 East 7th Street
Austin, Texas 78701
(512) 472-9990 Telephone
(512) 472-3183 Facsimile

Stephen P. Webb
State Bar No. 21033800

Gwendolyn Hill Webb
State Bar No. 21026300

ATTORNEYS FOR APPLICANT, BRADLEY B. WARE

## CERTIFICATE OF SERVICE

I hereby certify that I have this 14th day of May, 2010, served copies of the foregoing Applicant's Motion for Rehearing upon the parties to this proceeding, whose full and complete names and addresses appear below, by electronic mail, by certified mail, facsimile, hand delivery, and/or regular U.S. mail.

Honorable Paul Keeper
Administrative Law Judge
State Office of Administrative Hearings
P.O. Box 13025
Austin, Texas 78711-3025

Shana Horton, Staff Attorney
James Aldredge, Staff Attorney
Texas Commission on Environmental Quality
Environmental Law Division MC-173
P.O. Box 13087
Austin, Texas 78711-3087

Garrett Arthur, Attorney
Texas Commission on Environmental Quality
Public Interest Counsel MC- 103
P.O. Box 13087
Austin, Texas 78711-3087

Bradley B. Ware
911 Gann Brach Road
Killeen, Texas 76549

Gwendolyn Hill Webb

# Exhibit C

# June 7, 2006  Letter from BRA regarding Conditions of Withdrawal of Protest

# Bickerstaff, Heath, Pollan & Caroom, L.L.P.

816 Congress Avenue    Suite 1700    Austin, Texas 78701    (512) 472-8021    Fax (512) 320-5638    www.bickerstaff.com

June 7, 2006

App. Exh. _____ 42

*Via Hand Delivery*

Ms. LaDonna Castañuela
Office of the Clerk, MC105
Texas Commission on Environmental Quality
12100 Park 35 Circle, Building F, 1st Floor
Austin, Texas 78753

OPA H

JUN 0 7 2006

BY _____

Re:    Application No. 5594A by Bradley B. Ware

Dear Ms. Castañuela:

On behalf of the Brazos River Authority (BRA), I protest the above-referenced application and request that a contested case hearing be held on Application No. 5594A.

BRA holds the following water rights in the Brazos River Basin, both upstream and downstream of Water Use Permit No. 5594: Certificate No. 12-5155 (Possum Kingdom Lake); Certificate No. 12-5156 (Lake Granbury); Certificate No. 12-5157 (Lake Whitney); Certificate No. 12-5158 (Lake Aquilla); Certificate No. 12-5159 (Lake Proctor); Certificate No. 12-5160 (Lake Belton); Certificate No. 12-5161 (Lake Stillhouse Hollow); Certificate No. 12-5162 (Lake Georgetown); Certificate No. 12-5163 (Lake Granger); Certificate No. 12-5164 (Lake Somerville); Certificate No. 12-5165 (Lake Limestone); and, Permit No. 2925A (proposed Allens Creek Reservoir). One or more of these rights may be impaired if Water Use Permit No. 5594 is changed from a term permit to a permanent water right.

BRA would withdraw its protest and request for a contested case hearing if and only if Water Use Permit No. 5594, as amended, includes a special condition that it remain a term permit with an expiration date no later than November 7, 2017, which would be a 10-year extension of its present term. Additionally, BRA would not be opposed to the authorization to irrigate on additional 31 acres and to the use of an additional 20 acre-feet of water per annum, provided Water Use Permit No. 5594, as amended, remains a term permit with the special conditions as noted herein.

Thank you for you attention to this matter. I request that BRA and I be placed on all notice lists so that it may receive notice of all further actions with regard to Application No. 5594A.

Sincerely,

Bruce Wasinger

BW/bc

cc:    Lauralee Vallon
       David Wheelock
       Brazos River Authority

EXHIBIT
C

100

# Exhibit D

# Excerpts of Transcript Volume No. 1 of Hearing conducted October 28, 2009

COPY

SOAH DOCKET NO. 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

TCEQ DOCKET NO. 2008-0181-WR


APPLICATION OF BRADLEY B. ) BEFORE THE STATE OFFICE
WARE TO AMEND                ) OF
WATER USE PERMIT NO. 5594 ) ADMINISTRATIVE HEARINGS


ADMINISTRATIVE LAW JUDGE:  HON. PAUL D. KEEPER


*************************************************************

TRANSCRIPT OF PROCEEDINGS

TAKEN ON OCTOBER 28, 2009

AT AUSTIN, TEXAS

VOLUME 1    PAGES 1 - 249

*************************************************************


    TRANSCRIPT OF PROCEEDINGS, VOLUME 1, taken in the above-styled and numbered cause on the 28th day of October, 2009, from 9:01 a.m. to 5:01 p.m., before C. Mack Lane, CSR, in and for the State of Texas, reported by machine shorthand, at State Office of Administrative Hearings, 300 West 15th Street, Austin, Travis County, Texas 78201, pursuant to the rules of the Texas Administrative Code, the Texas Water Code, and the Texas Rules of Civil Procedure.

PLAINTIFF'S
EXHIBIT
D
PENGAD 800-631-6989

we'll get to the issues involving the Texas Water Code briefly. Please proceed.

MR. WEBB: All right.

Q. (BY MR. WEBB:) What is -- what is this page, Mr. Ware?

A. This is my father, Elwood Ware, Sr., on his Farmall tractor there and he used to row water back in the '30s and '40s.

Q. Okay. And what is Exhibit-2A -- or page 2A?

A. This is the thrashing where they harvested grain where all the neighbors would get together and thrash the grain back in the 1800s.

Q. Okay. And we've got one more. By the way, was 2A an actual picture of the Ware Farm?

A. Yes. All these are actual pictures of the farm.

Q. Has Ware Farm been using water historically?

A. Yes. My grandfather used to pump water minimally I would say, you know, during his time and all to water the cows and to do some of the crops like that and then my father during the '30s, '40s, '50s, he would what I would call heavily row water very -- what we would consider wasteful watering nowadays in today's technology, but that was the biggest heaviest time during my dad's farming.

Q.   And is it your understanding that one of the issues in this case is the historical use of water as part of your application?

A.   Yes.

Q.   Okay.  Very good.  What are we looking at now?  What page is that?

A.   This is the family cemetery.

Q.   Could you provide the judge a little bit of the actual location of the farm relative to the area that you're applying for?

A.   Well, it's in Bell County.  As I said earlier, it's 261 acres.  It's landlocked.  There's four neighbors landlocked inside the Parrie Haynes Ranch which is 4500 acres.  It's run by Texas Parks & Wildlife.

I would have to say the Ware Farm is the best part of Parrie Haynes Ranch.  They've only got maybe a quarter mile of river above me and down below us and I have two miles of the very best farmland.  The terrain is similar.  Ours has been kept up over the years of the cedar control, the fields being cleaned, the grasses and stuff like that and Parrie Haynes Ranch is heavily wooded and in dire need of some improvement, you know, from the fencing to the brush control and stuff.

Q.   Okay.   Now, you mentioned earlier that your family used to row irrigate.   What is row irrigation?

A.   Row crop irrigation is where you put beds or burrows or list the field and you run the water down every other row.   You pump it -- this picture you see up here is the -- was the pump station way back then where they pump it to high ground and let it free flow down the fields and crops to -- and, as I said earlier, technology has increased so much that this was terribly wasteful back in the days and my dad realized it was wasteful and kind of give up hopes of irrigation back in his days and it got shut down in the '60s or '70s.

Q.   Incidentally, the judge wanted to know a little bit about why Ware Farm doesn't have a permanent water right that you obtain through the adjudication process.   Could you enlighten the judge a little bit about why that is?

A.   My daddy got up into his 60s or so and physical stress kept him from work.   It's a matter of lots of work and rubber boots and stuff like that and all.   He knew how much -- he used to drive a pump off the tractor a lot of times.   He knew the amount of fuel that it took to pump that water and of course his mind set was the way he watered it.   He doesn't

understand about new technology that's come along.

So he had given up hope and during the '70s, my dad and mother went to through a tremendously bitter divorce from cattle being shot, the barns being burnt, and this was over a 10-year period, you know. I mean a violent situation. So my mother's deal was to destroy the farm because that's what he loved and my dad's deal was to save the farm because that's what he loved.

So water he had slowed down and might never quit at that time. Water was the least of his worries and the sad part about that is that was during the '70s during the adjudication period whenever I was still young and didn't know any better and we did big lick. We dropped the ball there to be able to get that water, but the water was used before that and I've tried to straighten that up.

Q.    Has water in fact been used on Ware Farm continuously since 1874?

A.    Yes.  We -- even when my dad was shut down in the '70s, I still went and set the small -- we had a little pump and heat motors and we set the pump and pumped water to the windmill tanks and filled them because the wind didn't blow during the summertime so we had to depend off of the river water to water the

cows not to mention the garden and little small patches here and there of ribbon cane or something like that that we might be growing at that time.

Q. Do you operate Ware Farm as a business today?

A. I try to. That's kind of a tricky thing now days to say what is a farmer. My thought was back whenever my grandfather's farm and that's all he did. Nowadays I pick up welding jobs and stuff like that in town because I have the equipment, I have the ability, and I can put it into my schedule and all, but to say I'm a 100 percent farmer myself, I can't say that. Probably y'all would. But I work 24 hours a day and I work seven days a week. I don't take vacations. I enjoy what I do. When I'm out there working whether it's building a fence or setting irrigation pipe, I enjoy that.

Q. How many acres do you have cultivation presently?

A. There's about 180 acres. You know, I'm improving things. I'm turning some into native pasture. It's rocky type soil or something like that so it bounces back and forth.

Q. What is page 6 of Exhibit-1?

A. That's my small valley irrigation system. I've got four different systems on the place.

A.   Yes, I'm still paying for it.

Q.   Okay.  Go on.

A.   But we had the irrigation system laying in the field bolted together and fixing to stand it up and put it on the tires and Brazos River Authority phoned and says "We have run into a snag or a problem with your permit," and I said, "Well, what do you mean?  I've got a contract.  You know, the pivot is in the field.  I hired -- I paid the electric company $15,000 to move electric poles out of my field where this pivot could make a circle.  I took out fences.  I removed trees to clear for this to get the advantage of the full size I could go with."  And they said -- well, TNRCC at that time said that we can't sell water upriver.  It's kind of a layman's term that I got out of it.  I never understood the full story I guess I should say.

But, anyhow, it turned out there was about ten -- eight or ten different people that had talked to Brazos River Authority, was lining up contracts, looking at the possibility.  There was two of us that had actually written contracts buying this water and I didn't know about the other fellow.  He's upriver from me about seven or eight miles.  And so I said, "Well, what are we going to do?  We've got

irrigation stuff in the field. We have spent $75,000 already. You know, there's fixing to be a lawsuit here because you're going to buy that irrigation equipment. I can guarantee you that." And they said "Well, let's see what we can do."

So they sent their lawyer out of Waco, which I was very impressed at that time, instead of just blowing us off. They went to Austin -- and I remember this was in '96 when all permits was suspended at that time. There was no way you could get water they said. They went down there and negotiated several trips. They kept us informed, me and the other fellow.

The lawyer eventually got back with -- the Brazos River Authority lawyer got back with us and said we've worked out a deal with the state to where we can get your water and so I got -- and of course when I applied back then, I applied for permanent water because I knew this was a 20-year deal. I knew that there's a possibility in the future that we would always need water and they said 10-year permit is all you could get.

So I got that because that's all I could get and they said, well, it's kind of like your problem. In 10 years we should be able to work out

something, you know, and so now we're to that 10-year deal. I know they stressed that you need to make sure your application gets in a couple of years in advance for getting it through the system and so --

Q.    Well, that brings us to where we are now. Would you identify what's been marked as Exhibit-2?

A.    This is the 5594 water permit that -- my short-term -- 10 year.

Q.    Now, is Exhibit-2 your entire application? Take a look at it.

A.    Yes, I believe so. I went through back there and filled out the conservation plan and all the deals.

Q.    Incidentally, has the Commission told you that there's a problem with the conservation plan?

A.    No. I've met all criteria except the water availability is my understanding.

Q.    All right. And is your signature on Exhibit-2?

A.    Yes.

MR. WEBB:  Your Honor, we offer Exhibit-2.

JUDGE KEEPER:  Any objection?

MS. HORTON:  No objection.

JUDGE KEEPER:  Admitted.

of the water available for a particular permit?

A. As far as I know, yes.

Q. What do you mean as far as you know?

A. I don't know how it reads.

Q. Well, I don't either. That's why I was asking. So it's a determination of the Executive Director, isn't it?

A. Yes.

Q. Of the water available for a particular application?

A. Yes.

Q. Okay. What is a Water Availability Model?

A. The Water Availability Model is -- I can speak specific to our Water Availability Models that we use as opposed to a generic Water Availability Model.

Q. I'm sorry. Mr. Thomas, I should have been more specific. I only want to hear about the Water Availability Model that you use in the agency.

A. Okay. A Water Availability Model -- Water Availability Model -- our Water Availability Models are designed to simulate the water permits in the basin and the water supply in the basin in priority order and to determine if when all of the senior water rights have been satisfied that there's additional

water available.

Q.   But it's computer simulation, isn't it?

A.   Yes.

Q.   And the computer simulation is two parts, the actual software program, isn't it?

A.   Yes.  There's a WRAP program, which is the word tran program that actually runs the data set. The data set is the input deck.  The WRAP program can be used for different data sets.  We use them as different basin models and then the specific data set that was used here is the Brazos data set which is the input deck.  The input deck or the data set has the specific water rights in the Brazos Basin, their priority dates, their relation to each other, their drainage areas, naturalized flows.  The WRAP program basically orders and runs calculations on that data.

Q.   Okay.  You've been in the Water Availability Department what?  11 years.  Has the Executive Director always used the current Brazos Water Availability Model?

A.   No.

Q.   What did he use before then?

A.   To my knowledge -- it was before I was working at the TCEQ, but to my knowledge there were previous models used, legacy models, and after a

sorry. We offer Exhibit-54.

JUDGE KEEPER: Any objection to the map?

MS. HORTON: No objection. It's fine.

JUDGE KEEPER: Exhibit-54 is admitted.

(Applicant's Exhibit-54 admitted)

Q. (BY MR. WEBB:) Would you identify what's been marked as Exhibit-47?

A. This is a copy of my Water Availability Review memo for Mr. Bradley Ware's application dated November 14, 2006.

Q. And so this is your actual one -- the one that's at bar in this case, correct?

A. Yes.

Q. Now, you were here when Ms. Horton stated the reason why the Executive Director is here?

A. Yes.

Q. And it was a disagreement of whether there was water available?

A. Yes.

Q. And would it be fair to say that the reason why everybody is in this room now is because of Exhibit-47?

A. I suppose so, yes.

Q. Not to put any pressure on you.

A. Thank you for that. It's at the heart of

everything, yes, sir.

Q.    Right.    This is where the Executive Director determined through you that there was no water available --

A.    Yes.

Q.    -- for Mr. Ware or unappropriated water available?

A.    Yes.

MR. WEBB:  Your Honor, off the record, please.

JUDGE KEEPER:  Let's go off the record for a moment.

(Recess from 11:51 a.m. to 11:53 a.m.)

JUDGE KEEPER:  It's five minutes to 12. Why don't we get back here at 1 and we'll start again.

(Noon recess was taken from
11:53 a.m. to 1:04 p.m.)

Q.    Based on an article of faith?

A.    And based on working models that are still working, yes.

Q.    Based on an article of faith?

A.    Okay.  Sure.

Q.    You agree with that?

A.    Sure.

Q.    All right.  Referring to Exhibit-47 right under Water Availability Review, would you please read the last full sentence of that first paragraph?

A.    "The applicant's request was modeled with a priority date of the administrative complete date of the application, January 5th, 2006."

Q.    All right.  Let me stop you there for a moment -- well, not stop you.  That's all there is to say.  Priority date is important for a model because that determines -- that's one of the variables that determines whether or not the unappropriated water is available, right?

A.    Yes.

Q.    As a matter of fact, it's a pretty substantial one, isn't it?

A.    Yes.

Q.    Because after all first in time is first in right.  That's the rule, right?

A.    Yes.

Q.    And so the earlier priority date gives the subject of the model a greater advantage than a later priority date.  Do you understand what I mean by that?

A.    I understand what you mean.

Q.    I'm real bad about stating these things.

A.    I would say greater potential, not greater advantage, but --

Q.    A greater potential of having his water permit granted, right?

A.    Right.

Q.    All right.  So let's look at Exhibit-2.  I don't know whether you have it up there.  It's the application.  Okay.  We're looking at sheet 4 of Exhibit-2 which is the second page of Mr. Ware's permit.  All right.  And I think you know where I'm going.  I'm going to special conditions 3B.  Would you read the last sentence of that special condition?

A.    "The priority date of this permit and all extension hereof shall be July 1st, 1997."

Q.    All right.  And you use a priority date of January 5th, 2006, correct?  Am I correct?

A.    Actually there's -- there's a little deeper story here.

Q.    I would love to hear it.

A.    The administrative complete date of this application was March 20, 2006.

Q.    Okay.  And that's not January 5th, 2006, either, right?

A.    That's correct.

Q.    So when you said the administrative complete date of the application was January 5th, 2006, that's not right, is it?

A.    That's an error.

Q.    All right.  Go on.

A.    When I received the application, I did a preliminary analysis to see if there was water available because we know that that particular water right is in an area of the basin of the state where there's very limited water available.  We do this in an effort to provide information to the applicant to allow them to supplement their application with alternative sources or to withdraw the application without spending money on four days notice if they determine they don't want to proceed with the application because there's limited water.

I did a preliminary analysis from Mr. Ware's application dated January 5th, 2006.  When I put this -- when I put this memo together, it was a clerical error on my part to carry the wrong date for

what the actual -- the actual analysis that is referenced in this memo used a priority date of March 20th, 2006, which is the administrative complete date.

Q. All right. Well, that indicates one aspect of Exhibit-47 that isn't accurate, but what's the story on not using July 1st, 1997?

A. It is our practice in the hydrology group to analyze new permits with the new priority date of the administrative complete date of the application.

Q. And did you think this was a new permit?

A. This was a new application to either renew or extend the term of this permit, yes.

Q. Well, does the Executive Director take the position that he can ignore orders of the TCEQ?

A. I don't know that the Executive Director does or doesn't take that position. I'm directed to process applications with the administrative complete date of the application.

Q. But wait a minute. Were you directed to ignore the fact that the TCEQ granted a permit where any extensions of the permit was to have -- were to have a July 1st, 1997, priority date?

A. I was directed to use the administrative complete date of the application.

Q.    Rather than the date that the agency told you to use?

A.    The agency told me to use the administrative complete date of the application.

Q.    Let's be clear about this.  The Executive Director told you to do that, but the TCEQ -- the actual commissioners directed anybody to use July 1st, 1997.  That's correct, isn't it?

A.    That's written in the -- that's written in his prior permit, yes.

Q.    Well, what does that mean when you say it's written in the prior permit?  What do you think that means?  I mean, read the entire paragraph and you tell me whether or not Mr. Ware qualified.

A.    This is special condition 3, special condition B, the authorization to divert and use 130 acre-feet of water per year shall expire and become null and void on November 7th, 2007, unless prior to such date permittee applies for an extension hereof and such application is subsequently granted for an additional term or in perpetuity.  The priority date of this permit and all extensions hereof shall be July 1st, 1997.

Q.    And Mr. Ware filed for an extension of this permit long before November 7th, 2007, didn't he?

A. Yes.

Q. So that meant he was entitled to a priority date on an extension of July 1st, 1997. Isn't that what that means?

A. That's how it reads, yes.

Q. So the priority date that the Executive Director used to do a Water Availability Review is erroneous, correct?

A. The priority date used to analyze Mr. Ware's application is the administrative complete date of the application which is the date that we use on every application that comes in.

Q. Well, I'm not talking about every application that comes in, Mr. Thomas. I'm talking about this one.

A. Yes, sir.

Q. I'm talking about an amendment to 5594.

A. Yes.

Q. You were directed to use July 1st, 1997, and you used a different one so that your whole Water Availability Review is erroneous, isn't it?

A. I was directed to use the date and --

MR. WEBB: Your Honor, move to strike. Object to the witness as being nonresponsive.

JUDGE KEEPER: Do you have a response to

that?

MS. HORTON: I think it's been asked and answered. I think what he's saying is that his job -- this is what he was told to do. So that's all he can do. He can't make a legal determination whether it's correct or incorrect. That's what his job was.

MR. WEBB: Your Honor, he has certainly not answered my question of why the Executive Director chose to disregard an express provision in a certificate and to use an erroneous priority date that definitely adversely affected Mr. Ware's rights. We need an answer to that in this record.

JUDGE KEEPER: Okay. Well, let me tell you what -- I'm going to give you my perspective on where we are in all of this for better or worse and that is that this gentleman is Mr. Thomas and he is not the Executive Director. So for -- I think what Mr. Thomas can testify to is what is within the scope of his knowledge as a fact witness. I believe he can also testify what is within the scope of his opinion as an expert witness, but only to the extent of his expertise. I don't believe he's an expert with respect to what the Executive Director believes or thinks, but I think he has given us what he knows with regard to what he has been instructed to do. Now

whether that comports with the law or otherwise, that determination will have to be made either through the testimony of another witness or through legal argument.

MR. WEBB: All right. Can we have this question, Your Honor?

Q. (BY MR. WEBB:) So the truth is, Mr. Thomas, you don't know why the Executive Director didn't direct you to use the July 1st, 1997, priority date? You just don't know?

A. I'm told that our practice --

MR. WEBB: Objection to hearsay, Your Honor.

JUDGE KEEPER: Well --

MR. WEBB: Your Honor, he's not entitled to answer my question with hearsay.

JUDGE KEEPER: One second. Response.

MS. HORTON: My response is that if he's asking what the Executive Director does or doesn't do, as you know, we're an organization with several levels above Mr. Thomas. So he can't -- either he can answer everything that -- the questions that are just within his personal knowledge or he can answer questions that are outside of that and say this is what I've been told, this is what I know, but he can't do both.

MR. WEBB:  Absolutely not, Your Honor. I'm not asking this witness to tell me what somebody else told him.  I asked a very precise question and that is you don't know the reason why the director -- the Executive Director told you to use one priority date as opposed to another.

MS. HORTON:  He has --

MR. WEBB:  Now --

JUDGE KEEPER:  Hold on.

MR. WEBB:  Now that's a yes or no question -- answer, Your Honor.  If he knows, fine; if he doesn't know, fine.

MS. HORTON:  May I respond?

JUDGE KEEPER:  Yes.

MS. HORTON:  Obviously he can't know what's in someone else's head, but he can know what that person told him was in his head and that's what he's doing.

MR. WEBB:  That is absolutely worthless information in an administrative record that relies on the rules of evidence, Your Honor.  We're not asking him to say what's in his head and what's not in his head.  If he knows and he has to know using competent probative evidence that satisfies one of the exceptions to the hearsay rule.

JUDGE KEEPER:  Here's what my problem is, Mr. Webb, and that is you began your testimony -- not your testimony, your line of questions beginning with some assertions about the fact that Mr. Thomas' memo of November 14th, 2006, is the action of the Executive Director, correct?

MR. WEBB:  As far as we know.  We haven't heard it's not the actions of the Executive Director.

JUDGE KEEPER:  Right.  So perhaps -- perhaps the manner in which to resolve this sort of legal almost existential question about who is speaking here, maybe the question that ought to be asked of this witness is why he took particular action that he took and if he was directed to take particular action, who did it?  I do not know, but my suspicion is that there maybe be other layers of administration between him the Executive Director.

MR. WEBB:  Well, Your Honor, we're satisfied that the record indicates that Mr. Thomas has said he was directed --

JUDGE KEEPER:  Right.

MR. WEBB:  -- to use the priority date that he did -- well, the priority date that he did, not the one that he wrote down that he did.

JUDGE KEEPER: I understand. Why don't we do this: Let's begin again and let's see where we can get and we will examine more carefully the steps that are taken down the road that you're traveling. So go ahead.

MR. WEBB: All right. We'll try to move on, Your Honor.

JUDGE KEEPER: Mr. Webb, I get it.

MR. WEBB: All right. Thank you.

Q. (BY MR. WEBB:) Incidentally, you weren't told by the Executive Director to ignore all special conditions in the existing permits that are seeking to be renewed, were you?

A. Not specifically, no.

Q. Sounds like a qualification to me. What do you mean not specifically? You were told generally to do that?

A. I was told to use a specific date. I was not told to ignore special conditions.

Q. All right. And I started to ask you this, but isn't July 1st, '97, the proper priority date to use?

A. July 1st, 1997, was the priority date of his previous application. It is the date that is stated in that permit.

134

Q.   Well, if he had made that determination, wouldn't that radically change his opinion in this case?

A.   I don't believe -- I don't know.  I don't believe so.

Q.   Okay.  Let me ask you -- let ask you to identify -- let me ask you what's been marked -- to identify what's been marked as Exhibit-50.

A.   This is a memorandum submitted by Kathy Alexander, hydrologist, on November 25th, 2008.  It's a Water Availability Analysis of the Brazos River Authority application 5851.

Q.   Okay.  And is this a Water Availability Analysis like the one you did for Mr. Ware?

A.   It's a Water Availability Analysis, yes.  I don't know --

Q.   What do you mean by the difference?

A.   I don't know that it's like the one that I did for Mr. Ware because Mr. Ware's -- Mr. Ware's was an application to renew a term permit.

Q.   Do you think this is an application for new authority?

A.   I don't know.

MS. HORTON:  Your Honor, I object to this exhibit entirely.  It's completely irrelevant to

this case.

MR. WEBB: Your Honor, we most certainly believe that this exhibit is not irrelevant whatsoever. At this point we were just asking the witness to identify the exhibit. Our next step is to offer the exhibit -- or actually, Your Honor, pages 1 through 7 of the exhibit.

We only have supplied the party with a copy of the entire document because we wanted to maintain the integrity of it as a certified copy. We actually only one want to offer into the record Exhibit-50 up to page 7 of 14 where the Executive Director makes a determination of the status of existing return flows in the Brazos River Basin at the time the Brazos River Authority came in and in support of the -- in support of our offer, Your Honor, we also submit our trial brief on the admissibility of Exhibit-50. It is our contention, Your Honor, that what we have here is a simple admission by a party opponent.

MS. HORTON: Your Honor, we haven't had an opportunity to brief this issue. I don't think it's fair that the Applicant gets to do that.

JUDGE KEEPER: Well, now, hold on a second. I mean, what happened here is where we are in

the process is that Mr. Webb has -- is heading down the road toward making an offer if he has not already made an offer.  You have objected and his response is --

MR. WEBB:  In part that written document, Your Honor.

JUDGE KEEPER:  Well, I mean, his response is in writing or at least a portion of it.  I mean, there's nothing improper about it, but I'll certainly give you the opportunity to respond in a reasonable fashion within a reasonable period of time.

MR. WEBB:  And to give them an opportunity to respond, we don't mind if we go off the record so that everybody has a chance to read my brief, Your Honor.

JUDGE KEEPER:  What's your preference?

MS. HORTON:  I would prefer to have the opportunity to present a written response tomorrow morning.

MR. WEBB:  Well, Your Honor, we need to be able to go on with the presentation of our case.  If you wish to take the issue under advisement while we continue with our case, we have no objection to that.

JUDGE KEEPER:  And that's acceptable to

you?

MS. HORTON: That's acceptable, yes.

JUDGE KEEPER: Okay. So if you would like to proceed, Mr. Webb.

MR. WEBB: All right. Incidentally, for all assembled, we have attached the copies of the cases to the brief.

JUDGE KEEPER: Mr. Webb, before you go any further, let me just make sure I'm with you. My questions are to your advantage, not to your disadvantage and that is: What you've presented here in Exhibit-50 is an interoffice memorandum which according to you provides some evidence of the existence of some additional -- I want to make sure I understand -- appropriated but unused water in the Brazos River Basin?

MR. WEBB: Absolutely not, Your Honor. That's why our brief lays it all out because it is kind of complicated.

JUDGE KEEPER: Okay.

MR. WEBB: Or not complicated. What Exhibit-50 is it's the same as Exhibit-47. It's the same as Exhibit-49. It is a determination by the Executive Director of the available water in the Brazos River Basin -- the same Brazos River Basin

using the same Brazos WAM using the same period of record and while it is true that the applicant in that case wants to be able to use that unappropriated water --

And that is what we're talking about, Your Honor. We're not talking about appropriated unused water. We're actually talking about unappropriated water. Once you read my brief, you'll see the Executive Director actually makes a determination that 74,387 --

MS. HORTON: Your Honor, I have to object to this. This is testimony as to what the exhibit contains and this is in the nature of a closing argument.

MR. WEBB: Well, Your Honor --

JUDGE KEEPER: Hold on. I'm going to overrule your objection. Mr. Webb, you can continue.

MR. WEBB: Right. The Executive Director makes that determination that 74,387 additional acre-feet is actually already in the Brazos River Basin and is available -- unappropriated water available for appropriation in this case by Brazos River Authority.

Now, we don't care what happens in the BRA application. We really don't. We do care about

that determination made by the same party, the same party in '97 to use a basin, the same party in 2006 to use a basin and after 2006 found out some additional information. Well, maybe he found out from additional expert witnesses elsewhere. It doesn't really matter to us. What matters is that that's the fact that we're talking about.

JUDGE KEEPER: Okay. Ms. Horton, let me clarify my ruling and I apologize. I did not mean to be stern with you or unreasonably stern. What I'm doing is I'm allowing Mr. Webb to make legal argument based upon evidence that has been offered but has not yet been admitted. So I'm willing to listen to whatever it is that he may have within the bounds of reason in terms of legal argument about all of this, but you're certainly not forestalled from making your own legal argument nor am I accepting what he has to say as testimony.

Okay. So I think that the best way to proceed just in terms of administrative/judicial economy here is to allow Mr. Webb to ask questions of this witness about this document and then I'll rule -- and I'll rule on his objection and -- I mean I'll rule on his offer and your objection and if you wish to submit something in writing in response to his trial

brief on admissibility of Exhibit-50, you're certainly welcome to do that. And when do you propose to do that by?

MS. HORTON: First thing tomorrow morning.

JUDGE KEEPER: That's certainly acceptable.

MS. HORTON: May I ask you a question?

JUDGE KEEPER: Certainly.

MS. HORTON: So you're going to go ahead and actually admit it before getting our response brief?

JUDGE KEEPER: No.

MS. HORTON: Okay. Thank you.

JUDGE KEEPER: What I'll do is I'll allow him to ask questions about it, but my choices seem to be to admit it and change my mind; if I decide to change my mind, conditionally admit it; but it's all variations on the same thing. So let's just proceed with the questions and if what I conclude is that it is inadmissible, then the line of questioning and the responses about it will be stricken.

Mr. Webb, please continue.

MR. WEBB: Thank you, Your Honor.

Q. (BY MR. WEBB:) Mr. Thomas, turning to page 3

of 14 -- first let me ask you this:  Is there more than one Brazos River Basin?

A.    No.

Q.    Is there more than one Brazos WAM?

A.    No.

Q.    Okay.  But the Brazos WAM can be updated with additional current conditions information, correct?

A.    Yes.

Q.    And that's what you were talking about earlier, correct?

A.    Yes.

Q.    And that's what the Executive Director apparently did in Exhibit-50, correct?

A.    Apparently, yes.  I'm not familiar with this document or this analysis.

Q.    All right.  The last think I wanted -- well, page 3 under Water Availability Analysis, what is the apparent period of record used by the Executive Director?

A.    1940 through 1997.

Q.    Same one, right?

A.    Yes, sir.

Q.    As you used -- as he used in Mr. Ware's case, correct?

A.    Yes, sir.

Q.   Next page 4 of 14, under return flows, the application requests appropriate of current and future return flow in the Brazos Basin discharged from 136 locations of various entities, right?

A.   Yes.

Q.   So return flows was used to update the current conditions by the Executive Director, correct?

A.   My understanding of reading that sentence is that return flows were used in the analysis in this Water Availability Analysis.

Q.   All right.  And that is what you said are updates of the current conditions, correct?

A.   Those are some of the updates, yes.

Q.   Okay.  So if the Executive Director got some information from whatever source to update the current conditions, that's no more than what you've been saying that the Executive Director does, correct?

A.   That's correct.

Q.   All right.  Next page, the current conditions data, read that out loud into the record.

A.   "The current conditions data set was updated with the amount of current return flows as indicated in the application (74,387 acre-feet which is the sum of the maximum reported annual discharge amounts for each plant)."

Q. So, in other words, the Executive Director was given information that he deemed reliable, correct?

A. Yes.

Q. That updated the current conditions?

A. Yes.

Q. So it's true, isn't it, then that since you wrote your water availability -- I keep getting it mixed up -- since the Executive Director wrote his Water Availability Review in 2006 for Mr. Ware, he learned new information?

A. Yes.

Q. And that information is now being sought to be used by somebody else?

A. Yes.

Q. Any reason why it couldn't be used for Mr. Ware since this hearing is taking place after he learned the new information?

A. I did not have this information.

Q. I'm not asking you that. I know you didn't, but is there any reason you can think of that Mr. Ware shouldn't be able to use this new information that the Executive Director has learned since he did the review in Exhibit-47? Any reason you can think of as an engineer?

A. Yes. One possible answer is the return flows from specific plans and the way that the Executive Director has directed us as the hydrologists to consider that information and to write permits based on return flows.

Q. Why would that make any difference?

A. Because we are directed by the Executive Director and I'm directed by my supervisors that we only write permits to authorize return flow to either the original source diverter of that water or to the discharger of that water --

Q. Well, now --

A. -- if either of those -- either of those entities are the ones who should be applying for return flows.

Q. Well, did I read Exhibit-50 wrong or was the Executive Director saying that other return flows other than from BRA were subject to BRA's use as potential sources of appropriated water?

A. I don't know. I'm not familiar with this document. I didn't prepare this document.

Q. All right. Next sentence, page 5 of 14, after the one that we read, read that into the record, the request to reuse.

A. "The request to reuse return flows was

modeled at the most downstream point in the basin to determine the volume of return flows available to BRA on a basin-wide basis."

Q. So the question -- the issue in Exhibit-50 is how can BRA use the additional return flows on a basin-wide basis. Did I misstate that?

A. I'm not sure that I understand the question. I'm sorry.

Q. Well, have I misstated that the issue in -- as represented in that sentence that you just read is the question of whether BRA should be able to use those return flows on a basin-wide basis? That's the issue, isn't it?

MS. HORTON: Your Honor, I would like to object. He's already stated that he is not familiar with this document.

MR. WEBB: Well, then, Your Honor, we should allow the professional engineer representative of the Executive Director to become at least familiar enough to be able to understand what the sentence says.

JUDGE KEEPER: So are you proposing that we take a break to allow him to read the document?

MR. WEBB: Absolutely, Your Honor, at least pages 1 through 7.

JUDGE KEEPER: Before we do that, Mr. Thomas, let me ask you a quick question. If we were to take a short break for you to be able to read this information, do you anticipate that you would be able to respond to Mr. Webb's question or shall we just take a break and see what happens?

THE WITNESS: I'm still not sure that I understand Mr. Webb's question, but I'm also not sure that just reading this document gives me all the background information that was used to prepare this document to know how the decision was made and how to answer his question.

MR. WEBB: Well, Your Honor, I'm certainly not asking this witness to give us any information of all the background information. Honestly, Your Honor, we don't care where the background information came from. All we know is that this party in this case has, since he told our client that there's no water available, made a determination that there's another 74,000 acre-feet available. He made that determination. This is an official release determination.

Mr. Thomas, discussed earlier in his testimony how the Executive Director works. He makes determinations, et cetera, et cetera of the water

availability. It's not -- we're not trying to retry BRA's application. We're not trying to try it. I understand it hasn't been tried. We don't want to. We don't care what BRA wants to do. We don't care how they want to use it. We don't care where they want to use it. We don't care what they use to give the information to the Executive Director if that's how it happened.

All we know is that the Executive Director bought it; that they agreed; they said yes, the water is there; the water is there for reappropriation and let's see what we do with your application. Well, the let's see what we do with application part is of no consequence to us. It's the determination that the water is there in the basin. That's the specific factual determination that is to say the least a little relevant and material in this case and that's all we care about.

So we don't need Mr. Thomas or want Mr. Thomas to tell us how the Executive Director came to make that determination, only to confirm that he did.

JUDGE KEEPER: Okay. Ms. Horton, do you wish to make a response?

MS. HORTON: No. That was the question

he asked and I think Mr. Thomas can read the document and answer that question of what his determination was.

JUDGE KEEPER: Okay. Let's take a short break. Mr. Thomas, if you'll read those seven pages and when you're -- we'll go off the record while you are. When you're ready, just signal and we'll come back on the record.

(Recess from 1:55 p.m. to 2:02 p.m.)

JUDGE KEEPER: So if we're ready, let's go back on the record. And, Mr. Thomas, have you had an opportunity to complete reading the seven pages of Exhibit-50?

THE WITNESS: Yes, I have.

JUDGE KEEPER: Thank you very much. And so, Mr. Webb, have you a question?

Q. (BY MR. WEBB:) So the question is: Did the Executive Director make the determination that another 74,387 acre-feet of additional water was available to BRA for use in its application?

A. Yes.

Q. All right. Isn't there a law regarding the use of return flows?

A. I'm not sure that I understand that question.

Q. Well, I don't want to be cryptic. Doesn't

Section .046 of the Texas Water Code, doesn't it capture return surplus water?

MR. WEBB: Your Honor, would you like to read along with us? We have another --

JUDGE KEEPER: What section are we looking at?

MR. WEBB: 11.046.

JUDGE KEEPER: Thank you.

Q. (BY MR. WEBB:) Would you read the highlighted section?

A. Yes. This is Section 11.046(c): "Once water has been diverted under a permit, certified filing, or certificate of adjudication and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication."

Q. So that means that some of that 74,387 acre-feet of water is available to Mr. Ware for reappropriation, correct?

A. I can't say that I know that.

Q. Okay. The point is you didn't use any portion of that additional water in the basin in your

model?

A. That's correct.

Q. Okay. And because of how the model works, the Brazos WAM works, additional water anywhere in the basin is used to assess whether or not a particular water right would have a negative impact on all of the water rights, isn't it?

A. I'm sorry. I'm not sure exactly what you're asking.

Q. Additional unappropriated water would benefit the entire basin, wouldn't it?

A. Yes.

Q. And so it doesn't matter whether it's above Mr. Ware, below Mr. Ware, above Stillhouse Hollow Lake, below it? It would benefit everyone, wouldn't it?

A. It would benefit everyone downstream of it and potentially that -- yes, I can -- I can say that it would benefit everyone in the basin, yes.

Q. Because after all, even if you're upstream where all of that beneficial water -- additional beneficial water is coming in, you don't have to count the -- the person upstream of where it's all coming in can use it all and the people downstream wouldn't have to worry, correct? And I'm being simplistic.

A.    There are situations where it would change priority calls and benefit everyone in the basin.

Q.    Incidentally, what was the priority date that the Executive Director used -- and I know it's not really relevant, but it's in the first seven pages. At the top of page 5 through 14, what was the priority date used?

A.    Priority date of October 15th, 2005 -- 2004.

Q.    So BRA even has a later priority date than Mr. Ware's July 1st, 1997, priority date?

A.    October 15th, '04, is later than July of '97, yes.

Q.    Not later than January 5th, 2006, is it?

A.    No.

Q.    Or March something 2006 either?

A.    That's correct.

Q.    All right.  So that wrong priority date really does hurt Mr. Ware, doesn't it?

MS. HORTON:  I'm sorry.  I think that's another mischaracterization.

MR. WEBB:  I'll withdraw that question, Your Honor.

Q.    (BY MR. WEBB:)  And just so the record is clear, you certainly didn't include -- you already answered that.  I don't have to ask that.  I'm almost

done, Mr. Thomas.

I don't know whether I've asked you this or not. You can't think of any reason why Mr. Ware wouldn't be entitled to any of this additional water that the Executive Director has discovered, do you?

A. No.

Q. Now, in light of Exhibit-50, isn't it -- wouldn't you agree with me, Mr. Thomas, that the analysis done by the Executive Director before he had this additional information really doesn't help the administrative law judge very much in making a determination of water availability for Mr. Ware, does it?

A. Are you asking if my analysis is useful?

Q. Yes. In light of all this new water that's not put into the model.

A. I believe my analysis is still useful and still correct.

Q. Correct from the terms of when it was done?

A. I believe it's still correct today.

Q. So are you stating that an additional 74,387 acre-feet wouldn't make any difference to a farmer's application for 150 acre-feet on a term permit basis?

A. If that additional 74,000 acre-feet were available to Mr. Ware and anyone else in the basin, it

would be. My understanding of this from reading this application is that that 74,000 acre-feet is from water rights owned by or discharged in connection with BRA and that it's not new water introduced to the basin. It's BRA's water that they are using.

Q. If you look at the last paragraph of Exhibit-50, page 4 of 14 going up to 5 of 14, doesn't that indicate that only certain portions of the 74,387 acre-feet were explicitly granted based on return flows now being claimed as part of the application?

Withdraw that question. I have a better question.

Looking at Exhibit-50 page 5 of 14, the sentence that begins because of this and part of the sentence before that starts at the 4 of 14, doesn't the Executive Director acknowledge that other parties other than BRA are entitled to some of these return flows?

A. The Executive Director recognizes that other parties have been granted water rights based in part on the presence of those return flows.

MR. WEBB: No further questions. We pass the witness.

MS. HORTON: I want to give the Public Interest counsel an opportunity to ask his questions.

## CROSS EXAMINATION

**QUESTIONS BY MR. ARTHUR:**

Q. Good afternoon, Mr. Thomas. So am I correct that the Brazos River WAM is updated periodically or the inputs or the data set?

A. The inputs and the data set are updated. As we grant new water rights, those new water rights are included in the data set.

Q. Okay. So at the timing of the updating, it is based on a new water right?

A. Well, there's also -- there's also an effort to make sure that the return flows are accounted for appropriately. That's not done on a regular basis. The water rights are added basically because they're -- they're added to perform an analysis and if that analysis indicates that a water right should be granted, then they're included in the latest version as those water rights become granted. An effort to go through and check and update the naturalized flows or to go throughout the whole basin and update all of the return flows is not done on a specific regular basis.

Q. Okay.

A. It's done as resources are available within the water right scheme.

Q. So recognizing that current conditions is

# Exhibit E

# April 20, 2010 Final Order of TCEQ

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 23, 2010

TO: Persons on the attached mailing list.

RE: Bradley B. Ware
TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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
Water Use Permit No. 5594

**Decision of the Commission on Application.**

The Texas Commission on Environmental Quality ("TCEQ" or "Commission") has made a decision to deny the above-referenced application. Enclosed with this letter is a copy of the Commission's order. Unless a Motion for Rehearing ("MFR" or "motion") is timely filed with the chief clerk, as described below, this action of the Commission will become final. A MFR is a request for the Commission to review its decision on the matter. Any motion must explain why the Commission should review the decision.

**Deadline for Filing Motion for Rehearing.**

A MFR must be received by the chief clerk's office no later than 20 days after the date a person is notified of the Commission's order on this application. A person is presumed to have been notified on the third day after the date that this order is mailed.

Motions may be filed with the chief clerk electronically at http://www10.tceq.state.tx.us/epic/efilings/ or by filing an original and 7 copies with the Chief Clerk at the following address:

> LaDonna Castañuela, Chief Clerk
> TCEQ, MC-105
> P.O. Box 13087
> Austin, Texas 78711-3087
> Fax: 512/239-3311

In addition, a copy of the motion must be sent on the same day to each of the individuals on the attached mailing list as indicated by an asterisk (*). A certificate of service stating that copies of the motion were sent to those on the mailing list must also be sent to the chief clerk. The procedures for filing and serving motions for rehearing and responses are located in 30 Texas Administrative Code (TAC) §80.272 and 30 TAC §1.10-1.11. The hardcopy filing requirement is waived by the General Counsel pursuant to 30 TAC §1.10(h).



The written motion must contain (1) the name and representative capacity of the person filing the motion; (2) the style and official docket number assigned by SOAH or official docket number assigned by the Commission; (3) the date of the order; and (4) a concise statement of each allegation of error.

Unless the time for the Commission to act on the motion is extended, the MFR is overruled by operation of law 45 days after a person is notified of the Commission's order on this application.

If you have any questions or need additional information about the procedures described in this letter, please call the Office of Public Assistance toll free at 1-800-687-4040.

Sincerely,

LaDonna Castañuela
Chief Clerk

LDC/ms


Enclosures

147

Bradley B. Ware
TCEQ Docket No. 2008-0181-WR
SOAH Docket No. 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

FOR THE APPLICANT:

Stephen P. Webb
Gwendolyn Webb
Webb & Webb
712 Southwest Tower
211 East 7th Street
Austin, Texas 78701

Bradley B. Ware
911 Gann Branch Road
Killeen, Texas 76549

INTERESTED PERSONS:

Andrew Miller
Kemp Smith LLP
816 Congress Avenue, Suite 1150
Austin, Texas 78701

Gene W. Ray, DVM
Town & Country Veterinary Medical Center
505 East Elms Road
Killeen, Texas 76542

Bruce Wasinger
Bickerstaff Heath Delgado Acosta LLP
3711 South MoPac Expressway
Building 1, Suite 300
Austin, Texas 78746

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Shana Horton, Staff Attorney
James Aldredge, Staff Attorney
Texas Commission on Environmental Quality
Environmental Law Division MC-173
P.O. Box 13087
Austin, Texas 78711-3087

Steve Ramos, Technical Staff
Texas Commission on Environmental Quality
Water Supply Division MC-160
P.O. Box 13087
Austin, Texas 78711-3087

FOR OFFICE OF PUBLIC ASSISTANCE
via electronic mail:

Bridget Bohac, Director
Texas Commission on Environmental Quality
Office of Public Assistance MC-108
P.O. Box 13087
Austin, Texas 78711-3087

FOR PUBLIC INTEREST COUNSEL
via electronic mail:

Garrett Arthur, Attorney
Texas Commission on Environmental Quality
Public Interest Counsel MC-103
P.O. Box 13087
Austin, Texas 78711-3087

FOR THE CHIEF CLERK
via electronic mail:

LaDonna Castañuela
Texas Commission on Environmental Quality
Office of Chief Clerk MC-105
P.O. Box 13087
Austin, Texas 78711-3087

* The Honorable Paul Keeper
Administrative Law Judge
State Office of Administrative Hearings
P. O. Box 13025
Austin, Texas 78711-3025

* Courtesy Copy via inter-agency mail

148

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY



THE STATE OF TEXAS
COUNTY OF TRAVIS
I hereby certify that this is a true and correct copy of a
Texas Commission on Environmental Quality document,
which is filed in the permanent records of the Commission.
Given under my hand and the seal of office on

APR 2 3 2010

LaDonna Castañuela, Chief Clerk
Texas Commission on Environmental Quality

AN ORDER Concerning the Application of Bradley B. Ware to amend water use Permit No. 5594; TCEQ Docket No. 2008-0181-WR; SOAH Docket No. 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

On April 14, 2010, the Texas Commission on Environmental Quality (TCEQ of Commission) considered the application (Application) of Bradley B. Ware to Amend Water Use Permit No. 5594 (Permit). A Proposal for Decision (PFD) was presented by Paul D. Keeper, an Administrative Law Judge (ALJ) with the State Office of Administrative Hearings (SOAH), who conducted a hearing in this case from October 28 through October 29, 2009, in Austin, Texas.

After considering the ALJ's PFD, the Commission adopts the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

*General Findings*

1. The applicant is Bradley B. Ware. Mr. Ware owns a 261-acre farm on the Lampasas River, about 15 miles southwest of Killeen, Texas.

2. Mr. Ware's street and mailing address is 911 Gann Branch, Killeen, Texas 76549.

3. Mr. Ware's farm is located in Bell County, Texas, and is within the Brazos River basin.

*History of the Permit*

4. On November 7, 1997, the Commission issued Mr. Ware the Permit for a ten-year term.

5.  The Permit authorized Mr. Ware to divert and use 130 acre-feet of water annually from the Lampasas River to irrigate 100 acres.

6.  The Permit also established July 1, 1997 as "the priority date of this permit and all extensions hereof . . . ."

7.  The Permit was to expire on November 7, 2007, unless before that date, Mr. Ware received the Commission's approval to extend the term or to convert the Permit to a ·perpetual right.

8.  Mr. Ware's rights under the Permit remained in effect pending a final administrative ruling on the Application.

9.  During the twelve years in which Mr. Ware has had irrigation rights, he has farmed hay, pumpkins, wheat, sorghum, oats, and winter peas.

10. Mr. Ware has tried to impound his water by installing six or seven earthen tanks, but the composition of the soil limits the amount of water that the tanks will retain.

11. Mr. Ware has purchased 100 acre-feet of water rights and installed 8,000 to 10,000 feet of two-inch pipes, plus an eight-inch pipe to a central pivot system.

12. On November 15, 2005, Mr. Ware timely filed his Application to: (1) either extend his Permit for another ten-year period or convert his Permit to a perpetual right, (2) withdraw 20 more acre-feet of water annually, and (3) irrigate 31 more acres of his farm.

13. On January 5, 2006, the ED determined that the Application was administratively complete.

14. On June 7, 2006, the Brazos River Authority contested the application.

15. On November 4, 2006, the ED's surface water availability and interstate compacts team completed a water availability review and determined that there was not sufficient water available at the Applicant's location to support the requested demand.

16. On November 6, 2006, the ED recommended denial of the Application.

2

151

17. On January 8, 2007, Mr. Ware requested a contested case hearing at SOAH.

18. On January 25, 2008, the Commission directly referred the case to SOAH for a hearing on the merits.

19. On April 3, 2008, the SOAH administrative law judge (ALJ) convened a preliminary hearing and took jurisdiction.

20. On January 12, 2009, the Brazos River Authority was granted the right to withdraw as a protesting party.

21. On October 1, 2008, the ALJ issued an order following a telephonic prehearing conference and notified the parties that the hearing on the merits would be held March 18 through 19, 2009.

22. At the request of Mr. Ware, the hearing on the merits was rescheduled to convene October 29 through 30, 2009.

23. The hearing convened on October 28, 2009, and adjourned on October 29, 2009. The administrative record closed on December 21, 2009, after closing arguments and replies were filed.

*ED's recommendation to deny the Application*

24. After Mr. Ware filed his Application in 2005, the ED's Surface Water and Interstate Compacts Team determined that "little to no water" was available at Mr. Ware's diversion point on the Lampasas River, without regard to whether the amended Permit would have a perpetual or limited term.

25. The ED's Surface Water Availability and Interstate Compacts Team confirmed the hydrologist's conclusion in a water availability review memo that calculated that insufficient water was available at Mr. Ware's diversion point to support even the original 130 acre-feet of term-limited appropriation rights.

3

26. In recommending denial of the Application, the ED relied on the Commission's Water Availability Model for the Brazos River basin (Model). The calculation used a historical period of record of 1940 to 1997.

27. Although previous water availability models were developed and used by the Commission, the current Model has been in use since 2001. The Commission has relied on the Model in evaluating all applications for appropriative rights since then.

28. In evaluating the Application with the Model, the ED used a priority date of January 5, 2006, the date on which the Application was administratively complete.

29. The Model predicts that Mr. Ware's current request could be satisfied at a 100% level in none of the years and at least 75% in 5.2% of the years.

*Standing*

30. The evidence presented by the ED at the hearing on the merits was generated by the Commission or was offered to support the integrity of the Commission's underlying information.

*The reliability of the Model*

31. The Model is designed to be the most accurate method available to the ED without regard to the size of the request for water.

32. The design relies in part on the Model's use of a period of record.

33. The period of record gives the Commission a set of historical boundaries ranging from the most severe basin-wide drought to the most severe flood periods ever recorded.

34. The historical period was developed by the Commission in conjunction with other state agencies and outside consultants.

35. The Model relies on an applicant's particular location within a river basin to determine availability.

4

36. If an applicant's diversion point is located within a large drainage area, then the applicant would be able to rely on large streamflows and potentially greater water availability.

37. The Commission gathers information about streamflows by relying on gauge information and data from other sources.

38. Where gauge information is unavailable, then the Commission may extrapolate information based on the readings at nearby gauging stations. This type of adjustment occurs during the creation of the naturalized flow data set.

39. Naturalized flow data has value to the Commission because it reflects the flows that would have occurred without the impacts created by human diversions and storage of water.

40. The Model takes into account an application's priority date in evaluating a request.

41. The role of the priority date is to determine the seniority status of a particular appropriative right previously given by the Commission.

42. By examining an application in terms of period of record, location, and priority date, the ED is able to evaluate an application of any size in terms of the current conditions presented.

43. At this time, the inclusion of more recent gauge flow data would have no effect on the range of data reflected in the historical period of record used in the Model.

44. The addition of "new water," if it were proved to exist, would be subject to all prior appropriation rights of senior water rights holder and could not be treated as available for new allocation.

45. The full amount of the Brazos River Authority's requested return flows become available only at the furthest downstream point in the basin; diversions at other points are possible due to specific facts and circumstances of that application.

5

154

*Priority dates*

46. The priority date of Mr. Ware's current Permit is July 1, 1997, and applies to "all extensions . . . ."

47. The priority date in the Permit has no relation to applications for new permits or to any matter other than establishing when the permit holder began the appropriation of water or when the permit holder acquired the right to use the water.

48. The priority date of Mr. Ware's application was established on the date on which it became administratively complete, January 5, 2006.

49. The Brazos River Authority is seeking a permit from the Commission to appropriate an additional 421,449 acre-feet per year of unappropriated water, or several thousand times the amount that Mr. Ware is seeking authority to appropriate from the same river basin.

50. The priority date of the application of the Brazos River Authority is October 15, 2004.

51. The priority date of the Brazos River Authority's application is earlier than that of Mr. Ware's application.

52. The ED engaged in no manipulation of the priority dates in recommending the denial of Mr. Ware's application.

## II. CONCLUSIONS OF LAW

1. The Commission has jurisdiction over the determination of water rights in Texas rivers and streams. TEX. WATER CODE ANN. ch. 11.

2. Notice was provided in accordance with TEX. WATER CODE ANN. § 11.132, 30 TEX. ADMIN. CODE (TAC) ch. 295, subch. C; and TEX. GOV. CODE ANN. §§ 2003.051 and 2003.052.

3. SOAH has jurisdiction to conduct a hearing and to prepare a Proposal for Decision in contested cases referred by TCEQ. TEX. GOV. CODE ANN. § 2003.47.

6

155

4. The Application became administratively complete on January 5, 2006. TEX. WATER CODE ANN. § 11.141 and 30 TAC § 297.44(c)

5. The Application was processed and the proceedings described in this Order were conducted in accordance with applicable statutes and the rules of the Commission and SOAH. TEX. WATER CODE ANN. ch. 11; 30 TAC ch. 80, 1 TAC ch. 155.

6. Mr. Ware held the burden of proof. 30 TAC § 80.17(a). Mr. Ware did not meet his burden.

7. Any person may appear at a hearing at which the issuance of a permit is to be considered. TEX. WATER CODE ANN. § 11.133.

8. The ED is required to participate as a party in contested hearings relating to applications about water rights. 30 TAC § 80.108(b)(1).

9. The ED is required to represent the Commission in hearings that raise matters that affect the public's interest in the state's environment and natural resources, including matters that have been determined to be policies of the state. TEX. WATER CODE ANN. § 5.228(a).

10. In contested case permit hearings, the ED's presentation is limited to "the sole purpose of providing information to complete the administrative record." TEX. WATER CODE ANN. § 5.228(c).

11. In a contested hearing, the ED's presentation is limited to "information developed by the Commission . . . ." TEX. WATER CODE ANN. § 5.228(a).

12. In a contested hearing, the ED may provide information that opposes an application, as long as the information is within the limits of the law. TEX. WATER CODE ANN. § 11.133.

13. All parties to a contested case have the right to present a direct case and to cross-examine the opposing party's evidence. 30 TAC § 80.115(a).

7

14. The ED has standing to appear as a party in this proceeding and was authorized to present the Commission's evidence and arguments in opposition to Mr. Ware's case.

15. An applicant may request that an application be remanded to the ED for action as an uncontested matter if: (1) all timely hearing requests have been withdrawn or denied or (2) all parties to a contested case reach a settlement so that no facts or issues remain controverted. 30 TAC § 80.101.

16. A hearing was required in this case because the ED remained a party to a contested case after the Brazos River Authority withdrew its opposition and because there was not a settlement between the remaining parties.

17. Scientific testimony presented by a party must be offered through the testimony of an expert, and that testimony must be based on a reliable foundation. TEX. R. EVID. 702.

18. A finder of fact is to determine the reliability of the evidence, and "[u]nreliable expert testimony is not evidence." *Gross v. Burt*, 149 S.W.3d 213, 237 (Tex. App.—Fort Worth 2004, pet. denied).

19. To establish the reliability of an expert's testimony, an offering party must first establish the reliability of the analysis that the expert used in reaching his conclusions. Six nonexclusive factors are used in determining whether scientific testimony is reliable:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses that have been made of the theory or technique.

8

*Gross v. Burt*, 149 S.W.3d at 237, citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997), *cert. denied*, 523 U.S. 1119 (1998) and *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

20. Mr. Ware did not establish that the method used by Mr. Jones, Mr. Ware's expert witness, was reliable.

21. The water of every flowing river in the State of Texas is the property of the state, and the Commission is the state's agent for the regulation of its water. TEX. WATER CODE ANN. § 11.021(a).

22. The Commission has the authority to allow persons to appropriate state water for specific uses. TEX. WATER CODE ANN. § 11.022.

23. The Commission may grant permits to applicants who seek to appropriate unappropriated state water. TEX. WATER CODE ANN. § 11.124.

24. The amount of water for which the Commission may grant permits may not be more than is available. TEX. WATER CODE ANN. § 11.023(e).

25. In 1967, the Texas legislature abandoned the state's former system of recognizing both riparian and appropriative rights. *In re Adjudication of Water Rights of Brazos III Segment of Brazos River Basin*, 746 S.W.2d 207, 209 (Tex. 1988).

26. In place of the former system, the legislature adopted "an orderly forum and procedure for the [Commission's] adjudication and administration of water rights." *Brazos III*, 746 S.W.2d at 209.

27. The Commission is required to "provide certainty in water management" by evaluating the state's major river basins. TEX. WATER CODE ANN. § 11.0235(d-2).

28. For all permits, the holder has the right to appropriate water only to the extent and for the purposes stated in the permit and subject to the protection of the holders of senior water rights. TEX. WATER CODE ANN. §§ 11.135(a) and 1351.

9

158

29. An "appropriative right" is the right to impound, divert, store, take, or use a specific quantity of state water acquired by law. 30 TAC § 297.1(4).

30. The holder's rights to appropriate water may be affected by the amounts that the holder actually uses or can beneficially use, and "all water not so used is considered not appropriated." TEX. WATER CODE ANN. § 11.025.

31. If the holder of a permit does not beneficially use his water, then the right of appropriation is considered to be not perfected. TEX. WATER CODE ANN. § 11.026.

32. The Commission has discretionary authority to temporarily reallocate unperfected appropriative water rights to persons other than the regular permit holder. An applicant may seek a term permit, a permit that is issued for a term of years rather than in perpetuity. TEX. WATER CODE ANN. §§ 11.1381(a) and 11.026.

33. A term permit allows an applicant to use water rights that have not been perfected by the holders. A term permit creates derivative rights, not original rights, so that the maximum use of water may be achieved. TEX. WATER CODE ANN. § 11.123.

34. The Commission may deny an application for a term permit if the permit will jeopardize financial commitments for water projects or if the permit will prevent the holder of the senior appropriative right from beneficially using his rights during the period of the term permit. TEX. WATER CODE ANN. § 11.1381(b) and (c).

35. If the Commission approves a permit, then the rights that it confers are subordinate to any senior appropriative rights. TEX. WATER CODE ANN. § 11.1381(d).

36. The Commission may issue a term permit "when there is insufficient unappropriated water in the source of supply to satisfy the application." 30 TAC § 297.19(a).

37. A holder of a senior appropriative right may challenge an application for a term permit by showing that the Commission's issuance of a term permit would adversely affect the holder's beneficial use of its senior rights. In proving this adverse effect, the holder may use as its proof: water use projections in the state or regional water plans, economic

10

indicators, population growth projections, electrical generation needs, or "other reasonable projections based on accepted methods." 30 TAC § 297.19(b)(2).

38. The Commission may deny an application if the proposed permit would be detrimental to the public welfare. 30 TAC § 297.19(b)(4).

39. In 1997, the Texas legislature mandated the Commission to adopt an updated water availability model (Model) for six river basins in Texas. TEX. WATER CODE ANN. § 16.012(g).

40. For direct diversions from a stream without sufficient water storage facilities, an applicant must prove that approximately 75% of the water requested is available approximately 75% of the time when distributed on a monthly basis and based on the available historic stream flow record. 30 TAC § 297.42.

41. Neither the ED nor an applicant is required to use the Model in determining whether water is available in each river basin in Texas.

42. The Commission has the authority to contract for "scientific and technical environmental services," including scientific data analysis, to be used in the modeling to be conducted by the ED. TEX. WATER CODE ANN. § 5.2291(a).

43. The ED has the authority to rely on scientific data analysis in enforcing the terms of a permit and in presenting information about an application for a permit. TEX. WATER CODE ANN. § 5.230.

44. A contesting permit holder may rely on "reasonable projections based on accepted methods," and an applicant and the ED may do the same. 30 TAC § 297.19(b)(2).

45. The Commission may use approximate numbers in estimating water availability in permit application proceedings. 30 TAC § 297.42(c).

46. For every permit, a priority date is established for the appropriation of water and for the claimant's right to use the water. TEX. WATER CODE ANN. § 11.141.

11

47. The measuring date for these priority dates is the date of filing of an administratively complete application. 30 TAC § 297.44(c).

48. The date on which a priority date comes into being is "[w]hen the Commission issues the permit . . . . " 30 TAC § 297.44(c).

49. An applicant's right to take and use water is limited "to the extent and purposes stated in the permit." TEX. WATER CODE ANN. § 11.135(a).

50. A permit may include special conditions that limit the total amount of water that may be diverted. TEX. WATER CODE ANN. § 11.135(b)(5).

51. With respect to all types of permits, the Commission may include " . . . conditions and restrictions . . . to protect the priority of senior water rights." TEX. WATER CODE ANN. § 11.1351

52. Each term permit is subject to the unique statutory limitation making term permits "subordinate to any senior appropriative rights." TEX. WATER CODE § 11.1381(d).

53. Courts generally interpret undefined terms according to their ordinary meaning. TEX. GOV'T CODE ANN. § 311.011(a); *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992).

54. In affirmative sentences, the ordinary meaning of "any" is "every" or "all." BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 52 (3d ed. 2009).

55. Term permits are subordinate to all senior water rights. TEX. WATER CODE ANN. § 11.1381(d); 30 TAC § 297.19(a).

56. Mr. Ware failed to carry his burden of proving that sufficient water exists in the Brazos River basin or that all applicable statutory and regulatory requirements have been met to warrant issuing to him the proposed Water Use Permit No. 5594A.

57. Pursuant to the authority of, and in accordance with, applicable laws and regulations, the requested Permit should not be granted.

12

161

58. Pursuant to 30 TEX. ADMIN. CODE ANN. §§ 80.23(d)(2), the Executive Director and Office of Public Interest Counsel may not be assessed any portion of the transcript and reporting costs.

## III. EXPLANATION OF CHANGES

1. The Commission sustained the ED's Exceptions regarding Findings of Fact Nos. 24, 25, 34, 37, 38, 39, 43, 45 and Conclusion of Law No. 40, as recommended by the ALJ in his March 17, 2010 reply to the parties' post-PFD submissions.

2. The Commission modified Finding of Fact No. 29 to provide consistency with the TCEQ's water availability review, included in the record as Applicant's Exhibit No. 47. The change was consistent with the ED's Exceptions.

NOW, THEREFORE, BE IT ORDERED BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, IN ACCORDANCE WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW THAT:

1. The application of Bradley B. Ware to amend Water Use Permit No. 5594 is denied.

2. The Applicant shall pay the court reporting and transcript costs for this case.

3. The Chief Clerk of the Commission shall forward a copy of this Order to all parties, and no amendment to Water Use Permit No. 5594 shall be issued.

4. All other motions, requests for specific Findings of Fact or Conclusions of Law, and other requests for general and specific relief, if not expressly granted, are denied for want of merit.

13

5.  If any provision, sentence, clause, or phrase of this Order is for any reason held to be invalid, the invalidity of any portion shall not affect the validity of the remaining portions of this Order.

6.  The effective date of this Order is the date the Order is final, as provided by 30 TAC § 80.273 and TEX. GOV. CODE ANN. § 2001.144.

ISSUED: APR 2 0 2010

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

Bryan W. Shaw, Ph.D., Chairman

14

# Exhibit F

# August 28, 1997 Interoffice Memorandum regarding Water Availability Analysis

# Texas Natural Resource Conservation Commission

## INTEROFFICE MEMORANDUM

To:    Kariann Sokulsky, Manager           August 28. 1997
         Water Rights Permitting and Conservation Section
         Water Quantity Division

Through: Herman Settemeyer, Leader
         Surface Water Availability & Interstate Compact Team
         Water Quantity Division

From:    Shiyan Jiang
         Surface Water Availability & Interstate Compact Team
         Water Quantity Division

Subject:  Bradley B. Ware, Application
         Lampasas River
         Brazos River Basin
         Bell County

## WATER AVAILABILITY ANALYSIS

### Application Summary

The applicant is seeking authorization to divert 130 acre-feet per year for irrigation purposes from the Lampasas River, tributary of the Little River, tributary of the Brazos River, the Brazos River Basin. The maximum diversion rate is 1.11 cfs (500 gpm).

### Downstream Water Rights of Record

There are 24 downstream water rights of record on the Lampasas River, authorizing 69,111 acre-feet per year for municipal, industrial, irrigation and mining purposes.

Reported consumptive use for these water rights during the period of 1970 through 1989 averaged 10,532 acre-feet per year (15 percent of the authorized amount) with a maximum in 1973 of 64,010 acre-feet (93 percent of the authorized amount).

There are 61 further downstream water rights of record on the Little River and the Brazos River, authorizing 817,744 acre feet per year for municipal, industrial, irrigation, mining, recreation and other purposes.

Reported consumptive use for these water rights during the period of 1970 through 1989 averaged 364,394 acre-feet per year (45 percent of the authorized amount) with a maximum in 1970 of 424,600 acre-feet (52 percent of the authorized amount).

EXHIBIT
F
PENGAD 800-631-6989

## Estimated Streamflow and Streamflow Simulation

Staff used two USGS gages to estimate streamflow at the appli...ant's location: 1) USGS gage 08104000 on the Lampasas River at Youngsport, Texas, which is located about 11 miles downstream of the applicant's location; 2) USGS gage 08103800 on the Lampasas River near Kempner, Texas, which is located about 13 miles upstream of the applicant's location. For the period of 1940 through 1993, the estimated streamflow at the applicant's location averaged 164,560 acre-feet per year with a maximum flow of 661,245 acre-feet in 1992 and a minimum flow of 11,692 acre-feet in 1951.

The Environmental Analysis for this application has recommended an instream flow restriction of 16 cfs at the applicant's location (or 12 cfs at USGS Gage No. 08103800) during the months July through March and 51 cfs at the applicant's location (or 32 cfs at USGS Gage No. 08103800) during the other months.

Using estimated streamflow, staff performed direct diversion simulation for the demand of 130 acre-feet per year with the streaflow restriction. Simulation results indicate that, for the period of 1940 through 1993, 100 percent and at least 75 percent of the demand of 130 acre-feet per year would be met in 44 and 78 percent of years, respectively. Monthly demand would be met in 84 percent of months.

## Unappropriated Water

The Commission's revised water availability computer model (Run V) for the Brazos River Basin indicates that there is inadequate unappropriated water available at the applicant's location. For the period of 1940 through 1979, 100 percent, at least 75 and 50 percent of the demand of 130 acre-feet per year would be met in 0, 0 and 27 percent of years, respectively.

## Summary

Based on this hydrological analysis, streamflow at the applicant's location is adequate to meet the requested demand of 130 acre-feet per year, but unappropriated water at the applicant's location is not adequate. However, the downstream water rights have not fully developed. Therefore, the hydrological analysis only supports issuance of a ten year term permit for the applicant.

Shiyan Jiang, (Ph.D),
Engineering Specialist

# HYDROLOGY UNIT ANALYSIS FACT SHEET

Applicant: Bradley B.Ware
Water Right:
River Order No: 1641680000
Stream: Lampasas River
Basin: Brazos River                                    County: Bell
Requested Amount: 130 acre-feet for one year
Drainage Area: 1,086 sq. miles

## Streamflow Data

Average Annual Streamflow, acre-feet: 164,560
Minimum: 11,692          Maximum: 661,245
Source: USGS gage 08104000 on Lampasas River at Youngsport
        USGS gage 08103800 on Lampasas River near Kempner
Period of Record:1940-1979 (810400) Adjustment Factor:0.8758(810400)
Period of Record:1963-1993 (810380) Adjustment Factor:1.3276(810380)

## Downstream Water Rights Considerations

On Lampasas River:              24  Water Rights    69,111 AF/Y
On Little River and Brazos River:  61  Water Rights   817,744 AF/Y

## Availability of Appropriation

Monthly Demand Distribution in Acre-Feet

| J | F | M | A | M | J | J | A | S | O | N | D |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8 | 8 | 10 | 10 | 1 | 19 | 19 | 18 | 9 | 10 | 10 | 8 |

Inflow: Streamflow
Study Period: 1940-1993
Annual Demand: 130                    Acre-Feet
Annual Demand Diverted in   44    Percent of Years
At Least 75% Annual Demand Diverted in   78   Percent of Years
Monthly Demand Diverted in   84   Percent of Months

Inflow: Unappropriated Water
Study Period: 1940-1976
Annual Demand: 130                    Acre-Feet
Annual Demand Diverted in   0     Percent of Years
At Least 75% Annual Demand Diverted in   0    Percent of Years
At Least 50% Annual Demand Diverted in   27   Percent of Years

Remarks: Environmental staff recommended instream flow restriction of
38 cfs (April - June) and 12 cfs (July - March) at USGS gage 08103800.

Signature: _____     Date: 8/20/97

# Texas Natural Resource Conservation Commi.,ion

## INTEROFFICE MEMORANDUM

**To:**       Kariann Sokulsky. Manager      **Date:**    July 28. 1997
            Water Uses and Availability Section
            Water Quantity Division

**Thru:**      Richard Kiesling
            Instream Uses Team
            Water Quantity Division

**From:**     John Botros
            Instream Uses Team
            Water Quantity Division

**Subject:**   Ware. Bradley B.
            Lampasas River. Brazos River Basin
            Bell County

Environmental reviews of water right applications are conducted in accordance with §11.147, §11.150, and §11.152 of the Texas Water Code and with TNRCC administrative rules which include 30 TAC §261.21 through §261.26, §261.41, §261.42, §261.43, and §297.48 through §297.52. These statutes require the TNRCC to consider the possible impacts of the granting of a water right on the instream uses of the affected body of water. Instream uses include, but are not limited to, water quality, fish and wildlife habitat, and recreation. In addition, possible impacts to bays and estuaries are addressed. Examples of significant impacts are those that affect natural resources; result in deterioration of water quality or flood protection; result in unallowable reduction of identifiable instream uses; endanger species of plant and animal life and their habitat; significantly reduce productivity of the bay and estuary systems; or contribute to a series of related projects that involve individually minor but collectively significant adverse impacts.

## ENVIRONMENTAL ANALYSIS

The applicant seeks authorization to divert and use not to exceed 130 acre-feet water per annum from the Lampasas River to irrigate 100 acres of land in Bell County. The maxin. diversion is 1.11 cfs. In order to protect instream uses, biological habitats, and water quality of the Lampasas River, staff recommends diversion be limited to times when streamflow at the USGS gage #0810003800 near Kemper, Texas is equal to or exceeds 38 cfs during the months of April through June and 12 cfs during July through March.

## INSTREAM USES

**Recreational Uses**

According to USGS topographic maps. the Lampasas River is a perennial stream. The Texas Parks and Wildlife (TPWD) publication. "An Analysis of Texas Waterways." characterizes this section of the river. the 42 miles above the Stillhouse Hollow Reservoir, as having low water levels most of the time. However, during periods of heavy rains, the river becomes an exciting recreational corridor to a scenic and interesting area.

**Aquatic and Riparian Habitats**

Aquatic and riparian habitats of the Lampasas River are of high quality. Based on photographs provided by the applicant. the banks appear to be heavily vegetated with native trees. brush and grasses which provide for aquatic habitats along the Lampasas River. Estimated from USGS gage data. monthly median flows for the Lampasas River prorated to the applicant's location range from a high of 123 cfs in May to a low 20 cfs in August (Table 1).

Table 1 Monthly Medians in cfs

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 42 | 48 | 53 | 62 | 123 | 72 | 31 | 20 | 25 | 31 | 36 | 39 |

TNRCC uses a default methodology for determining flow restrictions developed by Lyons (1979). Lyons recommends minimum flows of 40% of the monthly median flows for October through February and 60% of the monthly median flows for March through September to protect fisheries habitat. Applying Lyons' recommendations to the applicant's location, and averaging the recommendations for months October-February and March-September, minimum flows needed for habitat maintenance at the applicant's diversion point are 16 cfs during October-February and 32 cfs during March-September. A more appropriate grouping of the months. based on similar monthly medians, would be April-June and July-March. Based on these groupings the recommended minimum flows for habitat maintenance are 51 cfs during April-June and 16 cfs during July-March at the applicant's location. In order to simplify applicant's compliance to the suggested restrictions, these flows were prorated back to the USGS gage near Kemper, Texas to yield flow restrictions of 38 cfs during the months of April through June and 12 cfs during July through Mar

**Water Quality**

The applicant's proposed diversion point is located above Stillhouse Hollow Reservoir on the Lampasas River designated as Stream Segment No. 1217 of the State of Texas Water Quality Inventory (1996), a effluent limited segment. Designated water uses of the segment include contact recreation and high aquatic-life use. There are a total of seven permitted outfalls for a combined total discharge of 4.00 MGD. There are no known water quality problems in the segment.

For determining minimum flows which would sustain water quality, the seven day, two year low flow (7Q2) is used. The 7Q2 is defined as the lowest average flow for seven consecutive days that is

expected to recur every two years. The 7Q2 is statistically derived from historical daily flow data. The 7Q2 from the Texas Surface Water Quality Standards at the USGS gage #08103800 for the period of record, 1964-1994, is 11.43 cfs. Since the lower flow restriction of 12 cfs is higher than the 7Q2, the recommended flow restrictions should provide adequate protection for the water quality of the Lampasas River.

## BAYS AND ESTUARIES

The proposed diversion site is more than 200 river miles form the Gulf of Mexico. The proposed diversion of 130 acre-feet of water from the Lampasas River should not affect the bays and estuaries of the Brazos River Basin. The cumulative effect of all water rights in the Brazos River Basin upon the receiving bays and estuaries is not known.

## SUMMARY

The applicant seeks authorization to divert and use not to exceed 130 acre-feet of water per annum from the Lampasas River for irrigation purposes. The maximum diversion is 1.11 cfs. In order to protect instream uses, biological habitats, and water quality of the Lampasas River, staff recommends diversion be limited to times when streamflow at the USGS gage #08100380 near Kemper, Texas is equal to or exceeds 38 cfs during the months of April through June and 12 cfs during July through March. This instream assessment was conducted using current TNRCC operating procedures and policies and available existing data.

## LITERATURE CITED

Bounds, R. L. and B. W. Lyons. 1979. Existing reservoir and stream management recommendations statewide minimum streamflow recommendations. Federal Aid Project F-30-R-4. Texas Parks and Wildlife Department, Austin, Texas.

John Botros
Instream Uses

Richard Kiesling, Leader
Instream Uses

cc:     Lann Bookout, Water Quantity Division
        Michelle Town, Water Quantity Division
        Shiyah Jiang, Water Quantity Division

TEXAS NATURAL RESOURCE
CONSERVATION COMMISSION

INTEROFFICE MEMORANDUM

TO:        Texas Natural Resource Conservation          DATE: July 1, 1997
           Commission


THRU:      Chief Clerk, Texas Natural Resource Conservation Commission


FROM:      Water Rights Permits Team, Surface Water Uses Section


SUBJECT:   Bradley B. Ware
           Section 11.121 Water Use Permit Application
           Lampasas River, Brazos River Basin
           Bell Counties


The application was received April 25, 1997. Additional information needed to process the application was received June 12, 1997, and the application was declared administratively complete on June 23, 1997. Public Notice for the application should be sent to the applicant for newspaper publication and to all water right holders in the Brazos River Basin. The notice should indicate that the application will be considered by the Executive Director no sooner than October 24, 1997.

The applicant seeks authorization to divert and use not to exceed 130 acre-feet of water per year from the Lampasas River, tributary of the Little River, tributary of the Brazos River, Brazos River Basin at a maximum rate of 1200 gallons per minute to irrigate 100 acres of land in Bell County approximately 15 miles southwest of Killeen, Texas, within three tracts of land comprising 261 acres in the W. B___n Survey, Abst. No. 67, the D.G. Van Vicheton (Vecheton) Survey, Abst. No. 851, and the C. Edwards S___ey, Abst. No.291 in Bell County, Texas. Ownership of this land by the applicant is evidenced by a Warranty Deed with Vendor's Lien recorded in Volume 1524, page 671 of the Bell County Deed Records.

The applicant is requesting authorization to divert water from any point on the left, or east, bank of the reach of the river adjacent to his property. The upstream point of the river at his property line is N 60.6°W, 2,050 feet from the southeast corner of the aforesaid Van Vicheton Survey. The downstream point of the river at his property line is at Latitude 31.032°N, Longitude 97.992°W, and is also S37°E, 4200 feet from the aforesaid Survey corner.

Fees have been paid and a water conservation plan has been submitted with the application.

170

Bradley B. Ware
Page 2
July 1, 1997

The application is sufficient for filing.

Michelle Town
Water Rights Permitting Team
Water Quantity Division

Attachments

cc: Hydrology, Environmental, and Data Entry, TNRCC

WARE.MEM

Michelle Town
TNRCC
MC-160
Austin, Texas

Dear Michelle,

Please find enclosed:

     1. Boundry map of my property.
     2. Six (6) photos of the diversion point.
     3. Check for $1,610.28.
     4. Letter concerning flow restriction on Lampasas River.

Sincerely,

Bradley Ware



UNITED STATES
DEPARTMENT OF THE INTERIOR
GEOLOGICAL SURVEY

DING DONG, TEX.
N30575—W9745/7.5

1958
PHOTOREVISED 1979
AMS 8445 IV NE—SERIES V882

WARE Ranch
Exhibit D-1

Texas Natural Resource Conservation Commission
MC-160
Austin, Texas


Re: Flow Restriction on Lampasas River


Dear TNRCC:

I have lived on this ranch for the past 38 years - all my life, and the place has been in my family for 123 years. During all of that time we have paid taxes on this land to the center of the river. It has come to the point that we need water from the Lampasas River to be able to make the ranch produce a constant crop and to do so efficiently enough to pay the taxes and expenses of farming.

The Brazos River Authority led me to believe that I could buy Stillhouse Hollow "lake water" and not have to obtain any permits or have any restrictions from the state. I signed a contract to this effect. Because of that agreement I have spent nearly one hundred thousand dollars ($100,000.00). Since then I have learned that a state permit is required to use water from the Lampasas River.

In our meeting on April 25, 1997, it was discussed that the lowest flow that I could pump from would be 13 CFS and that last year in July, I would not have been able to pump.

The Ware Ranch has over two miles of river frontage. Everyday I see the river and fish from it often. The river was low last year, but not as low as it has been in the past, nor as low as it probably will be in the future. The river has always sustained the low times and has come back to be as nice as ever without doing any great danger to the environment. Last summer the river was not nearly as low as it was in the 70's when you could walk across the river without getting your shoes wet. The Lampasas is a low flowing river and fluctuates often. Historically, we have seen it range from being just holes of water to having over a hundred acres of my land covered. We have lived through the good times and the bad with the river.

Throughout the years we have always used what we thought was good stewardship so that the next generation would have something of which to be proud. Our goal has always been to improve this ranch and being able to use the river water for irrigation.

In the 60's it was necessary to sign up for rights to the water. My dad wanted what the ranch deserved, but knew that he was not financially able to afford the equipment necessary to pump the water, so he did not sign up. He wasn't the type to try to hoard up something he couldn't use.

Now we have found a way to put in an high efficiently system. We would ask that TNRCC consider the history and heritage of this ranch and the need of future generations. We ask that you not discriminate against us because we have not been able to financially provide the improvements that this ranch has always needed.

I feel that the restriction of 13 cfs is too extreme, especially with the discharge of waster water from the city of Lampasas. As you know, the summer months is when agriculture needs the most water.

This is also the reason why the Low Energy, Precise Application (LEPA) center pivot, using low drift nozzles and drag hoses was chosen over less expensive systems being used in this area The LEPA has a 95% efficiency rating and is the most efficient system being built today Please keep this in mind when setting the low flow restrictions It is possible that these more efficient systems should have a different rating that some of the older systems

My pumping location is on a natural gravel bed and when the river is low, Nature will restrict the amount of water that I can consume It is my feeling that in the past Nature has always had a way of restraining my use of the natural resources and thus protecting the environment.

Please consider my view as you make your decision. If you have any questions, please do not hesitate to contact me

Sincerely,

B. Ware

Bradley Ware

Ware Ranch
Rt 3. Box 211
Killeen, Texas 76542



Ware Ranch Killeen Tx.
5-5-97 Diversion Point



Ware Ranch Killeen Tx.
5-5-97 Diversion Point



Ware Ranch Killeen Tx.
5-5-97 Diversion Point



Ware Ranch Killeen Tx.
5-5-97 Diversion Point



Ware Ranch Killeen Tx
5-5-97 Diversion Point



Ware Ranch Killeen Tx.
5-5-97 Diversion Point

1205.28

MC-160   **BRADLEY B. WARE**                              1415
             DL 01253123
          RT 3 BOX 211   834-6327              6-8  .97
             KILLEEN, TX 76542

PAY TO THE   TNRCC                              $1510 28

One Thousand Five Hundred Ten 28/100 DOLLARS

FIRST TEXAS BANK
P O BOX 821  KILLEEN TEXAS 76540

winter peonint mail out      Brad B Ware

⑆11492393⑆ 1415 ⑈22 5871 4⑈

178

# Exhibit G

# November 14, 2006 Interoffice Memorandum regarding Water Availability Review for Permit No. 5594

# Texas Commission on Environmental Quality

### INTEROFFICE MEMORANDUM

**To:** Kathy Hopkins, Application Manager  
Water Rights Team  
Water Rights Permitting & Availability Section

**Date:** November 14, 2006

**Through:** Lann Bookout, Team Leader  
Surface Water Availability and Interstate Compacts Team

**From:** Jeff Thomas, Engineer  
Surface Water Availability and Interstate Compacts Team

**Subject:** Bradley B. Ware  
WR 5594  
CN 5594  
Lampasas River, Tributary of the Little River, Tributary of the Brazos River, Brazos River Basin  
Bell County

## WATER AVAILABILITY REVIEW

### Application Summary

Water Use Permit No. 5594 Authorizes the permittee (Bradley B. Ware) to divert and use not to exceed 130 acre-feet of water per year from the Lampasas River, Brazos River Basin. The permit will expire on November 7, 2007. The permittee has applied to extend the term an additional 10 years.

### Water Availability Review

The Commission's water availability model (WAM) for the Brazos River Basin protects existing water rights based on the prior appropriation doctrine. The period of record for the Brazos WAM is 1940 to 1997. The applicant's request was modeled with a priority date of the administrative complete date of the application, January 5, 2006.

The existing term permit contains an instream flow restriction of 38 cfs for the months April through June, and a flow restriction of 12 cfs for all other months. This flow restriction is applied at U.S.G.S. gaging station 08103800 near Kempner, TX. TCEQ Resource Protection Staff did not recommend any changes to the existing instream flow restriction.

Using the WAM Current Conditions simulation of the model, simulation results indicate that 100% and 75% of the annual demand of 130 acre-feet would be met in none of the years, and 5.2% of the years, respectively.



## Conclusion

The water availability analysis indicates there is not sufficient water available at the applicant's location to support the requested demand of 130 acre-feet per year. Therefore, hydrological analysis cannot support the granting of this application to renew the existing term permit.

Jeff Thomas, P.E., P.G.

## HYDROLOGY UNIT ANALYSIS FACT SHEET

Applicant: Bradley B. Ware

Water Right: 5594

Stream: Lampasas River

Basin: Brazos    County: Bell

Requested Amount: 130 af/yr

Remarks: Resource Protection staff did not recommend any changes or additions to the existing streamflow restrictions.

WAM code:

WR559411  130.  IRR319970701 1 2 0.0000          P5594_1  P559415594101              BRADLEY B WARE

# Exhibit H

# November 25, 2008 Interoffice Memorandum regarding Water Availability Analysis for BRA's Application No. 5851

App. Exh. _____ 50

# Texas Commission on Environmental Quality

## INTEROFFICE MEMORANDUM

To:      Ron Ellis, Application Manager      November 25, 2008
           Water Rights Permitting Team

Through:    Lann Bookout, Team Leader
           Surface Water Availability & Interstate Compacts Team

From:    Kathy Alexander, Hydrologist
           Surface Water Availability & Interstate Compacts Team

Subject:    Brazos River Authority
           Application 5851
           CN600506794
           Brazos River, Brazos River Basin

## WATER AVAILABILITY ANALYSIS

### Application Summary

The Brazos River Authority (BRA or the Authority) has applied for a permit, designated its "System Operation Permit". The BRA owns the following water rights, which comprise BRA's system of reservoirs: Certificate No. 12-5155 (Possum Kingdom Lake), Certificate No. 12-5156 (Lake Granbury), Certificate No. 12-5165 (Lake Limestone), Certificate No. 12-5157 (Lake Whitney), Certificate No. 12-5160 (Lake Belton), Certificate No. 12-5159 (Lake Proctor), Certificate No. 12-5164 (Lake Somerville), Certificate No. 12-5161 (Lake Stillhouse Hollow), Certificate No. 12-5163 (Lake Granger), Certificate No. 12-5162 (Lake Georgetown) and Certificate No. 12-5158 (Lake Aquilla). The BRA, along with the Texas Water Development Board and the City of Houston, owns Water Use Permit 2925A (Allens Creek Reservoir). The BRA also owns Certificate Nos. 12-5166 and 12-5167, which authorize various uses of water within the applicant's other certificates and permits. The applicant is currently authorized, pursuant to a TCEQ order, to manage and operate its tributary reservoirs as elements of a system, coordinating releases and diversions from the tributary reservoirs with releases and diversions from the applicant's main-stem reservoirs to conserve water.

BRA seeks a Water Use Permit to authorize:

- A new appropriation of state water in the amount of 421,449 acre-feet per year for multiple use purposes on a firm basis in the Brazos River Basin. Out of the 421,449 acre-feet per year of unappropriated water being requested, the maximum amount of unappropriated water that will be available if such water is diverted upstream at USGS gage No. 08091000 near Glen Rose, Texas is 150,538 acre-feet per year of firm water, and if such unappropriated water is diverted upstream at USGS gage No. 08098290 near Highbank, Texas, the maximum amount of unappropriated water that will be available at that location is 144,306 acre-feet per year of firm water.

- Diversion of the water from: (i) the existing diversion points authorized by BRA's existing water rights; (ii) the Brazos River at the USGS gage No. 08091000 near Glen Rose, Texas; (iii) the Brazos River at USGS gage No. 08098290 near Highbank, Texas; (iv) the Brazos River at the



Gulf of Mexico; and (v) at such other diversion points that may be identified and included in BRA's proposed Water Management Plan (WMP), which is subject to TCEQ's approval.

- Use of up to 90,000 acre-feet of water per year of the firm supply to produce, along with other unappropriated flows, an interruptible water supply of 670,000 acre-feet per year and the appropriation of that interruptible water supply. Out of the 1,001,449 acre-feet of firm and interruptible water being requested, the maximum amount of firm and interruptible water that will be available if such water is diverted upstream at USGS Gage No. 08091000 near Glen Rose, Texas is 60,538 acre-feet of firm water per year and 157,000 acre-feet of interruptible water per year and if such water is diverted upstream at USGS Gage No. 08098290 near Highbank, Texas, the maximum amount of firm water is 54,306 acre-feet of water per year and 303,000 acre-feet of interruptible water per year.

- An exempt interbasin transfer authorization to use, on a firm and interruptible basis, the appropriated water in the adjoining San Jacinto-Brazos Coastal Basin and the Brazos-Colorado Coastal Basin.

- An appropriation of current and future return flows (treated sewage effluent and brine bypass/return) to the extent that such return flows continue to be discharged or returned into the bed and banks of the Brazos River, its tributaries, and BRA's reservoirs. BRA indicates that such appropriation of return flows would be subject to interruption by direct use or indirect use within the discharging entity's city limits, extraterritorial jurisdiction, or contiguous water certificate of convenience and necessity boundary. Specified discharge points and amounts of water will be accounted for on a monthly basis as part of BRA's WMP, which is subject to TCEQ's approval.

- Operational flexibility to (i) use any source of water available to BRA to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the BRA's reservoirs on a priority basis; and (ii) release, pump and transport water from any of the BRA's reservoirs for subsequent storage, diversion and use throughout the BRA's service area.

- Recognition that the System Operation Permit will prevail over inconsistent provisions in the BRA's existing water rights regarding system operation.

- Use of the bed and banks of the Brazos River, its tributaries and BRA's reservoirs for the conveyance, storage, and subsequent diversion of (i) water appropriated under this application; (ii) waters that are being conveyed via pipelines and subsequently discharged into the Brazos River, its tributaries or stored in the BRA's reservoirs; (iii) surface water imported from areas located outside the Brazos River Basin for subsequent use; (iv) in-basin surface water and groundwater subject to BRA's control;(v) waters developed from future projects; and (vi) current and future reuse of surface and groundwater based effluent requested by this application. This bed and banks authorization is subject to BRA, after identifying specific points of discharge and diversion and conveyance and other losses, obtaining future authorizations to satisfy the requirements of TWC § 11.042. Such points of discharge and diversion and conveyance and other losses may also be identified and included in BRA's proposed WMP, which is subject to TCEQ's approval.

183

Until the construction of Allens Creek Reservoir is completed, the BRA requests that the System Operation Permit include special conditions which authorize:

- Appropriation of state water in the amount of 425,099 acre-feet per year for multiple use purposes on a firm basis in the Brazos River Basin. Out of the 425,099 acre-feet per year of unappropriated water being requested, the maximum amount of unappropriated water that will be available if such water is diverted upstream at USGS Gage 08091000 near Glen Rose, Texas is 150,538 acre-feet per year of firm water and if such unappropriated water is diverted upstream at USGS Gage 08098290 near Highbank, Texas the maximum amount of unappropriated water that will be available is, at that location, 175,306 acre-feet per year firm water.

- Use of up to 90,000 acre-feet of water per year of BRA's firm supply to produce, along with other unappropriated flows, an interruptible water supply of 869,000 acre-feet per year. Out of the 1,204,099 acre-feet of firm and interruptible water being requested, the maximum amount of firm and interruptible water that will be available if such water is diverted upstream at USGS Gage No. 08091000 near Glen Rose, Texas, will be 60,538 acre-feet of firm water per year and 190,000 acre-feet of interruptible water per year and if such water is diverted upstream at USGS Gage No. 08098290 near Highbank, Texas the maximum amount of firm water will be 85,306 acre-feet of water per year and 284,000 acre-feet of interruptible water per year.

- Exempt interbasin transfer authorization to use, on a firm and interruptible basis, the appropriated water in the adjoining San Jacinto-Brazos Coastal Basin and the Brazos-Colorado Coastal Basin and to transfer such water to any county, municipality or the municipality's retail service area that is partially in the Brazos River Basin for use in that part of the county or municipality's retail service area not within the Brazos River Basin.

## Water Availability Analysis

The Commission's Water Availability Model (WAM) for the Brazos River Basin protects existing water rights based on the prior appropriation doctrine. The period of record for the Brazos WAM is 1940 through 1997. The application was declared administratively complete on October 15, 2004. TCEQ Resource Protection Staff recommends that the application be subject to special conditions to protect aquatic habitat and the environment, including the following (For specific numeric values for the flow requirements below, refer to the Resource Protection Staff memo dated November 25, 2008):

1. Total storage in Permittee's system reservoirs is the trigger for determining hydrologic condition, which, in turn, determines instream flow requirements.
2. Interim instream flow requirements apply at six USGS gaging stations. The instream flow requirements are applicable at all times.
3. The level of flow (i.e., Subsistence, Dry, Average, or Wet) is determined seasonally based on hydrologic condition.
4. Permittee shall meet a seasonal schedule of individual high flow pulses. The magnitude, duration, timing and frequency and measurement location for the pulses are included as special conditions in Resource Protection Staff's memo (Additional discussion of how these high flow pulses were included in the availability analysis is included in Section C.2 (*Unappropriated Water*) of this memo).
5. In addition to the above requirements. Permittee is prohibited from diverting and

184

storing water authorized by this permit unless streamflow meets or exceeds the 7Q2 value at additional gages located below Permittee's reservoirs as specified in Resource Protection Staff's memo.

A.    *Interbasin Transfer and Bed and Banks*

Pursuant to TWC §11.085(v)(3) and (v)(4), the request for an exempt interbasin transfer does not require a water availability analysis. For the request to use the bed and banks of the Brazos River and its tributaries, the application indicates that although specific locations, quantities and diversion rates for the bed and banks request are unknown at this time, potential diversion locations include the perimeter of all existing and proposed BRA reservoirs. The application also indicates that potential diversion locations include the following stream reaches:

- Brazos River from the confluence of the Salt and Double Mountain Forks to the Gulf of Mexico,
- Double Mountain Fork of the Brazos River below Lake Alan Henry to its confluence with the Brazos River,
- Leon River from Lake Proctor to the confluence with the Little River,
- Lampasas River from Lake Stillhouse Hollow to the confluence with the Little River,
- Little River from the junction of Leon and Lampasas Rivers to the confluence with the Brazos River,
- Yegua Creek from Lake Somerville to the confluence with the Brazos River,
- Navasota River from Lake Limestone to the confluence with the Brazos River,
- Allens Creek from below Allens Creek Reservoir to confluence with the Brazos River,
- Any other tributary of the Brazos River into which water appropriated under this application (groundwater or surface water under the control of BRA) is discharged.

With the exception of Permit 2925 (Allens Creek Reservoir), BRA's current rights authorize use of the bed and banks of the Brazos River and its tributaries below the Authority's reservoirs to deliver water to downstream customers. The application indicates that the location of specific amounts, rates, releases and loss information will be detailed in BRA's Management Plan once the specific amount of unappropriated water and return flows available to BRA is determined. Staff is of the opinion that accounting for the bed and banks transfer of water through a delivery plan will mitigate any effects on basin water rights. The accounting/delivery plan should be included in BRA's Water Management Plan (WMP).

B.    *Return Flows*

The application requests appropriation of current and future return flows in the Brazos Basin discharged from 136 locations by various entities. These discharges include surface and groundwater based return flows. The surface water based return flow includes discharges from BRA facilities, discharges of water originating from BRA's water rights, as well as discharges from facilities owned by other entities and originating from non-BRA sources of supply.

A review of water rights in the Brazos River Basin indicates that Permit 4218 (diversion of 172 acre-feet of water from South Nolan Creek); Permit 5088 (diversion of 37 acre-feet of water from South Nolan Creek); and Permit 5089 (diversion of 60 acre-feet of water from South Nolan Creek) were explicitly granted based on the presence of return flows now being claimed as part of this application. Staff

recognizes the possibility that other basin rights were granted based on the presence of the requested return flows. Because of this, a priority date of October 15, 2004 is assigned to the applicant's diversions of historically discharged return flows. To evaluate the request for reuse of return flows, staff identified those return flows discharged from BRA facilities, or originating from diversions authorized by BRA's existing water rights, that have not been previously appropriated by other water rights as indicated in Table 1. below. BRA also requested reuse of return flows generated by four power plants that receive contract water from BRA's water rights. These return flows result from once through cooling water, or other power plant operations, and are thus highly variable. The application did not provide sufficient information to evaluate this request and these return flows were not included in the analysis.

The Current Conditions data set was updated with the amount of current return flows as indicated in the application (74,387 acre-feet which is the sum of the maximum reported annual discharge amounts for each plant). The request to reuse return flows was modeled at the most downstream point in the basin to determine the volume of return flows available to BRA on a basin-wide basis. Results indicate that 100% and 75% of the return flows were available in 45% and 81% of the years in the period of record, respectively and the monthly amount of discharged return flows was available in 87% of the months.

Table 1. Return Flows Available to BRA

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|---|---|---|---|---|---|---|
| Sportsmans World MUD WTP | 02461000 | 0.01 | Possum Kingdom | 100% | 11.2 | 0 |
| Double Diamond | 02789000 | 0.06 | Possum Kingdom | 100% | 67 | 0 |
| Authority SWATS | 02889000 | 2.5 | Granbury System | 100% | 730 | 0 |
| City of Copperas Cove | 10045003 | 2.5 | Lake Belton | 100% | 923 | 0 |
| City of Copperas Cove | 10045004 | 2.5 | Lake Belton | 100% | 1.375 | 0 |
| City of Copperas Cove | 10045005 | 4.0 | Lake Belton | 100% | 1.600 | 0 |
| City of DeLeon | 10078001 | 0.3 | Lake Proctor | 100% | 192 | 0 |
| City of Marlin | 10110002 | 2.0 | Whitney System | 16% | 159.4 | 0 |
| City of Harker Heights | 10155001 | 3.0 | Lake Belton | 100% | 2.780 | 0 |
| City of Gatesville | 10176002 | 2.2 | Lake Belton | 100% | 1.731 | 0 |
| City of Gatesville | 10176004 | 1.0 | Lake Belton | 100% | 703 | 0 |
| City of Granbury | 10178002 | 2.0 | Granbury System | 100% | 1313 | 0 |

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|---|---|---|---|---|---|---|
| City of Lampasas | 10205002 | 1.5 | Lake Stillhouse Hollow | 100% | 580 | 0 |
| City of McGregor (South WWTP) | 10219002 | 0.99 | Lake Belton | 95% | 651.7 | 0 |
| City of Moody | 10225001 | 0.2 | Lake Belton | 100% | 157 | 0 |
| Authority/LCRA BCRWSS West | 10264001 | 3.0 | Georgetown/Still-house System | 100% | 2,402 | 1,657 |
| Authority/LCRA BCRWSS East | 10264002 | 21.5 | Georgetown/Still-house System | 100% | 16,767 | 0 |
| City of Taylor | 10299001 | 4.0 | Granger System | 100% | 2,220 | 0 |
| Bell County WCID#1 | 10351001 | 0.9 | Lake Belton | 100% | 983 | 0 |
| Bell County WCID#1 | 10351002 | 18.0 | Lake Belton | 100% | 14,123 | 0 |
| Bell County WCID#1 | 10351003 | 6.0 | Lake Belton | 100% | 5,389 | 0 |
| City of Brenham | 10388001 | 3.55 | Lake Somerville | 100% | 2,485 | 0 |
| City of Dublin | 10405001 | 0.45 | Lake Proctor | 100% | 325 | 0 |
| City of Georgetown | 10489002 | 2.5 | Georgetown/Still-house System | 100% | 1,815 | 0 |
| City of Georgetown | 10489003 | 2.5 | Georgetown/Still-house System | 100% | 1,423 | 0 |
| City of Georgetown | 10489005 | 1.5 | Georgetown/Still-house System | 100% | 1,389 | 0 |
| City of Hamilton | 10492002 | 0.44 | Lake Proctor | 100% | 392 | 0 |
| City of Hillsboro | 10630001 | 1.81 | Lake Aquilla | 100% | 1,440 | 0 |
| City of Rosebud | 10731001 | 0.25 | Lake Stillhouse Hollow | 100% | 194 | 0 |
| Bell County WCID#3 | 10797001 | 0.675 | Lake Belton | 100% | 360 | 0 |
| City of Holland | 10897001 | 0.2 | Lake Stillhouse Hollow | 100% | 93 | 0 |
| Bell County WCID#2 | 11090001 | 0.094 | Lake Belton | 100% | 63 | 0 |
| Bell County WCID#2 | 11091001 | 0.08 | Lake Belton | 100% | 70 | 0 |
| Authority TBRSS | 11318001 | 10.0 | Lake Belton | 100% | 8,523 | 0 |

187

| Name | TPDES Permit Number | Permitted Discharge (mgd) | Current BRA Source | Percent of SW from BRA | Current Surface Water Returns (ac-ft/yr) | Current Ground-water Returns (ac-ft/yr) |
|---|---|---|---|---|---|---|
| Acton MUD | 14211001 | 0.6 | Granbury System | 100% | 366 | 0 |
| Acton MUD | 14212001 | 0.49 | Granbury System | 100% | 268 | 0 |
| City of Comanche | 14445001 | 0.6 | Lake Proctor | 100% | 324 | 0 |

C.    *Unappropriated Water*

The request for unappropriated water was incorporated into the TCEQ WAM as follows:

1)  The Dual Simulation[1] approach was used. For each existing BRA authorization:
    a)  Water rights activated only in the initial simulation represent existing diversions and storage authorized by the BRA's senior rights. These water rights calculate the total depletions and storage.
    b)  Water rights activated during the second simulation calculate the depletion for the senior rights limited by the streamflow depletion in the preceding step.
    c)  The final depletions are stored at a virtual control point until the priority date of the System Operation Permit application (October 15, 2004), and
    d)  BRA's reservoirs are refilled using a priority date of October 15, 2004, with the stored final depletions. Any remaining water is returned to the stream at the control points of the BRA's existing water rights.

2)  TCEQ Resource Protection Staff recommendations for instream flow protection were incorporated into the Brazos WAM at the priority date of the application as follows:
    a)  Seasonal flow requirements were converted to monthly values in acre-feet.
    b)  The instream flow requirements were subtracted from the seasonal pulse values to determine the incremental HFP (high flow pulse).
    c)  The incremental HFP was multiplied by the seasonal pulse frequency to determine the total pulse volume for each season.
    d)  The total pulse volume for each season was distributed by month
    e)  The monthly pulse volume was added to the monthly instream flow volume for each flow regime to determine the WAM instream flow constraint for each month for each flow regime. and
    f)  7Q2 flows for the additional control points were converted to an annual value in acre-feet and added to the model.
    g)  Based on a distribution of the annual diversion amount to a monthly value in WAM and conversion of that value to a daily diversion in cfs, staff determined that the diversion rate for BRA's diversions would be below 7,535 cfs at USGS Gage 08114000, Brazos River near Richmond.

3)  After applying the instream flow constraints. the new appropriation of water was then included in the

---

[1] For additional explanation of Dual Simulation, see Wurbs. Ralph A. 2007 *Water Rights Analysis Package (WRAP) Modeling System Users Manual* TR-256. Texas Water Resources Institute. College Station. Texas. Pp. 94-96

second simulation (which generated the final results) as follows:

a) All BRA reservoirs are refilled with any unappropriated water at the priority date of this application.

b) Diversions are made, backed up by system storage in all BRA reservoirs, and

c) All BRA reservoirs are then refilled again to ensure that all water potentially available under the permit application is impounded.

To determine the amount of water available for appropriation, Staff first evaluated the applicant's request for firm water, i.e., that amount of water that would be available 100% of the time during the period of record. The request for firm water was modeled using the TCEQ Full Authorization simulation, which does not include return flows. Staff evaluated the requests for firm yield water at the three points requested in the application; from upstream to downstream being Glen Rose, Highbank and the Gulf of Mexico. The most downstream point for measurement of instream flow requirements is the Richmond gage. Staff calculated the amount of flow available to BRA at the Gulf of Mexico by determining the amount of flow available at the Richmond gage and applying a drainage area ratio relationship between the Richmond gage and the WAM control point representing the basin outlet at the Gulf of Mexico.

The analysis was conducted for two scenarios. The first simulation included Allens Creek Reservoir at its fully authorized amounts for storage and diversion, and was used to determine the amount of water available for appropriation after considering all water rights at their fully authorized amounts. The second simulation was conducted to determine if the water appropriated for Allens Creek Reservoir could be used more efficiently by the BRA, in conjunction with other water rights requested by this application, until such time as Allens Creek Reservoir is constructed. The amount of firm water available to BRA is indicated in Table 2, below. To the extent that removal of the requirement for wet season pulses at Richmond resulted in additional unappropriated water, staff recommended the additional amount.

The application requested an amount of additional water that would be available on a reasonably dependable basis. The application states that this water would be available if 90,000 acre-feet of firm water was used, along with other sources available to the applicant, to produce the additional supply. Pursuant to 30TAC §297.42(d), Staff may recommend granting applications that are not based upon the continuous availability of historic, normal stream flow on a case-by-case basis. A system operation in conjunction with other water rights is an application that may not be required to be based on the continuous availability of historic, normal streamflow. The applicant has requested that the additional amount of water be evaluated using the criteria in 30TAC §297.42(c), that is, 75% of the water is available 75% of the time when distributed on a monthly basis (75/75 criteria). Staff modeled this request using the Full Authorization simulation and included the applicant's estimated current return flows. Model results (Table 3.) indicate that additional amounts of water are available to the applicant using the 75/75 criteria.

Table 2. New Appropriation of Water (includes Allens Creek)

| Location | Volume in acre-feet | |
|---|---|---|
| | Firm | Non-Firm |
| Glen Rose | 131,363 | 157,000 |
| Highbank | 144,306 | 303,000 |
| Richmond | 188,470 | 670,000 |
| Gulf of Mexico | 191,516 | 670,000 |

Table 3. New Appropriation of Water (does not include Allens Creek)

| Location | Volume in acre-feet | |
|---|---|---|
| | Firm | Non-Firm |
| Glen Rose | 131,363 | 190,000 |
| Highbank | 175,306 | 284,000 |
| Richmond | 237,920 | 869,000 |
| Gulf of Mexico | 241,765 | 869,000 |

No Injury Review

The application requests authorization for operational flexibility to use any source of water available to BRA to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the BRA's reservoirs on a priority basis. The new authorization requested in this permit has a priority date junior to most basin water rights. Although changes in operations for BRA's existing water rights resulting from additional operational flexibility have the potential to affect river flows in the Brazos River and its tributaries, Staff is of the opinion that implementation of accounting measures should mitigate any impacts to senior and superior water rights. These accounting measures should be part of the accounting/delivery plan, which should be included in the WMP.

The application requests authorization to release, pump and transport water from any of the BRA's reservoirs for subsequent storage, diversion and use throughout the BRA's service area. The request to release, pump and transport stored water should have no effect on other basin rights so long as BRA obtains the appropriate bed and banks authorizations as needed. In addition, special conditions requiring BRA to maintain an accounting of water in storage by priority date should mitigate any impacts to downstream senior and superior water rights.

The application requests that the Commission recognize that the System Operation Permit will prevail over inconsistent provisions in the BRA's existing water rights regarding system operation. This would include existing limitations on the percentage of reservoir storage allowed to be used in system operations and identification of sources of supply. Specifically, the existing system operation order requires the BRA to exclude tributary reservoirs from operation of the system during any period of time in which BRA's permitted storage space is less than 30% full. The application states that the Commission's review and approval of the BRA's Management Plan will provide equivalent safeguards and, at the same time, allow the BRA greater operational flexibility. Staff agrees that there may be inconsistent provisions and recommends special conditions to clarify inconsistencies while protecting other basin water rights.

Conclusion

Based on the review and analysis of this application, staff can support granting the application provided the permit contains the special conditions proposed by Resource Protection staff and additional special conditions as indicated below.

*A. Interbasin Transfer and Bed and Banks*

The water requested for exempt interbasin transfer will be authorized with a priority date of October 15, 2004 and as such will be among the most junior rights in the Brazos River Basin. Therefore, there can be

no effects on existing water rights and staff can recommend granting this request.

Staff can recommend authorization for the use of the bed and banks of streams already authorized in BRA's current permits, certificates and amendments, subject to identification of specific losses. Staff recommends that the permit contain the following special conditions:

1. The use of the bed and banks of Allens Creek from below Allens Creek Reservoir to the Brazos River is not authorized until Permittee applies for and is granted an amendment to Permit 2925A.

2. Permittee is authorized to use the following reaches, authorized in Permittee's certificates and amendments, for conveyance of water, previously appropriated to the Permittee and water authorized by this permit, downstream for diversion at Glen Rose, Highbank and the Gulf of Mexico and any of the Permittee's currently authorized diversion points within these reaches:
   A. Brazos River from below Possum Kingdom Reservoir to the Gulf of Mexico
   B. Leon River from Lake Proctor to the confluence with the Little River
   C. Lampasas River from Lake Stillhouse Hollow to the confluence with the Little River
   D. Little River from the junction of Leon and Lampasas Rivers to the confluence with the Brazos River
   E. Yegua Creek from Lake Somerville to the confluence with the Brazos River
   F. Navasota River from Lake Limestone to the confluence with the Brazos River

3. Prior to use of the bed and banks identified in Special Condition A.2. above, Permittee must submit to and have approved by the Executive Director, as part of its accounting/delivery plan, a procedure to estimate daily deliveries of water. This procedure should be in electronic format and detail by source, type and priority date, the amounts to be conveyed and delivered, losses associated with the conveyance, specific points of diversion, associated travel times, and times of commencement and termination of transit for conveyed waters. Documentation of actual deliveries as well as the accounting/delivery plan shall be maintained by the Permittee in electronic format and made available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the accounting/delivery plan must be approved by the Executive Director.

4. The use of the bed and banks of additional streams and tributaries in the Brazos River Basin for conveyance of water appropriated under this permit, or other sources available to the Permittee, is subject to Permittee, after identifying specific sources and types of water, specific points of discharge and diversion, and conveyance and other losses, obtaining future authorizations to satisfy the requirements of TWC § 11.042.

5. The use of additional points of diversion within the reaches specified in Special Condition A.2. above is subject to Permittee, obtaining authorization to use those diversion points. The points of diversion may also be identified and included in Permittee's proposed WMP which is subject to Commission approval.

*B. Reuse of Return Flows*

Staff can recommend granting BRA authorization to reuse return flows discharged from BRA facilities or originating from diversions under BRA's water rights, as indicated in Table 1. above. subject to the following special conditions to protect water rights granted based on the presence of those return flows as

well as other senior water rights:

1. Prior to the diversion of return flows authorized by this permit, Permittee must submit to and have approved by the Executive Director, a reuse accounting plan. The reuse accounting plan must be in electronic format and account, by source, for all return flows discharged and subsequently diverted. The reuse accounting plan should include amounts discharged by outfall, amounts of return flows used by permits granted based on the presence of these return flows, and estimated travel times and conveyance losses from discharge point to diversion point(s). If the return flows will be stored in Permittee's reservoirs, the reuse accounting plan should include any evaporative losses associated with the storage. Permittee shall maintain the approved reuse accounting plan in electronic format and make it available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the reuse accounting plan must be approved by the Executive Director. The reuse accounting plan shall be included as part of Permittee's accounting/delivery plan.

2. The right to divert discharged return flows from plants owned by the City of Granbury (TPDES Permit No. 10178002), Acton MUD (TPDES Permit Nos. 14211001 and 14212001), Bell County WCID #2 (TPDES Permit No. 11090001), City of Georgetown (TPDES Permit Nos. 10489002 and 10489003) and the City of Holland (TPDES Permit No. 10897001) is limited to the amount of surface water based return flows discharged from those plants that originates from water rights owned by the Permittee. Permittee is not authorized to divert groundwater based return flows discharged from these plants, except as may be authorized by Special Condition B.4.. Permittee must include in the reuse accounting plan the total amount discharged from the plants and the percentage of that water that is divertable under this permit.

3. Permittee is authorized to divert historically discharged groundwater based return flows from the Brazos River Authority/LCRA BCRWSS West (TPDES Permit No. 10264001).

4. Future discharges of groundwater based return flows may be diverted if those return flows originate from groundwater owned by Permittee or are discharged from treatment plants owned by the Permittee. Prior to diversion, Permittee must apply for and be granted an amendment to this permit authorizing these diversions and shall submit for approval by the Executive Director, a revised accounting/delivery plan addressing such new groundwater based discharges.

5. Permittee is authorized to divert only that water discharged by the City of Marlin (TPDES Permit No. 10110002) originating from water rights owned by the Permittee. Permittee shall calculate the divertable amount of the City's discharge and include this information in the reuse accounting plan.

6. Permittee shall only divert the actual annual amount of return flows discharged from the Bell County WCID #1 (TPDES Permit Nos. 10351001 and 10351002) and the City of Harker Heights (TPDES Permit No. 10155001) less up to 172 acre-feet as authorized by Permit 4218. 37 acre-feet as authorized by Permit 5088 and 60 acre-feet as authorized by Permit 5089 when the aforementioned permits are being used.

7. Diversions and storage of return flows shall not occur at rates or in amounts higher than the actual daily amount of return flows discharged into watercourses in the Brazos River Basin. after accounting for the calculated losses and travel time from the discharge point(s) to the diversion point(s) in accordance with the accounting/delivery plan.

192

8. Prior to diversion of the water authorized herein, if sufficiently accurate measuring devices are not available, Permittee shall install and maintain measuring device(s) capable of measuring within plus or minus 5% accuracy, at the discharge point of each wastewater treatment plant (WWTP) to record the amount of return flows discharged into the Brazos River or its tributaries on a daily basis.

9. The priority date for diversion of up to 116,434 acre-feet (103.899 mgd) of return flows is October 15, 2004.

10. The priority date for diversion of future return flows in excess of 116,434 acre-feet (103.899 mgd) of discharged return flows is October 15, 2004 but is not subject to call by senior and superior permit holders in the basin and is not subject to instream flow limitations.

11. Prior to diversion of any return flows in excess of the individual TPDES Permit limits indicated in the Table 1. Return Flows Available to BRA, Permittee must apply for and be granted the right to reuse those return flows. Permittee must amend the reuse accounting plan to include future return flows prior to diverting said return flows.

12. The diversion of up to 116,434 acre-feet (103.899 mgd) of water is dependant upon potentially interruptible return flows or discharges and is conditioned on the availability of those discharges. The right to divert the discharged return flows is subject to revocation if discharges become permanently unavailable for diversion and may be subject to reduction if the return flows are not available in quantities and qualities sufficient to satisfy the permit. Should any of the discharges become permanently unavailable for diversion, Permittee shall immediately cease diversion of those return flows and reflect such reductions in the reuse accounting plan.

13. Permittee's diversion and use of return flows is subject to interruption by direct use or indirect use within the discharging entity's corporate limits, extraterritorial jurisdiction, or contiguous water certificate of convenience and necessity boundary, provided the discharging entity has applied for and been granted authorization to reuse the return flows.

## C. *Unappropriated Water*

Staff can recommend granting reduced amounts of unappropriated water as follows:

Table 4. New Appropriation of Water

| Location | Volume in acre-feet | |
|---|---|---|
| | Firm Water | Non-Firm Water |
| Glen Rose | 131,363 | 157,000 |
| Highbank | 144,306 | 303,000 |
| Richmond | 188,470 | 670,000 |
| Gulf of Mexico | 191,516 | 670,000 |

Table 5. New Appropriation of Water (does not include Allens Creek)

| | Volume in acre-feet | |
|---|---|---|
| Location | Firm | Non-Firm |
| Glen Rose | 131,363 | 190,000 |
| Highbank | 175,306 | 284,000 |
| Richmond | 237,920 | 869,000 |
| Gulf of Mexico | 241,765 | 869,000 |

In order to ensure that existing basin rights are protected, the following special conditions should be included in the permit:

1. Prior to diversion or storage of the additional water authorized by this permit, Permittee shall provide to and have approved by the Executive Director, a daily accounting/delivery plan that includes, at minimum, the following:

    a. The accounting/delivery plan shall address reservoir storage and withdrawal plans for each system reservoir and account by priority date and amounts for any inflows, evaporation, water in storage and diversions from the reservoirs under all of Permittee's priority dates and authorizations including reuse.

    b. A method to account for inflows to system reservoirs for purposes of compliance with special conditions requiring passage of pulse flows and estimation of those inflows.

    c. An accounting of instream flow and pulse requirements to include total system storage, gage flows at the measurement points, high flow pulse volume impounded and the release schedule for the impounded high flow pulse, and timing, magnitude and duration of pulse flows.

    d. The accounting/delivery plan must detail how measurements will be taken to determine if impoundment or diversions under either Permittee's senior or junior rights can be made.

    e. The accounting/delivery plan must identify, account for, and distinguish between firm and non-firm water supplied or delivered from Permittee's system of reservoirs. In addition, the accounting/delivery plan must specify diversion points for this water if those diversion points are not specifically identified in this permit. Any additional diversion points must be within the reaches where use of the bed and banks is authorized. Any diversion points outside those reaches will require an amendment to this permit.

    f. Permittee shall maintain the approved daily accounting/delivery plan in electronic format and make it available to the general public during normal business hours and to the Executive Director upon request. Modifications or changes to the plan must be approved by the Executive Director.

2. If the total amounts of firm water indicated above are diverted at Glen Rose or Highbank, the additional amount of firm water available below those points is reduced accordingly. Permittee shall include the amount of that reduction in the accounting/delivery plan.

3. The full additional amount of non-firm water is only available when the amount of firm water is reduced by 90,000 acre-feet at Glen Rose, Highbank and the Gulf of Mexico. If less than the full amount of non-firm water is used, the amount of the firm water reduction shall be adjusted proportionately.

4. The non-firm water authorized above includes 74,387 acre-feet of historically discharged return flows. A reduction in firm yield water is not required in order to divert these return flows

5. The remaining 42,047 acre-feet of return flows out of the total amount of 116,434 acre-feet of return flows (Table 1.) may be diverted by the Permittee so long as the total diversions under this permit for all of the authorizations do not exceed the amounts of firm water and non-firm water indicated in Tables 4. and 5., above unless Permittee applies for and is granted the authorization to divert additional amounts of water.

6. Permittee may not exercise a priority call on water rights in the Brazos River Basin with priority dates senior to October 15, 2004 for purposes of increasing storage in and/or diversion from Permittee's system reservoirs where drawdown of Permittee's system reservoirs is caused by compliance with the terms and conditions of this permit.

7. The request for operational flexibility to use any source of water available to Permittee to satisfy the diversion requirements of senior water rights to the same extent that those water rights would have been satisfied by passing inflows through the Permittee's system reservoirs on a priority basis is limited as follows:

   a. To water previously stored in Permittee's reservoirs as documented in the accounting/delivery plan required in Special Condition C.1. above.

   b. Use of this option shall not cause Permittee to be out of compliance with Special Condition C.1. and Special Condition C.6.

8. Permittee may divert water from storage in its permitted reservoirs and store that water in Permittee's other reservoirs for use within the Permittee's service area so long as all diversions and storage are included in and comply with the provisions of the accounting/delivery plan and Special Condition C.1. above.

9. The total amount of water diverted and released from Permittee's system reservoirs in any year for each authorized purpose of use may not exceed the cumulative authorized total for each purpose until Permittee applies for and is granted amendments to the underlying authorizations.

10. Permittee is required to comply with the existing System Operation Order and certificates of adjudication requiring Permittee to exclude tributary reservoirs from operation of the system during any period of time in which Permittee's permitted storage space in that reservoir is less than 30% full (until all system reservoirs are below 30% capacity, at which time the reservoir can resume system operation), until such time as Permittee submits, and the Commission approves, a WMP for the Brazos River Basin which details how such limitations will be altered. Any alterations to the limitations must be in compliance with the accounting provisions required in Special Condition C.1 above.

11. Until such time as the ports are closed on the dam impounding Allens Creek Reservoir, authorized by Permit 2925, Permittee may impound and divert additional unappropriated water as specified in Table 5, subject to Special Conditions C.1. through C.10. above.

12. Permittee shall prepare and submit to the Commission, a Water Management Plan (WMP) which shall include such studies and other information as may be required by the Commission to demonstrate Permittee's compliance with and its ability to comply with all of the Special Conditions included in this permit.

13. The initial proceedings to consider the adoption of the WMP, and any major amendment thereof, shall be pursuant to contested case procedures. Any proceeding to consider the adoption or major amendment of the WMP shall be preceded by notice and opportunity to request a hearing, in accordance with the Commission's regulations applicable to water rights permitting proceedings. The WMP shall provide an adaptive management strategy for water supply and thus may be amended from time to time upon the request of Permittee or on the Commission's own motion. The initial accounting/delivery plan shall be submitted as part of the WMP.

Kathy Alexander/Hydrologist

# Exhibit I

# Excerpts of the October 17, 2011 Proposal for Decision

# State Office of Administrative Hearings



Cathleen Parsley
Chief Administrative Law Judge

October 17, 2011

Les Trobman, General Counsel
Texas Commission on Environmental Quality
P.O. Box 13087
Austin Texas 78711-3087

> Re:  SOAH Docket No. 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; TCEQ Docket No.; 2005-1490-WR; In Re:
> Concerning the Application by the Brazos River Authority for Water Use
> Permit No. 5851 and Related Filings

Dear Mr. Trobman:

The above-referenced matter will be considered by the Texas Commission on Environmental Quality on a date and time to be determined by the Chief Clerk's Office in Room 201S of Building E, 12118 N. Interstate 35, Austin, Texas.

Enclosed are copies of the Proposal for Decision that has been recommended to the Commission for approval. Any party may file exceptions or briefs by filing the documents with the Chief Clerk of the Texas Commission on Environmental Quality no later than **November 7, 2011**. Any replies to exceptions or briefs must be filed in the same manner no later than **November 17, 2011**.

This matter has been designated **TCEQ Docket No. 2005-1490-WR ; SOAH Docket No. 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**. All documents to be filed must clearly reference these assigned docket numbers. All exceptions, briefs and replies along with certification of service to the above parties shall be filed with the Chief Clerk of the TCEQ electronically at http://www10.tceq.state.tx.us/epic/efilings/ or by filing an original and seven copies with the Chief Clerk of the TCEQ. Failure to provide copies may be grounds for withholding consideration of the pleadings.

Sincerely,                                          Sincerely,

William G. Newchurch                               Hunter Burkhalter
Administrative Law Judge                           Administrative Law Judge

WGN; HB/nl
Enclosures
cc: Mailing List



| | | |
|---|---|---|
| CONCERNING THE APPLICATION BY THE BRAZOS RIVER AUTHORITY FOR WATER USE PERMIT NO. 5851 AND RELATED FILINGS | § § § § § | BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS |

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................... 1

II.    BRA'S CURRENT WATER RIGHTS.................................................................. 5

III.    APPLICATION DETAILS...................................................................................... 6

IV.    PARTIES.................................................................................................................. 7

V.    PROCEDURAL HISTORY.................................................................................... 8

VI.    JURISDICTION ...................................................................................................... 9

    A. The Required Notice Was Provided............................................................... 9

    B. Settlements Do Not Require Amendments or Additional Notice ...................... 11

    C. BRA May Seek a New Permit Instead Of Permit Amendments ........................ 13

VII.    OVERVIEW OF WATER-RIGHT PERMITTING LAW...................................... 16

VIII.    GENERAL REQUIREMENTS OF WATER CODE CHAPTER 11 AND RULES ..................................................................................................................... 17

    A. Completeness of Application......................................................................... 17

    B. The Application does not adequately identify a maximum rate of diversion as required by 30 TAC § 295.6................................................................................ 19

    C. Because BRA opted to pursue a two-step process, the Application does not adequately identify points of diversion as required by 30 TAC § 295.7............... 20

    D. New Water Facilities and Maps..................................................................... 30

    E. Other Compliance Issues............................................................................... 31

IX.    CCG'S AND MR. WARE'S IMPAIRMENT CLAIMS............................................... 31

X.     WATER AVAILABILITY AND IMPAIRMENT OF EXISTING RIGHTS .......... 41

       A. Overview ............................................................................................................ 41

       B. The two-step process makes it impossible to fully analyze water availability at
          this time............................................................................................................ 44

       C. In three specific respects, the Section 11.134 analysis of the SysOp Permit
          shows that it *will* negatively impact senior water rights..................................... 49

             1. As a result of the two-step process, the SysOp Permit overstates the
                amount of water available coming from the Possum Kingdom Reservoir
                and the other reservoirs............................................................................. 49

             2. Prior to construction of the Allens Creek Reservoir, the SysOp Permit
                overstates the amount of water available.................................................. 53

             3. As a result of the two-step process, the SysOp Permit overstates the
                amount of water available in the "Glen Rose Scenario."............................ 60

XI.    BENEFICIAL USE................................................................................................... 63

XII.   ENVIRONMENTAL FLOWS..................................................................................... 69

       A. Overview of Environmental Flow Law ............................................................ 70
       B. Environmental-Flow and Instream-Use Requirements Are Not Onerous ........ 74
       C. Environmental Flow Standards Have Not Been Adopted ................................. 75
       D. Expert Witnesses on Environmental Issues...................................................... 75
       E. Interim Environmental Flows Proposed For This Permit.................................. 78
       F. Fish and Wildlife Habitats and Water Quality................................................. 80
       G. Salinity .......................................................................................................... 87
       H. Golden Algae ................................................................................................. 102
       I. No dispute Concerning Bays and Estuaries ...................................................... 103
       J. No Dispute Concerning Groundwater .............................................................. 104

XIII.    PUBLIC WELFARE, PUBLIC INTEREST, AND INSTREAM USES................. 105

         A. Public Interest and Welfare Concerns Already Addressed ............................ 105

         B. Overview of Parties' Concerns ........................................................................ 106

         C. Scope of the Public Interest and Welfare Inquiry ....................................... 107

         D. Adequate and Lower Cost Water Supplies .................................................. 110

         E. Avoidance of Environmental Impacts........................................................... 113

         F. Burden of Proof Concerning Public Welfare, Public Interest, and Instream
            Uses............................................................................................................... 114

         G. Instream Recreational Use of Water............................................................ 116

         H. Agricultural Use of Water.............................................................................. 119

         I. BRA's Application Is Not Detrimental to the Public Welfare......................... 119


XIV.    CONSISTENCY WITH WATER PLANS ................................................................ 120

         A. Water Code § 11.134(c) is not an impediment to permit issuance in this
            case. .............................................................................................................. 120

         B. As required by Water Code Section 11.134(b)(3)(E), the BRA Application and
            the proposed SysOp Permit are consistent with the adopted State and Regional
            Water Plans. .................................................................................................. 121


XV.     CONSERVATION AND DROUGHT PLANNING ................................................ 124

         A. Applicable Law............................................................................................... 124

         B. BRA Evidence and Arguments...................................................................... 126

         C. The ED's Review............................................................................................ 128

         D. FBR's Objections .......................................................................................... 129

         E. NWF Objections............................................................................................. 131

         F. ALJs' Conclusion ........................................................................................... 137


XVI.    RETURN FLOWS ................................................................................................. 137

         A. Applicable Law............................................................................................... 139

B.  Once discharged, return flows are "state water" and, therefore, available for
    appropriation by others..................................................................................................... 140

        1.  BRA's Arguments ..................................................................................... 141

        2.  The ED's Arguments .................................................................................. 144

        3.  The ALJs' Analysis .................................................................................... 147

            a.  BRA misconstrues Section 11.042(c): The bed and banks authorization
                contemplated in Section 11.042(c) applies to a wide array of types of
                water, including return flows..................................................................... 148

            b.  The ED misconstrues Section 11.046(c): The right to appropriate return
                flows provided by Section 11.046(c) does not extend only to the discharger
                of those return flows, the owner of the base water right from which the
                return flows originated, or someone having contractual rights with either
                of them................................................................................................... 148

            c.  Sections 11.042(c) and 11.046(c) are reconcilable because they address
                mutually exclusive scenarios..................................................................... 149

            d.  BRA's request to divert "future" return flows (i.e., return flows that are
                not already being discharged into the Brazos River Basin) is reasonable
                and preferable to the approach advocated by the ED................................. 151

            e.  BRA's diversions of return flows, both current and future, should be
                treated as new appropriations subject to satisfying instream flow
                requirements........................................................................................... 154

            f.  Both BRA's and the ED's versions of the SysOp Permit comply with 30
                TEX. ADMIN. CODE § 297.42(g)............................................................... 156

XVII.   BED AND BANKS AUTHORIZATION ................................................................ 156

XVIII.  INTERBASIN TRANSFERS .............................................................................. 159

XIX.    OTHER CONCERNS REGARDING THE TWO-STEP PROCESS..................... 160

        A.  The Two-Step Process Is Unprecedented .............................................. 160
        B.  The First of the Two Steps May Result In an Order That Is Not Final .......... 165

XX.    FOLLOWING CONSTRUCTION OF THE ALLENS CREEK RESERVOIR,
       THE ED'S LIMITATIONS ON THE OPERATION OF THE RESERVOIR ARE
       UNNECESSARY.................................................................................................... 173

XXI.   COASTAL MANAGEMENT PLAN ................................................................ 175

XXII.  WETLANDS................................................................................................. 177

XXIII. NEED FOR A WATERMASTER.................................................................. 178

XXIV.  POSSIBLE FUTURE LOSS OF USGS GAUGES ....................................... 183

XXV.   PERMIT CONDITIONS PROPOSED BY OTHER PARTIES........................... 184

XXVI.  TRANSCRIPTION COSTS........................................................................... 189

XXVII RECOMMENDATION ................................................................................. 193

F.     ALJs' Conclusion

Based on the above, the ALJs conclude that BRA's application complies with all applicable drought and water conservation planning legal requirements.

## XVI. RETURN FLOWS

The BRA Application raises a number of complex issues related to return flows. It treats return flows[491] from any source as "state water" available for appropriation to the extent that such return flows continue to be discharged or returned to the Brazos River or its tributaries. BRA based its requested appropriation, at least in part, on the availability of return flows, current and future, from all sources once they are discharged into a watercourse. Under the approach advocated by BRA, the original sources of the return flows would include groundwater, surface water from the Brazos River Basin, and surface water imported from other basins.[492] Under BRA's approach, if discharged return flows were treated as state water available for appropriation, the results would be as follows:

- Once discharged, all return flows would be available for appropriation pursuant to Water Code § 11.046(c) for beneficial use by any existing water right holder or future appropriator.

- Once discharged, all return flows would be subject to established rules regarding the use and appropriation of state water.

- To the extent return flows make up part of a new appropriation, both current and future return flows would be subject to environmental flow requirements.

---

[491] Return flows are treated wastewater or unused portions of diversions that are discharged into watercourses in the state. BRA Ex. 15 at 46.

[492] BRA Ex. 8B at 9; BRA Ex. 15 at 46.

- The appropriation of current and future return flows would be permitted only to the extent they are available as unappropriated water after meeting the needs of all existing senior water rights.[493]

The ED disagrees with the BRA approach and, instead, proposes a different treatment for the appropriation of return flows. Rather than proposing a new appropriation, the ED proposes to give BRA a "bed and banks" permit to transport only those return flows originating from BRA's water rights or from wastewater treatment facilities owned or operated by BRA. Under the ED's approach, BRA would not be entitled to appropriate return flows originating from sources other than BRA's water rights or from wastewater treatment facilities owned or operated by BRA.[494] Under the ED's approach, use of return flows would be implemented as follows:

- A Water Code § 11.042(c) bed and banks authorization for indirect reuse could be obtained by the holder of the base water right, the owner or operator of the wastewater treatment facility, or a third party with contractual rights from either of them.
- The authorization, while not considered an appropriation, would be given the priority date of the application insofar as it applies to historically discharged return flows in order to protect existing rights.

- Historically discharged return flows would be subject to environmental flow and beneficial inflow requirements.

- Discharges in excess of historically discharged amounts would not be subject to call by senior water rights and would have no environmental flow requirements.

- The maximum authorization would be limited to the current TPDES permitted discharge amount. Any increase in the TPDES permitted discharge would necessitate an amendment of the bed and banks permit to authorize use of the increased volume.[495]

---

[493] BRA Initial Brief at 56-57.

[494] BRA Ex. 15 at 48; ED Ex. K2 at 6-14.

[495] BRA points out that none of these provisions have been explicitly adopted by Commission by rule or order. Thus, BRA worries there would be little assurance that Section 11.042 will necessarily be implemented in same fashion in the future.

These competing approaches raise a number of issues, each of which is addressed below.

## A.    Applicable Law

The disputes regarding the treatment of return flows for the SysOp Permit largely turn on the construction of Water Code §§ 11.042 and 11.046. Those statutory provisions provide, in relevant part, as follows:

> Sec. 11.042. DELIVERING WATER DOWN BANKS AND BEDS. (a) Under rules prescribed by the commission, a person ... may use the bank and bed of any flowing natural stream in the state to convey the water from the place of storage to the place of use or to the diversion point of the appropriator.
>
> ...
>
> (b) A person who wishes to discharge and then subsequently divert and reuse the person's existing return flows derived from privately owned groundwater must obtain prior authorization from the commission for the diversion and the reuse of these return flows. The authorization may allow for the diversion and reuse by the discharger of existing return flows, less carriage losses, and shall be subject to special conditions if necessary to protect an existing water right that was granted based on the use or availability of these return flows. Special conditions may also be provided to help maintain instream uses and freshwater inflows to bays and estuaries. A person wishing to divert and reuse future increases of return flows derived from privately owned groundwater must obtain authorization to reuse increases in return flows before the increase.
>
> (c) Except as otherwise provided in Subsection (a) of this section, a person who wishes to convey and subsequently divert water in a watercourse or stream must obtain the prior approval of the commission through a bed and banks authorization. The authorization shall allow to be diverted only the amount of water put into a watercourse or stream, less carriage losses and subject to any special conditions that may address the impact of the discharge, conveyance, and diversion on existing permits, . . . instream uses, and freshwater inflows to bays and estuaries. Water discharged into a watercourse or stream under this chapter shall not cause a degradation of water quality to the extent that the stream segment's classification would be lowered.
>
> Sec. 11.046. RETURN SURPLUS WATER. (a) A person who takes or diverts water from a watercourse or stream for the purposes authorized by this code shall conduct surplus water back to the watercourse or stream from which it was taken

if the water can be returned by gravity flow and it is reasonably practicable to do so.

(b) In granting an application for a water right, the commission may include conditions in the water right providing for the return of surplus water, in a specific amount or percentage of water diverted, and the return point on a watercourse or stream as necessary to protect senior downstream permits . . . or to provide flows for instream uses or bays and estuaries.

(c) Except as specifically provided otherwise in the water right, water appropriated under a permit . . . may, prior to its release into a watercourse or stream, be beneficially used and reused by the holder of a permit . . . for the purposes and locations of use provided in the permit . . . . Once water has been diverted under a permit . . . and then returned to a watercourse or stream, however, it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or to appropriation by others unless expressly provided otherwise in the permit . . . .

B.     **Once discharged, return flows are "state water" and, therefore, available for appropriation by others.**

At the hearing, the primary question regarding return flows was: Once return flows are discharged into a watercourse, should they be considered "state water" and, therefore, available for appropriation by anyone, or do they remain the property of (or at least reserved for) the original water-right holder or discharger?  BRA describes this issue as possibly "the most significant legal issue presented by this proceeding" with "far-reaching impacts" in the state.[496] The dispute centers on the construction of two provisions, Water Code §§ 11.042 and 11.046(c), both amended as part of Senate Bill 1 in 1997 (SB 1).[497]  BRA relies primarily upon Section 11.046(c), which states that once water has been diverted and is returned to a watercourse "it is considered surplus and therefore subject to . . . appropriation by others." The ED relies primarily upon Section 11.042(c), which states that a person who wishes to "convey and subsequently divert water in a watercourse" must obtain approval of the Commission through a bed and banks permit.

---

[496] BRA Initial Brief at 51.

[497] Act of 1997, 75th R.S., ch. 1010, General and Special Laws of Texas.

1.      BRA's Arguments

In support of its approach, BRA starts by examining the state of the law regarding return flows in place at the time the legislature passed SB 1. BRA argues that TCEQ policy regarding return flows and reuse prior to passage of SB 1 was clear, and was consistent with the approach now being advocated by BRA.[498] The ED disputes the claim that TCEQ policy prior to SB 1 was clear or consistent.[499] On this point, the evidence in the record appears to support BRA. That evidence indicates that, prior to SB 1:

- return flows discharged into a state watercourse were considered "state water;"

- direct reuse (*i.e.*, reuse of the water *prior to discharge*) was authorized unless the water right provided otherwise;

- indirect reuse (*i.e.*, reuse of the water *following discharge into a watercourse*) required a new water right; and

- bed and banks permits were available for developed water (groundwater-based discharges and imported water) that had not been historically discharged.[500]

Historically, return flows served as the basis for water rights recognized in the water rights adjudication process: they were included in the water availability analysis for permitting on a case-by-case basis (*e.g.*, Lake Livingston); they were included in early "legacy" WAMs; and they were specifically recognized in the Commission's Regulatory Guidance Document as being available for appropriation and included in then-current WAMs.[501]

---

[498] BRA Initial Brief at 52-53.

[499] ED Reply Brief at 3-4. The ED's claim on this point is undercut by his admission that the treatment of return flows in water rights appropriation "changed when the TCEQ created its new models as required by Senate Bill 1."

[500] BRA Ex. 58 (Interoffice memo documenting Commission's December 13, 1996 work session); *see also Domel v. City of Georgetown*, 6 S.W.3d 349, 353-54, 360 (Tex. App. – Austin 1999, pet. denied); *see also South Texas Water Co. v. Bieri*, 247 S.W.2d 268, 272-73 (Tex. Civ. App – Galveston 1952, writ ref'd n.r.e.); HUTCHINS, THE TEXAS LAW OF WATER RIGHTS 155 (1961); BRA Ex. 72.

[501] BRA Ex. 71 (Summary of Historical Treatment of Return Flows); BRA Ex. 56 (Excerpts from TNRCC Regulatory Guidance Document).

Against this backdrop, SB 1 amended Texas Water Code §§ 11.042 and 11.046(c) in 1997. BRA contends that the SB 1 amendments, with the exception of groundwater-based return flows, confirmed rather than revised the then-existing law with respect to the treatment of return flows.[502] BRA argues that the legislature did not intend to radically change the existing law regarding return flows when, in SB 1, it adopted Section 11.042(c), particularly because SB 1 also enacted Section 11.046(c), which appears to restate existing law regarding return flows.

Prior to SB 1, Section 11.042 simply authorized delivery of stored or conserved water via a bed and banks permit, essentially as reflected by the current subsection (a). SB 1 added Subsections (b) and (c). Subsection (b) allows the Commission to authorize bed and banks permits for delivery and reuse of *groundwater-based return flows*, subject to conditions described therein. Subsection (c) allows the Commission to authorize bed and banks permits "for a person who wishes to convey and subsequently divert water," also subject to conditions.

BRA points out that Subsection 11.042(b) specifically addresses "reuse" of "return flows," while Subsection 11.042(c) generically refers to "water" and does not explicitly mention "return flows" or "reuse."[503] As construed by BRA, the reference in Subsection (c) to "water" necessarily implies some ownership interest in the water sought to be transported, such as would be present for "developed water" (imported surface water or raw groundwater not naturally part of the water in the basin) but would not be present in return flows once discharged into a watercourse.[504] TPWD agrees with this interpretation.[505]

---

[502] BRA Initial Brief at 53-55.

[503] The ED incorrectly asserts that Section 11.042(c) "specifically discuss[es] *reuse* of return flows." ED Initial Brief at 16 (emphasis in original).

[504] BRA Initial Brief at 7.

[505] TPWD Initial Brief at 2.

BRA contends that if, as the ED suggests, Subsection 11.042(c) deals with return flows, then Subsection 11.042(b) would be entirely unnecessary because return flows, whether based on groundwater or surface water, would already be covered by Subsection (c). BRA argues that, because it specifically addresses return flows (and limits its authorization to *groundwater-based* return flows), the existence of Subsection (b) suggests that Subsection (c) must be addressing a category of water other than return flows.[506]

As to Section 11.046, SB 1 added Subsections (b), (c), and (d). In BRA's view, the amendments simply codified existing law regarding return flows. Significantly, Subsection (c) authorizes direct reuse, but then explicitly states that, once the water is returned to the watercourse, "it is considered surplus water and therefore subject to reservation for instream uses or beneficial inflows or *to appropriation by others.* . . ."[507] In BRA's view, this means that return flows are state water, available for appropriation "by others," so long as those flows are not otherwise required for senior rights or environmental needs.[508] TPWD and OPIC agree.[509]

In BRA's view, the two statutes can only be construed so that no conflict exists between them by defining the word "water" in Section 11.042(c) to mean "developed water" (*i.e.,* imported surface water or raw groundwater not naturally part of the water in the basin).[510] BRA contends that the benefits of its approach include:

- All return flows would be available for appropriation and beneficial use.

---

[506] BRA Initial Brief at 54.

[507] (Emphasis added.) BRA contends that the final phrase of the subsection—"unless expressly provided otherwise in the permit, certified filing, or certificate of adjudication"— provides a vehicle for the water right holder to seek reuse authorization by amendment of the underlying water right.

[508] BRA Initial Brief at 40.

[509] TPWD Initial Brief at 3; OPIC Initial Brief at 5-6.

[510] TPWD makes the same argument. TPWD Initial Brief at 2.

- All return flows would be available for satisfaction of environmental flow needs, and the needs of senior water rights, often enhancing the reliability of senior water rights. By contrast, the ED's approach would generally subject only historically discharged return flows to such requirements, while future discharges would not be subject to the priority system or environmental flow requirements.

- The BRA approach is consistent with historical permitting decisions.

- The BRA approach does not result in multiple categories of water with independent accounting requirements, facilitating enforcement under the prior appropriation system.

- Under the BRA approach, all return flows would be subject to well-established requirements applicable to all state water. By contrast, because it is not mandated by statute or defined by rules, much of the ED's approach could be modified in the future if the Executive Director or Commission chose to do so.[511]

BRA submits that these public policy considerations clearly support treating return flows as state water available for appropriation following their discharge into a watercourse.

## 2. The ED's Arguments

Under the ED's approach, specific accounting provisions would be imposed to require that the discharge and diversion of return flows be accounted for separately from other water in the river.[512] The ED believes that its approach does a better job of describing how return flows will be accounted for in order to protect water rights.[513] In the ED's view, there is a conflict between Sections 11.042 and 11.046,[514] that can only be resolved by defining "others" in Section 11.046(c) to mean that only the discharger of return flows, the owner of the base water right, or someone having contractual rights with either of them can be the ones to apply to reuse the

---

[511] BRA Exs. 77 and 78.

[512] Tr. 1975-81.

[513] ED Initial Brief at 13.

[514] See, e.g., BRA Ex. 59 (Chenoweth February 25, 2005 memo).

return flows.[515]   Dow agrees with this interpretation, because it considers it to be "more conservative and likely to be more protective of existing water rights."[516]

The ED construes Subsection 11.042(c) to apply to, among other things, all return flows other than groundwater-based return flows (which are addressed by Subsection 11.042(b)).[517] The ED disagrees with BRA's contention that the word "water" in Subsection 11.042(c) should be construed to mean "developed water." The ED argues that Subsection 11.042(c) is addressing a wider category than Subsection (b) which only addresses "return flows." Thus, the ED contends that Subsection (c) deals with a broad array of different kinds of water, including return flows.[518] BRA counters that when Section 11.042(c) is construed as broadly as the ED proposes, it not only creates a significant break from pre-existing law, but it also creates the "conflict" with Section 11.046(c) that results in the ED's strained and otherwise unsupported limitation of "appropriation by others" to three specific categories of persons not identified in the statute.[519]

The ED bases his approach, at least in part, on Commissioner statements made at the Commission's August 12, 2005 work session.[520] BRA counters that this Commission work session is a "slender and ambiguous reed" upon which the ED relies. For example, at the conclusion of the work session, the Commission directed the staff to prepare a memo memorializing its decisions. However, the staff was never able to do so because it could not reach consensus on what had been decided as to how to implement Sections 11.042 and 11.046.[521]

---

[515] BRA Ex. 59 (Chenoweth February 25, 2005 Memo); TPWD Ex. 1 at 35-36 (Chenoweth Deposition); Tr. 2060, 2079-80.

[516] Dow Initial Brief at 47.

[517] ED Reply Brief at 4.

[518] ED Reply Brief at 4-5.

[519] BRA Initial Brief at 55.

[520] BRA Ex. 66 (Interrogatory Nos. 2 & 3). None of the current Commissioners was serving at that time.

[521] TPWD Ex. 1 at 47-48.

Further, the ED's current position on Section 11.046 appears to be inconsistent with the Commission's decision regarding construction of that statute in a prior contested hearing, ironically a position that was adopted by the Commission at the urging of the ED. That case involved accounting for inflows and storage in Lake Grapevine among three holders of water rights of different priorities.[522] In response to exceptions filed by the ED and by Dallas County Park Cities Municipal Utility District (DCPCMUD), the Commission ruled that return flows discharged by the City of Grapevine (the most junior water right holder) and subject to Grapevine's pending indirect reuse application were properly allocated to the senior water rights first. The senior water right holder, DCPCMUD, asserted a prior right to Grapevine's return flows, unsupported by any contract or other agreement with Grapevine. In making its decision, the Commission relied upon Section 11.046, holding that upon discharge Grapevine's return flows became state water subject to the prior appropriation system.[523] Among other things, the ED told the Commission that "[I]f a water right holder uses water, then returns it to the watercourse or stream it is considered unappropriated state water and may be used by others."[524]

It is undisputed that the Commission has never adopted rules or a formal policy authorizing the approach that is now being advocated by the ED.[525] BRA submits that the ED's position, reserving return flows solely for the discharger or water right holder, cannot be justified and should not be followed.

---

[522] An Order granting the Executive Director's Petition to Amend Certificate of Adjudication No. 08-2363 of Dallas County Park Cities Municipal Utility District, Certificate of Adjudication No. 08-2458 of City of Dallas, and Certificate of Adjudication No. 08-2362 of City of Grapevine; TNRCC Docket Nos. 95-1626-WR and 96-1017-WR; SOAH Docket Nos. 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 and 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 (Apr. 4, 2000).

[523] Exs. BRA 74, 75, and 76.

[524] BRA Ex. 75 at 5.

[525] Tr. 2002, 2061-64.

### 3.    The ALJs' Analysis

The ALJs disagree with both parties' competing analyses of Sections 11.042(c) and 11.046(c). As noted by TPWD, the return flows issues raised by the BRA Application are "extremely complex," and involve a great deal of ambiguity about confusing legal and regulatory issues.[526] In its initial brief, TPWD states:

> There is no adopted TCEQ policy that controls the outcome of the application [regarding return flows]. The ED staff is using its own interpretation of existing law to review the application, and it simply has a different approach than TPWD and BRA. It is up to the Administrative Law Judges to examine the different approaches and determine how to apply the law. There is no commission policy that guides the resolution of these contested issues.

The ALJs agree. A considerable amount of evidence was introduced by the parties attempting to prove that the TCEQ currently has, or has had in the past, an established approach to reuse issues.[527] On balance, however, this evidence demonstrates that no consistent agency policy exists with respect to these reuse issues. As such, there is no official TCEQ interpretation to which the ALJs might defer. Accordingly, the ALJs make the following conclusions regard how the bed and banks and return flow provisions of the Water Code should properly be applied to the SysOp Permit.

---

[526] TPWD Initial Brief at 9.

[527] *See, e.g.,* Exs. TPWD 1, BRA Exs. 56-58, 61, 67, 70, 72-73,75; ED Exs. A1, C1, D1, E1, F1, and G1; *see also* Tr. 2005 (Alexander acknowledging that return flow issues historically handled on "case-by-case" basis, without a fixed policy).

### a. BRA misconstrues Section 11.042(c): The bed and banks authorization contemplated in Section 11.042(c) applies to a wide array of types of water, including return flows.

Section 11.042(c) authorizes a person to obtain a bed and banks authorization to "convey and subsequently divert *water* in a watercourse."[528] BRA argues that the only way this section can be read so as to avoid a conflict with Section 11.046(c) is to interpret the word "water" in Section 11.042(c) to mean developed water, but not return flows. This interpretation is not reasonable and is contrary to the plain wording of the statute. If the Legislature had intended for Section 11.042(c) bed and banks authorizations to only be available for raw surface water imported from another basin or raw groundwater, then it could easily have so stated in the statute. There is ample evidence that the Legislature knows how to be specific when it wishes to. For example, in Subsection (a-1) the legislature authorized bed and banks permits for a different type of imported water—water imported from another state. Similarly, in Subsection (b), the Legislature chose allow beds and banks authorizations for a highly specific category of water – ":existing return flows derived from privately owned groundwater." The use of the broad and generic word "water" in Subsection (c), indicates a legislative intent that the bed and banks authorization contemplated in that subsection should apply to a wide array of various types of water, including return flows.

### b. The ED misconstrues Section 11.046(c): The right to appropriate return flows provided by Section 11.046(c) does not extend only to the discharger of those return flows, the owner of the base water right from which the return flows originated, or someone having contractual rights with either of them.

Section 11.046(c) provides that once water has been diverted and is returned to a watercourse "it is considered surplus and therefore subject to . . . appropriation *by others*."[529] The ED argues that the only way Sections 11.042(c) and 11.046(c) can be read so as to avoid a

---

[528] Emphasis added.

[529] Emphasis added.

conflict is to interpret the phrase "by others" in Section 11.046(c) to mean that only the discharger of return flows, the owner of the base water right from which the return flows originated, or someone having contractual rights with either of them can be the ones to apply to reuse the return flows. Again, this interpretation is not reasonable and is contrary to the plain wording of the statute. Clearly, the legislative intent behind this language was that once a holder of a water right discharges his return flows back into a watercourse, then third parties (*i.e.*, "others") could seek to appropriate that returned water. The ED would define the universe of "others" to include only the discharger, and those related to the original water right. For example, assume City X holds a permit to divert and use Brazos River water. Under the ED's approach, if City X discharges its return flows into the Brazos River, then the only "other" that would be entitled to seek to appropriate those return flows would be City X. This result is directly contrary to the clear statutory language. Moreover, the ALJs find that the ED's interpretation is exactly the opposite of what the statute allows. As discussed further below, because Section 11.046(c) states that discharged return flows are available for appropriation "by others," the discharger of the return flows is *not* among those who can seek to appropriate the flows pursuant to Section 11.046(c).

### c. Sections 11.042(c) and 11.046(c) are reconcilable because they address mutually exclusive scenarios.

The ALJs believe that no conflict exists between Sections 11.042(c) and 11.046(c) because the two sections deal with different subject matters. As noted by TPWD[530] and OPIC,[531] Section 11.042(c) does not create an independent right to appropriate water. It merely entitles a person to "convey and subsequently divert" water for which he already holds an appropriative right. Stated differently, a bed and banks authorization can only be issued to a person who already has the right to use the water he seeks to convey. On the other hand, and again as noted

---

[530] TPWD Initial Brief at 1.

[531] OPIC Initial Brief at 7.

by TPWD[532] and OPIC,[533] Section 11.046(c) deals with an appropriative right. It is well-settled in Texas that water becomes state water once it enters a watercourse.[534] Section 11.046(c) simply codifies this rule by making it clear that once the water has been returned to a watercourse, it can be appropriated.

This means that the determination of which section is applicable to a request to divert return flows depends upon the relationship of the requestor to the return flows being sought. Based upon the wording of the two statutes, the ALJs conclude that when BRA seeks to reuse its own surface water-based return flows,[535] it need only obtain a bed and banks authorization pursuant to Section 11.042(c), and need not obtain an appropriative right pursuant to Section 11.046(c). Notably, Section 11.046(c) expressly states that return flows, once discharged into a watercourse, become available for appropriation "by others" (*i.e.*, persons *other than* the discharger). In other words, Section 11.046(c) does not enable a discharger of return flows to obtain a new appropriative right for those discharges. Instead, if a discharger wishes to retain the right to divert its return flows after they have been discharged back into a watercourse, the only mechanism available to the discharger is through Section 11.042(c).[536] In such cases, when BRA seeks to reuse its own return flows, it is seeking to "convey and subsequently divert" water for which it already has a diversion right. The parties agree that BRA could, if it so desired, fully utilize its appropriative right through direct reuse. Thus, by seeking to indirectly reuse its water via a bed and banks permit, it is simply seeking to do what it is otherwise entitled to do via direct reuse.

---

[532] TPWD Initial Brief at 3-4.

[533] OPIC Initial Brief at 6.

[534] Water Code § 11.021(a); *Edwards Aquifer Authority v. Day*, 274 S.W.3d 742 (Tex. App. – San Antonio 2009, pet. granted).

[535] For the sake of convenience, throughout this discussion, the ALJs refer to the "discharger" of the return flows. However, the ALJ's broadly define "discharger" as "the discharger of return flows, the owner of the base water right from which the return flows originated, or someone having contractual rights with either of them."

[536] In effect, the bed and banks authorization granted in Section 11.042(c) works as an exception to the general rule in Section 11.046(c) that once return flows are discharged into a watercourse, the discharger loses claim to those waters.

Conversely, the ALJs conclude that when BRA seeks to divert someone else's surface water-based return flows it need only obtain an appropriative right pursuant to Section 11.046(c), and need not obtain a bed and banks authorization pursuant to Section 11.042(c). In such a case, and consistent with the wording of Section 11.046(c), BRA would clearly be an "other" person seeking to appropriate someone else's return flows. Likewise, BRA would not be seeking to "convey," as required by Section 11.042(c), someone else's return flows, but only to divert those flows.

The ALJs note a caveat to this general rule. In order to address the needs of in-basin dischargers and many of its own customers, BRA's version of the proposed SysOp Permit adopts a return flow policy that encourages direct reuse and indirect reuse of return flows by dischargers, within their boundaries or service areas, by allowing BRA's appropriation of others' return flows to be interrupted for these purposes. Additionally, as a result of an agreement with the Cities of Bryan and College Station, a provision addressing groundwater-based return flows, without any service area limitation, has also been requested and is included in the BRA preferred draft of the permit. In this respect, BRA's position differs from a pure "state water" approach to return flows that might prevent future indirect reuse by dischargers.[537] Because this deviation from the general rule—that return flows become state water upon discharge into a watercourse — is agreed to by BRA and serves as a limitation upon BRA's permit, the ALJs find no reason to reject it.

> **d. BRA's request to divert "future" return flows (_i.e._, return flows that are not already being discharged into the Brazos River Basin) is reasonable and preferable to the approach advocated by the ED.**

In the Application, BRA seeks to appropriate both current and future return flows, "to the extent that such return flows continue to be discharged or returned to the bed and banks of the Brazos River, its tributaries, and BRA reservoirs."[538] In BRA's modeling, future return flows for

---

[537] BRA Ex. 1 at 30-32; BRA Initial Brief at 61-62.

[538] BRA Ex. 15 at 16.

the year 2060 were estimated based on projected population multiplied by current per capita return flows based on historical data. In certain cases, future return flows were reduced to account for existing or proposed reuse projects.[539] BRA then included those estimated future return flows in the WAM and assumed they would be available to all water rights in order of seniority. Any amounts left over were assumed to be available to the SysOp Permit, subject to environmental flow requirements.[540]

The ED argues that granting BRA an appropriation based upon future return flows poses a risk of harm to senior water rights holders because the water availability analysis will likely find more water available than actually exists in the stream.[541] Dow agrees: "If the water availability is inflated because the amount of return flows assumed to be discharged into the river exceeds the amount that is actually discharged into the river, the water availability analysis will overestimate the unappropriated water."[542]

BRA responds that over-appropriation is not a risk because the objective of the draft SysOp Permit was to ensure that, in actual practice, BRA is able to divert return flows only to the extent that they are actually being discharged into the basin, and to not interfere with the ability of return flow dischargers from reusing their own return flows if they wish to do so.[543] A number of special permit conditions are included in the draft permit to achieve those goals. Special condition 5.A.1. in the SysOp Permit requires development of a return flow accounting plan prior to use of the return flows, in order to assure that the amount of supply actually available for use based on return flows is accurately determined.[544] Special condition 5.A.2 provides that BRA's ability to divert surface water-based return flows is subject to interruption

---

[539] BRA Ex. 15 at 46.

[540] BRA Ex. 15 at 46.

[541] ED Ex. KA-1 at 18, 33-34; ED Initial Brief at 18.

[542] Dow Reply Brief at 39.

[543] Tr. 423.

[544] BRA Ex. 8B at 8; BRA Ex. 15 at 47.

by direct use or indirect use by the discharger of those return flows, provided that the discharger is using those return flows within its corporate limits, extraterritorial jurisdiction, or contiguous water certificate of convenience and necessity (CCN) boundaries and the discharger has applied for and been granted authorization to reuse the return flows. This provision is meant to ensure that dischargers will be able to develop their own reuse programs.[545]   Similarly, Special Condition 5.A.3 provides that BRA's ability to divert groundwater-based return flows is subject to interruption by direct or indirect reuse by the discharger of those return flows, provided that the discharger obtains a bed and banks authorization to reuse the return flows. This provision is also meant to ensure that dischargers will be able to develop their own reuse programs.[546] Special condition 5.A.4 requires the installation of meters at the discharge points for each wastewater treatment plant (WWTP) from which return flows will be used, and the recording of discharge amounts on a daily basis. Discharges from a WWTP generally cannot be used until such meters are installed.[547]

OPIC has no objection to BRA's approach regarding appropriation of future return flows, contending that all diversions of return flows by BRA under the SysOp Permit, regardless of whether those diversions are of existing or future return flows, should be treated as new appropriations and, therefore, subject to all legal requirements for new appropriations including instream flow requirements.[548] That issue will be discussed more in the next section.

As stated above, the ED argues that granting BRA an appropriation based upon future return flows poses a risk of harm to senior water rights holders because the water availability analysis will likely find more water available than actually exists in the stream. However, the ED's treatment of return flows in the ED's modeling efforts and draft SysOp Permit is not consistent with that approach. Under the ED's approach, BRA would obtain authorization to

---

[545] BRA Ex. 8B at 8-9; BRA Ex. 15 at 47.

[546] BRA Ex. 8B at 9; BRA Ex. 15 at 47.

[547] BRA Ex. 8B at 9; BRA Ex. 15 at 47.

[548] OPIC Initial Brief at 5.

divert return flows up to the amount of return flows that each discharger can make pursuant to its Texas Pollution Discharge Elimination System (TPDES) permit.[549]   The ED calculated that the total discharge amount for all applicable TPDES permits was 120,625 acre-feet.[550]   The ED conceded, however, that actual current discharge totals might be much less than 120,625 acre-feet.[551]   In other words, the ED's Proposed Permit would also authorize BRA to divert future return flows that do not currently exist in the stream, albeit for a smaller quantity of such return flows.   Moreover, the ED's draft SysOp Permit then explicitly allows BRA to appropriate future return flows (*i.e.,* return flows over and above the TPDES total of 120,625 acre-feet).[552]

The ALJs conclude that, assuming the Commissioners agree with the overall two-step approach contemplated in this application, BRA's approach as to future return flows is sufficiently tailored so as to avoid authorizing diversions of return flows that are not actually in the river at the time.   The special conditions in BRA's draft SysOp Permit are sufficient to ensure that, in actual practice, BRA will be authorized to divert only return flows that are actually being discharged, and without interfering with the ability of return flow dischargers to reuse their own return flows if they wish to do so.

> e.     **BRA's diversions of return flows, both current and future, should be treated as new appropriations subject to satisfying instream flow requirements.**

NWF and OPIC contend that all diversions of return flows by BRA under the SysOp Permit, regardless of whether those diversions are of existing or future return flows, should be

---

[549] ED Ex. KA-1 at 30; ED Initial Brief at 18.

[550] ED Ex. K2 at 13; Tr. 2107.

[551] Tr. 2007-08, 2107-08.

[552] ED Ex. K2 at 13-14. Admittedly, the right to use future return flows is limited by an additional clause mandating that, prior to use of such future return flows, BRA "must apply for and be granted the right to reuse those return flows." ED Ex. K2 at 14. In this regard, the ED's draft permit is confusing. On the one hand, it grants BRA the right to use future return flows with a 2004 priority date. On the other hand, it states that, before BRA may use such return flows, it must obtain the right to use such return flows.

treated as new appropriations and, therefore, subject to all legal requirements for new appropriations, including instream flow requirements.[553] BRA agrees with them.

The ED takes a different approach. As noted above, as to what he considers "current" return flow discharges (*i.e.*, the TPDES total of 120,625 acre-feet), the ED would give BRA the right to divert those return flows at a 2004 priority date and would make those diversions subject to instream flow requirements.[554] As to what he considers "future" return flow discharges (*i.e.*, those over and above 120,625 acre-feet), the ED would give BRA the right to divert those return flows at a 2004 priority date, but the diversions would not be subject to instream flow requirements.[555] The rationale behind this different treatment is that future return flows "have not been present in the river" and, thus, have not been relied upon in the past to satisfy instream needs.[556]

The Commission need not decide if the ED's position is legally correct. BRA is willing to make all of its diversions of return flows (both current and future) subject to instream flow requirements.[557] BRA asserts, convincingly, that its approach is more protective of the environment because it makes more water subject to instream flows protections.[558] In light of BRA's consent to such treatment of future return flows, the ALJs conclude that all BRA diversions of return flows under the SysOp Permit, both current and future, should be treated as subject to satisfying instream flow requirements.

---

[553] NWF Reply Brief at 7; OPIC Initial Brief at 5.

[554] ED Ex. K2 at 13; ED Ex. KA-1 at 26, 31; Tr. 2108-09.

[555] ED Ex. K2 at 13-14; ED Ex. KA-1 at 26, 31; Tr. 437, 2107.

[556] ED Ex. KA-1 at 31.

[557] BRA Ex. 8B at 8;

[558] Tr. 2722-23.

f.      Both BRA's and the ED's versions of the SysOp Permit comply
        with 30 TEX. ADMIN. CODE § 297.42(g).

Pursuant to 30 TEX. ADMIN. CODE § 297.42(g), a water right may be granted based upon the availability of return flows. However, a water right granted upon return flows might cease in the future because of new or increased direct or indirect reuse by the discharger. Thus, Section 297.42(g) states that a water right granted based upon the availability of return flows must "be granted with the express provision that the water available for the water right is dependent upon potentially interruptible return flows or discharges."

In reliance upon this rule, the ED crafted the draft SysOp Permit to make a distinction between the quantities of water available under the permit as "firm" water and as "non-firm" water (with "non-firm" being the water based upon the availability of return flows).[559] The ED contends that this is the required approach in order to comply with Section 297.42(g).[560] BRA's version of the SysOp Permit makes no distinction between "firm" and "non-firm" water. It does, however, expressly note that diversions of return flows are based upon potentially interruptible return flows.[561] Thus, both approaches comply with the requirements of 30 TAC § 297.42(g). Accordingly, having proven that its version is compliant, the ALJs conclude that BRA is entitled to its choice of approach over the ED's.

## XVII. BED AND BANKS AUTHORIZATION

BRA's application for a bed and banks authorization complies with Water Code § 11.042, which provides, in relevant part:

---

[559] ED Ex. KA-1 at 23-24, 30; ED Ex. K2 at 5-6; Tr. 2009-10.

[560] ED Ex. KA-1 at 23-24.

[561] BRA Ex. 8B at 8-9.

222

# Exhibit J

# Transcript Volume No. 2 of Hearing conducted October 29, 2009

SOAH DOCKET NO. 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

TCEQ DOCKET NO. 2008-0181-WR

APPLICATION OF BRADLEY B. )  BEFORE THE STATE OFFICE
WARE TO AMEND            )           OF
WATER USE PERMIT NO. 5594 )  ADMINISTRATIVE HEARINGS

ADMINISTRATIVE LAW JUDGE:  HON. PAUL D. KEEPER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF PROCEEDINGS

TAKEN ON OCTOBER 29, 2009

AT AUSTIN, TEXAS

VOLUME 2    PAGES 250 - 400

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF PROCEEDINGS, VOLUME 2, taken in the above-styled and numbered cause on the 29th day of October 2009, from 9:03 a.m. to 3:39 p.m., before C. Mack Lane, CSR, in and for the State of Texas, reported by machine shorthand, at the State Office of Administrative Hearings, 300 West 15th Street, Austin, Travis County, Texas 78201, pursuant to the rules of the Texas Administrative Code, the Texas Water Code, and the Texas Rules of Civil Procedure.

EXHIBIT
J
PENGAD 800-631-6989

Lake, that Mr. Ware's 150 acre-feet still must go to satisfy water rights downstream to the Gulf of Mexico and upstream to Lubbock at the playa lakes?

A.    Yes.

Q.    Okay.  I ask you to look at page 4 of 14 on water availability.

JUDGE KEEPER:  Which exhibit?

MRS. WEBB:  50, Applicant's 50.

THE WITNESS:  Okay.

Q.    (BY MRS. WEBB:)  And can you read that paragraph that begins a review of water rights in the Brazos River Basin?

A.    "A review of water rights in the Brazos River Basin indicates that Permit 4218 (diversion of 172 acre-feet of water from South Nolan Creek), Permit 5088 (diversion of 37 acre-feet of water from South Nolan Creek), and Permit 5089 (diversion of 60 acre-feet from South Nolan Creek) were explicitly granted based on the presence of return flows now being claimed as part of this application."

Q.    Okay.  Continue.

A.    "Staff recognizes the possibility that other basin rights were granted based on the presence of the requested return flows.  Because of this, a priority date of October 15th, 2004, is assigned to the

applicant's diversions of historically discharged return flows."

Q. Okay. Now, that October 15th date, that is the -- that is the date of administrative completeness of this systems operation permit --

A. Yes.

Q. -- by Brazos River Authority?

A. Yes.

Q. And that sentence regarding the priority date of October 15th, 2004, describes the Executive Director's position at the time this memo was written regarding the allocation of return flows available for appropriation in the Brazos River Basin?

A. Yes.

Q. Okay. And so there were return flows available and you gave them a priority date of October 15th, 2004?

A. Yes.

Q. Okay. You mentioned that there were 74,387 acre-feet of return flows resulting from different discharges up and down the Brazos River Basin determined to be available by TCEQ hydrology?

A. Yes.

Q. And those are the return flows that were given the October 15th, 2004, priority date?

A.   Yes.

Q.   Okay.  And that -- and none of those return flows, not any portion of them were allocated for use by Mr. Ware under either a 1997 priority date or any other priority date?

A.   The return flows were considered and --

Q.   Yes or no, Ms. Alexander.

A.   No.

Q.   Okay.  Thank you.  Okay.  When you say that the Executive Director has at present determined that water available for diversion by Brazos River Authority under this systems operation permit is available at a diversion point on the Gulf, you did determine that, didn't you?

A.   Yes.

Q.   Under certain circumstances, and under certain terms and conditions, and we don't know how any of that is going to play out; but if that water is -- if that water -- and let me ask you:  That water that's available, it's not 74,387 acre-feet, is it, that you determined to be available for diversion by BRA down at the Gulf?

A.   Are we talking just about return flows?  I'm not sure I understand.

Q.   I'm talking about the draft permit,